CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
September 15, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| Elizabeth F. Parker | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Tauran Management Group, LLC, | ) | |
| | ) | Civil Action No. 5:24-cv-00060 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Kayne Kreitzer *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

In May 2021, Plaintiffs Elizabeth F. Parker and Tauran Management Group, LLC ("Tauran") discovered that Defendant Kayne Kreitzer had accessed Tauran's systems and data without authorization. They brought this lawsuit against Defendants Bruce Kuhlman, Trinity Technology Group, Inc. ("Trinity"), KR Contracting, Inc. ("KR Contracting"), Kayne Kreitzer, and Kreitzer Group, LLC ("Kreitzer Group") for violations of federal and state law stemming from these events.

This matter is before the court on Defendants Kuhlman, Trinity, and KR Contracting's motion to dismiss, (Dkt. 26), and Defendants Kreitzer and Kreitzer Group's motion to

dismiss, (Dkt. 29). For the reasons stated below, the court will grant Defendants' motions to dismiss.

## I.    Background

### A.  Factual History

Parker and Tauran allege federal claims pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and § 1962(d), and state claims involving misappropriation of trade secrets, Va. Code § 59.1-336, tortious interference with contract, common-law conspiracy, and statutory conspiracy, Va. Code §§ 18.2-499, 18.2-500. (*See* Compl. (Dkt. 1).) The facts are taken from Plaintiffs' complaint and, at this stage, are presumed to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

#### 1.  Parker forms Tauran

As early as 2003, Parker worked for Trinity, a government contractor providing intelligence and security services, as a Human Resources and Information Technology Manager. (Compl. ¶ 14.) Between 2003 and 2006, she and her colleagues "grew [Trinity] into a successful multi-million dollar" company that serviced the Transportation Security Administration ("TSA") and Department of Homeland Security, along with other federal agencies. (*Id.*) Trinity first began working with TSA in 2006 as part of TSA's "Screening Partnership Program" to provide private screening for weapons, explosive devices, and other items prohibited in airports. (*Id.* ¶ 15.) By 2012, Trinity had won contracts with nine of the fourteen airports that participated in the Screening Partnership Program. (*Id.*) As successful

as the program was, Trinity sold its intelligence division that same year and downsized to just one division containing 45 employees. (*Id.* ¶ 16.) At the same time, Trinity "contracted out its IT services to Jamal Parker."[1] (*Id.*)

One of the services Trinity provided was customer service support for passengers traveling through the airports in which it provided security screening. (*See id.* ¶ 18.) By 2014, Trinity had grown again, such that it was "too burdensome" to have product managers work directly on passenger claims. (*Id.* ¶ 17.) Though Trinity decided to centralize calls and passenger claims at one headquarters, "it quickly became apparent that [responding to such claims] was too much to add to an existing employee's duties." (*Id.*) Additionally, because the employees covered airports "nationwide," many hours passed without coverage. (*Id.*) Responding to these difficulties, Trinity's President and Vice President "persuaded [Elizabeth] Parker to form [Tauran], with the intent of building an entity that would survive a projected sale of [Trinity]." (*Id.* ¶ 18.) Tauran provided customer support to passengers traveling through Trinity airports from a centralized "HUBZone contact center." (*Id.*) Starting in May 2014 and throughout 2015, Parker continued to work full-time at Trinity, while Jamal Parker oversaw Tauran's operations. (*Id.* ¶ 19.)

2. Tauran develops Concourse

In 2015, Trinity "experienc[ed] growing pains, including data duplication and inaccuracies across multiple platforms, which caused inefficiencies and a decrease in employee

---

[1] For clarity, the court will refer to Jamal Parker throughout by his full name.

morale." (*Id.* ¶ 20.)  With Jamal Parker's assistance, Tauran began to create a custom Operations Management System ("OMS") named "Concourse," which could replace many of Trinity's multiple platforms and become a "central hub for employee data." (*Id.* ¶ 21.)  The OMS included customizations for government contractors supporting the TSA Screening Partnership Program, including: "[a] method that would allow tying all employee and applicant data to proposals, contracts, payroll, operations, and government compliance"; "[a] way to link accurate and timely personnel data"; "[a] complex fix to the unwieldy mesh of log-ins, overlapping systems, and incoherent software applications via a single-source log-in that allowed managers and employees to manage company data nationwide"; and "[a]n all-in-one [Human Resource Information System]/OMS system that offered government compliance functionality . . . [along with] full employee life-cycle tracking tied together in such a manner that any client could track anything that touched each employee from proposal requirements, the applicant process, all the way through contracts and operations." (*Id.*)

On August 25, 2015, Tauran entered into an agreement with the company Lanteria, which agreed to provide the source software that Tauran would customize to build Concourse. (*Id.* ¶ 23.)  After Lanteria signed a non-disclosure agreement, Jamal Parker informed Kreitzer—who was then Lanteria's Director of U.S. Sales and Operations—of Tauran's plans for developing Concourse. (*Id.*)  To build Concourse, Tauran needed to customize Lanteria software into an "instance," which is "a technical environment with a specific purpose." (*Id.* ¶ 22.)  Customizing Lanteria software into an "instance" required "taking [the] program and significantly, extensively and profoundly altering it so that it contained company specific

software that could be installed, overseen, managed, and run" by government compliance operations vendors.  (*Id.*)  Over the next year, Parker, on behalf of Tauran, worked closely with Kreitzer to develop Concourse.  (*Id.* ¶ 24.)  Jamal Parker assisted with IT development.  (*Id.* ¶ 25.)  By 2016, Tauran had developed a functional prototype of the system.  (*Id.* ¶ 26.)

     3.  <u>Kreitzer joins Tauran</u>

During this time, Kreitzer informed Parker and Jamal Parker about his desire to move to a career in IT.  (*Id.*)  When Kreitzer left his role at Lanteria in August 2016, Jamal Parker offered Kreitzer a consultant position as Tauran's Systems Administrator, which involved administering Tauran's Microsoft and Lanteria instances for Tauran and, eventually, Tauran's other governmental compliance clients.  (*Id.* ¶¶ 27–28.)  Kreitzer accepted the position and signed a consultant agreement and NDA on September 16, 2016.  (*Id.* ¶ 28.)  The agreement contained a period of performance from September 9, 2016, to September 9, 2018, and contained provisions for auto-renewal and cancellation by written notice.  (*Id.*)  Kreitzer worked as a consultant providing system administration and software development services until he became a full-time employee of Tauran on January 1, 2019.  (*Id.* ¶ 29.)  During this time, Kreitzer "largely handled [Tauran's] day-to-day operations" alongside another employee.  (*Id.* ¶ 32.)  Kreitzer "took control of almost the entire IT work conducted by [Tauran]," even setting himself up with full administrator access to Tauran's Microsoft Reseller account with SYNNEX in April 2018.  (*Id.* ¶ 30.)  At unknown times during his employment, Tauran paid for Kreitzer to attend Microsoft training, arranged for him to receive a security clearance, and gave him administrative privileges to Tauran's OMS, Concourse and Microsoft instances, and

other client-specific instances.  (*Id.* ¶ 33.)  Kreitzer also "knew that [Tauran's] HRIS/OMS System, Lanteria Instance, Concourse and Microsoft Instances, respectively, were the intellectual property of [Tauran] and Parker."  (*Id.* ¶ 35.)

### 4.  KR Contracting purchases Trinity

Trinity, meanwhile, was again facing the prospect of sale.  Trinity's Vice President asked that Trinity hire Jamal Parker as its IT Director to ensure continuity through the sale of the company's assets; as a result, Jamal Parker worked as a Trinity employee from 2017 until his eventual termination on May 3, 2021.  (*Id.* ¶ 31; *see id.* ¶ 14.)  Elizabeth Parker also remained a Trinity employee through December 2020.  (*Id.* ¶ 32.)  Though Kreitzer became a full-time employee of Tauran in January 2019, (*id.* ¶ 29), on October 8, 2019, he again became a Tauran consultant "with the same NDA and substantially the same terms as his prior consultant contract—at a higher rate of pay," (*id.* ¶ 34).

In December 2020, KR Contracting bought Trinity.  (*Id.* ¶ 31.)  After the sale of Trinity to KR Contracting, Parker left Trinity and took control of Tauran's management.  (*Id.* ¶ 37.)  Jamal Parker remained working for Trinity, updating Trinity's IT infrastructure to a secure cloud server farm.  (*Id.* ¶ 38.)  Kreitzer remained a Tauran consultant after the sale.  (*Id.* ¶ 36.)  From January through April 2021, Tauran provided IT, HR, and customer service support to Trinity.  (*Id.* ¶ 39.)

### 5.  Trinity and Tauran's contractual relationship

From June 2014 to May 2021, Tauran had a subcontract to provide IT and administrative support and customer service to Trinity.  (*Id.* ¶ 43.)  Specifically, Tauran

provided four services to Trinity: (1) "[a]dministering Microsoft licenses as a certified Microsoft reseller"; (2) "[h]osting and administering [Trinity's] HR data on [Tauran's] Microsoft Government Cloud"; (3) "[a]dministering [Trinity's] IT, Customer Service and Employee Resources Help Desks, respectively"; and (4) "[p]roviding administrative surge support." (*Id.* ¶ 44.)  For these services, Trinity paid Tauran an average of $400,000 per year; from January 1 to May 31, 2021, Tauran earned $130,927 from this contract. (*Id.* ¶ 45.)

On April 30, 2020, Tauran and Trinity entered into a "Subcontract Agreement" effective May 1, 2020, through April 30, 2021, with two option years. (*Id.* ¶ 46.)  In April 2021, Trinity "did not expressly renew the Option, but [Trinity] proceeded as if the Option had been renewed." (*Id.* ¶ 47.)  The agreement was "terminable for convenience," and Tauran performed its duties under the agreement through May 31, 2021. (*Id.* ¶ 46.)

6. <u>Kreitzer's actions prior to May 3, 2021</u>

At some point prior to May 3, 2021, Trinity's Florida airports—which used Concourse—began experiencing IT problems. (*Id.* ¶ 39.)  Though Jamal Parker asked to travel to Florida to resolve the issues, his request was denied by Trinity. (*Id.*)  Instead, "Kreitzer 'happened' to be vacationing in Florida." (*Id.* ¶ 40.)  Tauran asked Kreitzer, who was still a consultant, if he would go to Trinity's airports in Sanford and Sarasota to fix Trinity's IT issues. (*Id.* ¶¶ 40–41.)  Kreitzer did so on March 2 and March 9, 2021. (*Id.* ¶ 41.)  At that time, Kreitzer met Kuhlman, the CEO of both Trinity and KR Contracting, (*id.* ¶¶ 6–7), and "together, the two formulated a plan to steal [Tauran's] HRIS/OMS Concourse System for their own purposes," (*id.* ¶ 42).

In the months leading up to May 3, 2021, Kreitzer "provided training and troubleshooting" to support Tauran's and Tauran's clients' systems, including Tauran's Microsoft Government Cloud instance, Tauran's client management system, and Trinity's Microsoft and Lanteria instances. (*Id.* ¶ 51.) However, although Tauran hired another former Lanteria employee for Kreitzer to train, "Kreitzer always had a reason for not training the [new] consultant and/or Parker in all his responsibilities." (*Id.* ¶ 52.) Kreitzer also did not "provide the appropriate technical documentation." (*Id.*) Finally, at some point prior to May 3, 2021, Kreitzer turned off the audit logs for his actions as Tauran's Systems Administrator. (*Id.* ¶ 66.) These logs must be intentionally turned off by an administrator, which "runs against industry standards." (*Id.*)

Separately, on April 12, 2021, Kreitzer registered Kreitzer Group, LLC with the Virginia State Corporation Commission. (*Id.* ¶ 53.) Although the complaint asserts that this timing "was not a coincidence," it does not allege any facts as to the nature or purpose of the new organization.

On May 3, 2021, Kuhlman terminated Jamal Parker. (*Id.* ¶¶ 31–32.) At 11:00 a.m. the same day, Tauran lost access to Trinity's systems. (*Id.* ¶ 54.) Parker, who was then serving as CEO of Tauran, called James Smith, a Senior Vice President at Trinity, while Tauran began to troubleshoot the systems without former IT Director Jamal Parker. (*Id.* ¶¶ 54–55; *see id.* ¶ 48.) At 2:14 p.m., Smith returned Parker's call. (*Id.* ¶ 56.) He informed her that he was not sure what was happening but that he would investigate, and he asked that he be given until lunchtime the next day to get back to Parker with more information. (*Id.*) Parker agreed and

- 8 -

notified Smith that Trinity was still responsible for the Microsoft services provided by Tauran. (*Id.*)

At 6:03 p.m., without the knowledge of Tauran, Kreitzer used his SYNNEX administrative privileges and Trinity user account to remove Tauran as the delegated Microsoft Partner responsible for administering Trinity's Microsoft online services.  (*Id.* ¶ 57.)  At 7:01 p.m., Tauran contacted Kreitzer over text "because the TauranGroup.com domain and Azure instance had disappeared."  (*Id.* ¶ 58.)

At that time, Parker decided to lock down Tauran's systems.  (*Id.*)  Surprised to find himself locked out of his account, Kreitzer asked for access from Parker.  (*Id.* ¶ 59.)  Following a brief exchange over text, Parker "in good faith" unlocked Kreitzer's Tauran account "so that Kreitzer could fix the data breach and loss of control over secure, confidential and proprietary data," asking for reassurance as to his intentions when she did so.  (*Id.* ¶¶ 60–61.)

At 9:14 p.m., Tauran's Program Manager forwarded a Microsoft notice that showed that User ID Kayne.Kreitzer@TrinityTechnologyGroup had removed Tauran as the delegated administrator of Trinity's Microsoft online services at 6:03 p.m.  (*Id.* ¶ 62.)  The transaction confirmation was also sent to the Trinity IT Help Desk email account, which Tauran's Program Manager monitored.  (*Id.* ¶ 63.)  This action "left [Tauran] responsible for all the now unused licenses previously assigned to [Trinity]," which Kreitzer understood.  (*Id.* ¶ 64.)  Because Kreitzer was the Systems Administrator, he "acted as the point of contact for IT vendors and his account was used in multiple workflows."  (*Id.* ¶ 65.)  As such, "his accounts

could not be immediately deleted"—instead, the login credentials for all known accounts belonging to Kreitzer were reset. (*Id.*)

      7. <u>Trinity terminates contract with Tauran</u>

      At 12:09 p.m. on May 4, 2021, Tauran received an email from Smith notifying the company that Trinity was terminating Tauran's subcontract for convenience, effective May 31, 2021, to bring outsourced functions in-house. (*Id.* ¶¶ 32, 48, 67; *see* Dkt. 1-2 at 41.) The termination letter specifically requested Tauran's "assistance" with migrating Concourse and transferring employee data back to Trinity within a three-week period. (Dkt. 1-2 at 41.) Kuhlman hired Kreitzer to replace Jamal Parker at Trinity that same day. (Compl. ¶¶ 31–32.)

      On May 13, 2021, Tauran prepared an invoice for Trinity which included the final payments under the subcontract, as well as payment for Concourse migration. (Dkt. 1-2 at 51; *see id.* at 49.) Five days later, Aaron Dobbs, Trinity's Vice President of Finance, emailed Tauran stating that he spoke with Smith regarding payment of Trinity's Microsoft licenses and was told that "there should be no charge since they were deleted on 5/3." (Compl. ¶ 69.) Dobbs also conveyed that Smith told him that "Concourse will be fully migrated on 5/21." (*Id.*) When Parker asked Dobbs what was meant by that statement, as Trinity had not asked Tauran to continue with the data migration, "Dobbs said he did not know anything about it." (*Id.*)

      On May 20, 2021, when asked for supporting documentation for the invoice, Parker conveyed that some of the billed hours were "necessary to provide Trinity their Concourse

data" and that payment of the invoice was "required to initiate the transfer of Concourse data."
(Dkt. 1-2 at 49–50.)

On May 21 and May 22, 2021, Kreitzer accessed Tauran's Microsoft Government Cloud using credentials created while employed by Tauran. (Compl. ¶ 70.) While in the Cloud, Kreitzer "downloaded and deleted data" "without [Tauran's] knowledge or authorization." (*Id.*) On May 24, 2021, Trinity informed Tauran that it no longer needed Tauran's assistance with the migration of Trinity's data and that that service "should be removed from the invoice." (*Id.* ¶ 71; *see* Dkt. 1-2 at 49.) On May 26, 2021, Tauran sent Kreitzer a cease-and-desist letter by certified mail. (Compl. ¶ 72.) On July 29, 2021, Trinity emailed Tauran "acknowledging the removal of Concourse data from [Tauran's] servers on 5/21/2021." (*Id.* ¶ 73.)

8.  Parker and Tauran's response

After "tr[ying] desperately for months to solve what she originally just believed to be a data breach involving Kreitzer's unauthorized access," Parker eventually realized that Kreitzer had "destroyed her ability to use her existing systems and stolen the intellectual property that served as a foundation for these systems." (*Id.* ¶ 74.)

From May 3, 2021, to January 2022, Tauran "attempted to regain access to all data breached by Kreitzer and attempted to regain control over its HRIS/OMS and CMS Instances, and its Microsoft Instances." (*Id.* ¶ 76.) Tauran reached out to officials from the U.S. Securities and Exchange Commission and U.S. Department of Commerce to inform them of the suspected data breach on May 28, July 9, and July 16, 2021. (*Id.* ¶ 77.) Parker also contacted

the Defense Counterintelligence and Security Agency on May 28, 2021, to advise of the possible data breach. (*Id.* ¶ 78.) On September 7, 2021, Trinity's former Benefit Administrator provided a written statement documenting a conversation with Kreitzer wherein he "described his ability to access and remove Concourse data from Tauran's servers," (*id.* ¶ 75; *see* Dkt. 1-2 at 55), providing Plaintiffs with the new information that "Kreitzer had set up an alter ego account as a means of sneaking in [Tauran's] 'backdoor,'" (Compl. ¶ 83). Ultimately, it became clear to Plaintiffs "that Kreitzer and [Trinity] had effectively stolen [Tauran's] entire HRIS System, and that [Trinity], in effect, had worked with Kreitzer to reap the benefits of this great theft." (*Id.* ¶ 81.) As of the date of this complaint, Trinity was still using Concourse. (*Id.* ¶ 21.)

Parker, as CEO of Tauran, seeks relief for actual losses in the amount of $38.1 million, unjust enrichment totaling $3 million, damages for emotional distress totaling $1 million, and various other damages totaling $19.9 million, as well as reasonable attorney's fees. (*Id.* at 41–43.)

**B. Procedural History**

Plaintiffs filed a complaint on August 9, 2024, alleging nine causes of action. First, they allege a violation of the DTSA against Defendants Kreitzer, Kreitzer Group, Kuhlman, and Trinity (Count I). (*Id.* ¶¶ 91–108.) They allege that Tauran took reasonable measures to protect its trade secrets, but that Kreitzer and Kreitzer Group "used improper means to access and misappropriate the Trade Secrets in that they breached their duty to maintain secrecy." (*Id.* ¶ 98.) They also allege that Kuhlman and Trinity "used improper means to access and

misappropriate the Trade Secrets in that they induced Defendants Kreitzer and [Kreitzer Group] to breach Kreitzer's duty of maintaining secrecy" by offering a salary increase and a "reputational/business 'helping hand' from Kuhlman and Kuhlman's companies, which are well-connected to other government agencies." (*Id.* ¶ 99.) Plaintiffs also bring federal RICO claims against all Defendants under 18 U.S.C. § 1964(c). (*Id.* ¶¶ 109–35.) They allege that Defendants violated §§ 1962(c) (Count II) and (d) (Count III). (*Id.* ¶ 111.) Plaintiffs also allege misappropriation of trade secrets in violation of Va. Code § 59.1-336 *et seq.* against all Defendants (Count IV). (*Id.* ¶¶ 136–53.)

Next, Plaintiffs allege claims for tortious interference with contract against Defendants Kreitzer and Kreitzer Group (Count V), (*id.* ¶¶ 154–63), and against Defendants Kuhlman and KR Contracting (Count VI), (*id.* ¶¶ 164–74). Plaintiffs further bring common-law conspiracy claims against all Defendants (Count VII). (*Id.* ¶¶ 175–84.) In addition, Plaintiffs raise statutory conspiracy claims against all Defendants under Va. Code § 18.2-499 and § 18.2-500 (Count VIII). (*Id.* ¶¶ 185–96.) Finally, Plaintiffs ask the court to pierce the veil between Defendants Kreitzer Group and Kreitzer and between Defendants KR Contracting and Kuhlman and "assess damages against Kreitzer and Kuhlman in their individual capacities" (Count IX). (*Id.* ¶¶ 197–203.)

Kuhlman, Trinity, and KR Contracting (the "Kuhlman Defendants") filed a motion to dismiss on October 17, 2024. (Dkt. 26.) Kreitzer and Kreitzer Group (the "Kreitzer Defendants") filed a motion to dismiss the following week. (Dkt. 29.) Following an extension of time to file, Plaintiffs filed a response to the Kreitzer Defendants' motion to dismiss on

November 21, 2024, (Dkt. 40), and a response to the Kuhlman Defendants' motion to dismiss on November 22, 2024, (Dkt. 42). Both sets of Defendants filed replies on November 29, 2024. (Dkts. 44, 45.) The court heard argument on the motions on May 14, 2025. (*See* Dkt. 61.)

## II.    Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In reviewing a motion to dismiss, the court "accepts as true all well-pleaded facts in a complaint and construes them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (cleaned up). While evaluation is generally limited to the complaint itself, Fed. R. Civ. P. 12(d), a court may also examine documents attached to the complaint as exhibits or those explicitly incorporated into the complaint by reference. Fed. R. Civ. P. 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

- 14 -

## III.    Analysis

### A.  Parker's Claims (All Counts)

First, the Kuhlman and Kreitzer Defendants argue that Parker does not "allege a viable direct or derivative action" in her complaint and therefore has no right of action.  (*See* Kuhlman Defs.' Mem. at 14–19 (Dkt. 27); Kreitzer Defs.' Mem. at 13–17 (Dkt. 30).)  Plaintiffs concede this point and stipulate that they will dismiss Elizabeth Parker as an individual plaintiff "when they amend their Complaint after a hearing on the other aspects of the motion to dismiss."  (Pls.' Resp. to Kuhlman Defs. ¶ 10 (Dkt. 43).)  The court will accordingly grant Defendants' motions to dismiss all counts brought by Parker and proceed to analysis of Tauran's claims against Defendants.

### B.  Federal Misappropriation of Trade Secrets (Count I)

Kuhlman, Trinity, and the Kreitzer Defendants next argue that Tauran's federal trade-secrets claim is time-barred.  (Kuhlman Defs.' Mem. at 19–24; Kreitzer Defs.' Mem. at 8–11.) Specifically, they argue that the DTSA's three-year statute of limitations bars claims under Count I.  A motion to dismiss filed under Rule 12(b)(6) "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *see Rubenstein*, 825 F.3d at 214.  However, a defendant may properly raise a statute-of-limitations defense "when the face of the complaint includes all necessary facts for the defense to prevail."  *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 577 (4th Cir. 2017) (internal quotation marks omitted).  For the

reasons discussed below, the court finds the complaint alleges the facts necessary for the court to consider the statute-of-limitations defense at the Rule 12(b)(6) stage.

The DTSA allows the owner of a trade secret to bring a civil action to recover for its misappropriation. 18 U.S.C. § 1836(b)(1). But a potential plaintiff has only three years from when she discovered—or should have discovered through reasonable diligence—the misappropriation to file suit on her claim. *Id.* § 1836(d). A court applying the DTSA's discovery rule "may determine as a matter of law when a claim should have been discovered only when uncontroverted evidence irrefutably demonstrates when [the] plaintiff discovered or should have discovered the fraudulent conduct." *Safe Haven Wildlife Removal & Property Mgmt. Experts, LLC v. Meridian Wildlife Servs. LLC*, 716 F. Supp. 3d 432, 448 (W.D. Va. 2024) (internal quotation marks omitted). For the reasons that follow, the court finds that is the case here.

At the outset, the court notes that Tauran variously describes the "trade secrets" at issue as "the intellectual properties and systems" of the customized Concourse program and individual instances, (Compl. ¶ 93), "the intellectual property that served as a foundation for these systems," (*id.* ¶ 74), and "[t]he information contained within [Concourse]" and Tauran's other instances, (*id.* ¶ 85). It identifies misappropriation as occurring when the Kreitzer Defendants "access[ed] [Concourse and the other Tauran instances] without authorization and then retain[ed] copies of all the information in these accounts," (*id.* ¶ 100), and when Kuhlman and Trinity "us[ed] system information and secrets taken from" those accounts, (*id.* ¶ 101). Tauran also maintains that the misappropriation consisted of Kuhlman, Trinity, and the

Kreitzer Defendants' destruction of Tauran's "ability to use [its] existing systems" and the theft of unspecified trade secrets.  (*Id.* ¶ 74.)

Tauran concedes that it was aware of a data breach in May 2021.  (*See* Pls.' Resp. to Kuhlman Defs. ¶ 38.)  It also "knew that Kreitzer had accessed data in the Spring and early Summer," after his departure from Tauran.  (*Id.* ¶ 39; *see* Dkt. 1-2 at 52–53.)  Nevertheless, it maintains that it did not discover—and could not have discovered—the misappropriation of trade secrets any sooner than September 7, 2021, when Tauran received an email from Amanda Bates, Trinity's former Benefit Administrator, providing it with the information that "Kreitzer had set up an alter ego account as a means of sneaking in [Tauran's] 'backdoor.'" (Compl. ¶¶ 74–75, 80–83, 103.)  Tauran argues that despite "months of attempting to find the many data breaches, lost data, theft of [Tauran's] access to and control over its servers, and its HRIS Instances," (*id.* ¶ 81), it could not have reasonably discovered Defendants' misappropriation of trade secrets without this new information.

This court disagrees.  To begin, Tauran pleads actual knowledge of the alleged misappropriation on at least three occasions prior to August 9, 2021—three years prior to the filing of its complaint.  First, Parker—on behalf of Tauran—filled out a Cybersecurity & Infrastructure Security Agency Incident Report describing an incident where a "[f]ormer consultant accessed Azure Government[2] without authorization," possibly "multiple times," with "[s]uspected unauthorized download of data not for public use."  (Dkt. 1-2 at 65–70.)

---

[2] Azure Government, Tauran explains, is where "[Tauran's] trade secrets—its highly specialized HRIS/OMS Concourse system—were located."  (Pls.' Resp. to Kuhlman Defs. ¶ 98.)

Although the Report is not itself dated, it captures that the incident began on the afternoon of May 22, 2021, and was detected three days later on May 25, 2021. (*Id.* at 66.) This unauthorized access and download of data is precisely what Tauran describes as the misappropriation at issue in this claim. (*See* Compl. ¶ 100 ("Defendants Kreitzer and [Kreitzer Group] have wrongfully misappropriated such Trade Secrets by accessing the [Tauran] HRIS/OMS Account, the [Tauran] Microsoft Account, and other [Tauran] Instances without authorization and then retaining copies of all the information in these accounts . . . .").) Next, Tauran—again through CEO Parker—sent Kreitzer a cease-and-desist letter on May 26, 2021, explicitly noting that "review of Tauran's Microsoft Government Cloud tenant reveal[ed] that [Kreitzer] accessed Tauran's Government Cloud on multiple occasions, without authorization, and downloaded proprietary data." (Dkt. 1-2 at 52–53.) That is, Tauran had actual notice as of May 26, 2021, that Kreitzer had committed actions that meet Tauran's own description of misappropriation. (*See* Compl. ¶ 100.) Finally, on July 16, 2021, Parker—using her Tauran email address—also acknowledged in an email to U.S. Securities and Exchange Commission officials that Tauran had "concluded beyond a doubt that Mr. Kreitzer accessed [its] systems without authorization and removed data," and that it had "discovered an access mechanism that may have facilitated [Kreitzer's] access" during its investigations. (Dkt. 1-2 at 56–57.)

The court finds these explicit acknowledgements persuasive and uncontroverted, particularly given Tauran's own description of the acts making up the alleged misappropriation. However, it notes that in responsive briefing and at the hearing on the motions, Tauran has attempted to re-characterize the misappropriation as the theft or

destruction of systems, rather than the theft of the information contained within those systems. Tauran did not make such a distinction in its complaint, when it alleged that Kreitzer and Kreitzer Group "wrongfully misappropriated" trade secrets "by accessing the [Tauran] HRIS/OMS Account, the [Tauran] Microsoft Account, and other [Tauran] Instances without authorization and then retaining copies of all the information in these accounts." (Compl. ¶ 100; *see id.* ¶ 85 (describing trade secrets as "[t]he information contained within [Tauran's] HRIS/OMS System, CMS, Lanteria, and Microsoft Instances").) Indeed, "retaining copies of all the information" contained in the accounts, including Concourse, sounds suspiciously like the data breach, which Tauran now insists is not misappropriation. Tauran may not amend its complaint now through briefing on a motion to dismiss. *See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013).

However, even were the court to find that Tauran had adequately pled this distinction and that the data breach did not constitute misappropriation, the court finds that Tauran should have discovered the misappropriation when it occurred. Tauran was first put on notice of the potential misappropriation of trade secrets when it learned that Kreitzer, then Tauran's Systems Administrator, made unauthorized system changes on the evening of May 3, 2021, and then departed for a competitor company the following day. (Compl. ¶¶ 32, 54–64; Dkt. 1-2 at 44–46); *see Compass Marketing, Inc. v. Flywheel Digital, LLC*, Civil Action No. GLR-22-379, 2023 WL 2213687, at *7 (D. Md. Feb. 24, 2023) (finding "inquiry notice" of misappropriation of trade secrets where two "trusted senior executives" left company to form a direct competitor), *aff'd*, 2024 WL 3292676 (4th Cir. July 3, 2024). Tauran was again put on notice

when it learned that Concourse data was migrated to Trinity without authorization at the end of May, which Tauran attributed to Kreitzer. (Compl. ¶¶ 70–71; *see* Dkt. 1-2 at 52–53); *Compass Marketing, Inc.*, 2023 WL 2213687, at *7 (finding notice again where employees were "recruited" to compete with former employer and stole files upon departure). Reasonable diligence required Tauran to investigate whether Kreitzer had acquired or disclosed trade secrets as a part of these acts and to investigate any issues with the affected systems arising in the weeks after Kreitzer left to determine whether they were related to Kreitzer's departure. *See Compass Marketing, Inc.*, 2023 WL 2213687, at *7.

Even so, Tauran would have this court believe that, following these acts, it could not through reasonable diligence have discovered that Defendants had misappropriated trade secrets until the September 7, 2021 email from Amanda Bates. Setting aside the fact that Parker's July 16, 2021 email to U.S. Securities and Exchange Commission officials appeared to acknowledge the very backdoor later reported by Bates, (*see* Dkt. 1-2 at 56–57), the information Bates shared was only that Kreitzer had used a backdoor account when he migrated the Concourse data to Trinity in late May—*not* that Kreitzer had used that backdoor in the time since that migration, (*id.* at 55). That is, the email only clarified the means by which Kreitzer committed the May data breach. The statute of limitations for the DTSA runs for three years "after the date on which the *misappropriation* . . . is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d) (emphasis added). It does not run from the date on which a party learns of the means or method by which that misappropriation is committed. Tauran acknowledges in its complaint that, by September

- 20 -

2021, it had spent "months . . . attempting to find the many data breaches, lost data, [and] theft of [Tauran's] access to and control over its servers[] and its HRIS Instances." (Compl. ¶ 81.)  That is, Tauran knew that acts which it describes as misappropriation had occurred in the months prior to September 2021.  Its later discovery of the means by which that misappropriation might have been committed has no bearing on the statute of limitations.

Finally, Tauran contends that the limitations period should be tolled as to claims against the Kreitzer Defendants because Parker filed a warrant in debt against Kreitzer in the Page County General District Court in November 2023.[3]  (Pls.' Resp. to Kreitzer Defs. ¶¶ 15–18 (Dkt. 41); *see* Dkt. 44-1.)  Specifically, Tauran argues that Va. Code § 8.01-229 tolls any applicable statute of limitations following a voluntary nonsuit for a period of six months or the remainder of the original limitations period, whichever is longer.  (Pls.' Resp. to Kreitzer Defs. ¶ 16.)  Va. Code § 8.01-229(E)(3) states:

> If a plaintiff suffers a voluntary nonsuit as prescribed in § 8.01-380, the statute of limitations with respect to such action shall be tolled by the commencement of the nonsuited action, regardless of whether the statute of limitations is statutory or contractual, and the plaintiff may recommence his action within six months from the date of the order entered by the court, or within the original period of limitation, . . . whichever period is longer.  This tolling provision shall apply irrespective of whether the action is originally filed in a federal or a state court and recommenced in any other court, and shall apply to all actions irrespective of whether they arise under common law or statute.

---

[3] While a court generally may not consider documents outside the pleadings on a Rule 12(b)(6) motion, the court may consider matters of public record when ruling on a motion to dismiss, including records from other court proceedings. *See Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009).  The court will therefore consider the civil cover sheet for the warrant-in-debt action, which is attached to the Kreitzer Defendants' reply brief.  (*See* Dkt. 44-1.)

Va. Code Ann. § 8.01-229(E)(3). Parker nonsuited the warrant-in-debt action on March 11, 2024. (Pls.' Resp. to Kreitzer Defs. ¶ 16.) Accordingly, Tauran contends that it had until September 11, 2024, to file this action. (*Id.* ¶¶ 16–17.)

Because Congress has prescribed a statute of limitations for DTSA claims, however, Virginia's nonsuit tolling statute does not apply. The United States Supreme Court has made clear that "[i]f Congress explicitly puts a limit upon the time for enforcing a right which it created, . . . [t]he Congressional statute of limitation is definitive." *Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946). In that event, state tolling or saving statutes do not apply. *See McDowell v. Valley Health Sys.*, No. 5:25-cv-00002, 2025 WL 1456273, at *4 (W.D. Va. May 21, 2025) (collecting cases). This is true regardless of whether the plaintiff filed the original, nonsuited action in federal or state court. *See id.*; *Crain v. Gaston Cnty. Bd. of Educ.*, No. 3:15-CV-00188, 2015 WL 6449413, at *3–4 (W.D.N.C. Oct. 23, 2015) (rejecting plaintiff's argument that North Carolina's nonsuit tolling statute applied to claims originally filed in state court alleging violations of the Americans with Disabilities Act because there is a federally prescribed limitations period for that statute). This court therefore concludes that Va. Code § 8.01-229(E)(3) did not toll the three-year limitations period for Tauran's DTSA claim.[4]

Because Tauran filed its complaint alleging its DTSA claim more than three years after it discovered or should have discovered the alleged misappropriation of its trade secrets, that

_____

[4] Moreover, even if the DTSA did not contain a statute of limitations, it is unclear whether § 8.01-229(E)(3) could apply to toll Tauran's claims, given that the underlying warrant in debt was brought by Parker alone and Tauran therefore is not a "plaintiff [who] suffer[ed] a voluntary nonsuit."

claim is time-barred.  The court will thus grant Defendants' motions to dismiss with respect to the DTSA claim.  It will dismiss that claim with prejudice because further amendment would be futile.  *See Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 630–31 (4th Cir. 2008).

## C.  RICO (Counts II, III)

Tauran next brings federal RICO claims against all Defendants.  (*See* Compl. ¶¶ 109–35.)  "Any person injured in his business or property by reason of a violation of [18 U.S.C.] section 1962" may bring a civil RICO action.  18 U.S.C. § 1964(c).  Tauran raises two claims against Defendants: one under 18 U.S.C. § 1962(c), and one under 18 U.S.C. § 1962(d).  "Section 1962(c) prohibits the conduct of a 'pattern of racketeering activity' affecting interstate commerce; Section 1962(d) prohibits conspiracy to engage in such conduct."  *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 105 (4th Cir. 2025).  The court will address each claim in turn.

### 1.  18 U.S.C. § 1962(c) (Count II)

Tauran first raises a § 1962(c) claim against Defendants.  (Compl. ¶¶ 109–29.)  Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  A RICO claim alleging a violation of § 1962(c) must therefore sufficiently plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" to survive a 12(b)(6) motion.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  Defendants argue that Tauran has

- 23 -

failed to state a cognizable RICO enterprise claim because it has not plausibly alleged an enterprise between Defendants and because it has not sufficiently pled a pattern of racketeering activity.  (Kuhlman Defs.' Mem. at 26–36; Kreitzer Defs.' Mem. at 18–26.)  This court agrees.

       *i.  Enterprise*

To begin, Tauran must allege both an enterprise and the existence of a person, who violated § 1962(c) by his or her association with and participation in the enterprise.  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62 (2001); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 841 (4th Cir. 1990) (en banc); *Cook v. McQuate*, No. 7:15-cv-00456, 2016 WL 5794232, at *7 n.11 (W.D. Va. Aug. 18, 2016).  An enterprise is "an ongoing organization, formal or informal, in which the various associates function as a continuing unit."  *Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997); *see* 18 U.S.C. § 1961(4).

Tauran alleges that each Defendant is a "person" within the meaning of the statute.  (Compl. ¶ 115.)  It also alleges, without explanation or supporting factual allegations, that "[Trinity], KR Contracting, Kuhlman, Kreitzer, and [Kreitzer Group] all constitute enterprises."  (*Id.* ¶ 124.)  Apparently unaware of the myriad possible combinations of these "persons" and "enterprises," Tauran provides no further detail, leaving it to Defendants and this court to guess at which person or persons Tauran alleges are associated with which

enterprise or enterprises.[5]  This, of course, is insufficient to satisfy Rule 12(b)(6)'s pleading requirement.  *See Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'").  The court will therefore dismiss Tauran's § 1962(c) claim to the extent it alleges that each individual Defendant is an enterprise.

Still, Tauran also alleges that all Defendants together make up an association-in-fact enterprise, (Compl. ¶ 124), with the common purpose and scheme of what it terms "the Kreitzer-Kuhlman Data Breach," (*see id.* ¶¶ 118–22).  An association-in fact enterprise consists of "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 452 U.S. 576, 583 (1981).  Such an enterprise must contain three structural elements: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

Setting aside the first two factors, Tauran simply does not allege sufficient longevity to support an association-in-fact enterprise.  Tauran does not allege the date of the formation of this enterprise, which alone is fatal to its claim.  *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1007 (E.D. Va. 2021) ("Plaintiff's allegations are insufficient because the Court is left to guess

_____

[5] Although Tauran attempts to narrow this allegation in its responsive briefing, the court will not consider those arguments because Tauran cannot amend its complaint through its briefs.  *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184–85.

- 25 -

when, exactly, the enterprise took shape.").  Though Tauran alleges that Kreitzer and Kuhlman together "formulated a plan to steal [Tauran's] HRIS/OMS Concourse System" in March 2021, (Compl. ¶ 42), Tauran does not describe how or when other Defendants such as Trinity, KR Contracting, and Kreitzer Group joined the enterprise.  Indeed, Kreitzer Group could not have joined the enterprise in March 2021 because it was not even registered as a company until the following month.  (*Id.* ¶ 53.)

Additionally, even were the court to assume that Tauran had adequately alleged the formation of the enterprise at some point around March 2021, Tauran has not alleged the continued existence of the enterprise beyond May 22, 2021, which is the date of the last alleged predicate act.  The closest Tauran comes is alleging that the pattern of racketeering activity "is continued whenever any aspect of the Internet or mail system [is] used to perpetuate the criminal acts" described in the complaint. [6]  (*Id.* ¶ 126.)  This amounts to a legal truism, not a factual allegation that there have been further events supporting the continued existence of the enterprise.[7]

Assuming, then, that the enterprise was formed sometime in early March 2021 and ended on May 22, 2021—a period which, again, appears impossible due to the formation of Kreitzer Group in April 2021—an approximately three-month period does not sufficiently

---

[6] In the briefing on the motions to dismiss, Tauran now claims that "the active use of the stolen HRIS system continues." (Pls.' Resp. to Kuhlman Defs. ¶ 85.)  But Tauran does not point to any paragraph in its complaint supporting this statement.

[7] Tauran also alleges that Trinity continues to use Concourse.  (Compl. ¶ 21.)  This factual allegation does not, however, support the continued existence of the RICO enterprise consisting of Trinity, Kuhlman, Kreitzer, KR Contracting, and Kreitzer Group, as it speaks only to an action taken by Trinity, presumably for Trinity's own (and not the enterprise's) benefit.

support longevity.  *See Nunes*, 531 F. Supp. 3d at 1007 (finding a six-month period insufficient).

As such, Tauran has not adequately pled an association-in-fact enterprise as required to

maintain a § 1962(c) claim.

> ii.  *Pattern of racketeering activity*

Even were the court to find that Tauran had sufficiently pled a RICO enterprise,

Tauran also fails to allege a pattern of racketeering activity.  "'Racketeering activity' is defined

as any of a number of predicate acts, including mail and wire fraud."  *Al-Abood v. El-Shamari*,

217 F.3d 225, 238 (4th Cir. 2000); *see* 18 U.S.C. § 1961(1)(B).  A pattern exists when "two or

more predicate acts of racketeering [were] committed within a ten year period."  *ePlus Tech.,*

*Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002).  Tauran must plausibly allege that each

Defendant committed at least two predicate acts of racketeering activity to maintain a § 1962(c)

claim.  *Doe 1 v. Varsity Brands, LLC*, Civil Action No. 6:22-2957, 2023 WL 4209799, at *16

(D.S.C. June 27, 2023) (collecting cases); *see Nunes*, 531 F. Supp. 3d at 1011; *United States v.*

*Taylor*, 942 F.3d 205, 216 (4th Cir. 2019) ("The defendants acknowledge that their convictions

[under § 1962(c)] will stand as long as there was sufficient evidence to support the jury's finding

that each defendant committed at least two racketeering acts.").

Tauran alleges that "Defendants engaged in multiple instances of wire fraud involving

the use of the Internet to unlawfully access, transmit, and steal data," as well as the "theft of

intellectual property" and "destruction of [Tauran's] HRIS systems," in furtherance of "an

overall scheme to use interstate communications and computer systems to destroy

[Tauran]/Parker." (Compl. ¶ 112.) Its complaint outlines five acts it contends constitute racketeering activity.

First, on May 3, 2021, Kreitzer blocked Tauran and its employees from accessing company databases "using interstate wires." (*Id.* ¶ 118.) Second, on the same day, Kreitzer removed Tauran as Trinity's Microsoft Provider, again "using interstate wires." (*Id.* ¶ 119.) Third, on May 21, 2021, Kreitzer "working in concert with the other Defendants, accessed a protected computer without authorization" in violation of 18 U.S.C. § 1030. (*Id.* ¶ 120.) Additionally, Defendants "knowingly and with the intent to defraud accessed a computer without authorization to take [Tauran's] trade secrets" in violation of the DTSA. (*Id.*) Fourth, on May 22, 2021, Kreitzer, "working in concert with the other Defendants, intentionally accessed a facility through which electronic communication service is provided, and obtained electronic communications while they were in electronic storage." (*Id.* ¶ 121.) The electronic communications were "trade secrets" which Defendants "obtained unauthorized access to and thereafter stole, while acting willfully and maliciously" in violation of 18 U.S.C. § 2701. (*Id.*) And fifth, on May 21, 2021, Kreitzer, "working in concert with the other Defendants . . . temporarily removed and disabled data belonging to [Tauran]." (*Id.* ¶ 122.) Defendants also "obtained a copy of computer data belonging to [Tauran]," allegedly in violation of the Virginia Computer Crimes Act, Va. Code § 18.2-152.1. (*Id.*)

To begin, Tauran fails to sufficiently allege that these acts constituted wire fraud, a predicate act. Though Tauran asserts that actions were taken "using interstate wires," it does not provide any factual allegations describing how any part of the alleged acts used interstate

wires.  Such a conclusory statement is insufficient to survive a Rule 12(b)(6) motion.  Because Tauran does not cite any other statute or reason why the first and second acts described would constitute racketeering activity, the court finds them insufficient to constitute predicate acts as alleged.

Next, Tauran alleges that Kreitzer's action in "access[ing] a protected computer without authorization"—part of the third described act—constitutes racketeering activity because it is violative of 18 U.S.C. § 1030.  (Compl. ¶ 120.)  The RICO statute, however, "does not recognize a violation of 18 U.S.C. § 1030 as a predicate act of racketeering activity," so Tauran cannot rely upon this as a predicate act.  *Singletary v. Sunbit Now, LLC*, No. 3:24cv877, 2025 WL 2427165, at *12 n.9 (E.D. Va. Aug. 22, 2025); *see* 18 U.S.C. § 1961(1)(B).  The same is true for Tauran's allegations in the fourth act described that Kreitzer intentionally accessed a facility through which electronic communication service is provided and that he and Defendants obtained electronic communications in violation of 18 U.S.C. § 2701.  *See* 18 U.S.C. § 1961(1)(B).  The court therefore finds that the named part of the third act and the entirety of the fourth act cannot constitute predicate acts.

Finally, Tauran alleges that, as the fifth act, Kreitzer temporarily removed and disabled data belonging to Tauran and that Defendants "obtained a copy of computer data belonging to [Tauran], in violation of the Virginia Computer Crimes Act."  (Compl. ¶ 122.)  Section 1961(1) outlines various predicate acts constituting "racketeering activity," including enumerated federal offenses and "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, [or] extortion . . . which is chargeable under State law and punishable

by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). When determining whether a state crime constitutes a predicate act, courts regularly "look beyond how states label criminal offenses" and instead "ask whether the conduct punished by state law falls within one of the listed generic offense categories." *AMA Sys., LLC v. 3B Tech, Inc.*, Civil Action No. DLB-21-1472, 2022 WL 2133905, at *7 (D. Md. June 14, 2022). The Virginia Computer Crimes Act states in relevant part that "[a]ny person who uses a computer or computer network, without authority" is guilty of criminal computer fraud if he "[o]btains property or services by false pretenses." Va. Code Ann. § 18.2-152.3. Such an act does not fall within those generic offense categories listed in § 1961(1). Accordingly, the court finds that Tauran's fifth alleged act does not constitute a predicate offense.

That leaves, then, only the alleged predicate act on May 21, 2021, when "Defendants knowingly and with the intent to defraud accessed a computer without authorization to take [Tauran's] trade secrets," which Tauran alleges is a violation of the civil provision of the DTSA. (Compl. ¶ 120.) Because Tauran needed to allege at least two predicate acts for each Defendant, and because no other predicate acts are sufficiently alleged, the court need not continue its analysis of the DTSA claim. Tauran has not adequately alleged racketeering activity as to any Defendant, and the court will accordingly grant Defendants' motions to dismiss as to the § 1962(c) claim.[8]

---

[8] The court notes in doing so, however, that even had Tauran sufficiently alleged two predicate acts for each Defendant, "two acts alone do not necessarily establish a pattern." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001). A plaintiff must also "show that the racketeering predicates are related, *and* that they amount to or pose a

2.  18 U.S.C. § 1962(d) (Count III)

Tauran next brings a RICO conspiracy claim under 18 U.S.C. § 1962(d).  (Compl.
¶¶ 130–35.)  "[T]o prove a RICO conspiracy, evidence must show the existence of a RICO
'enterprise' in which the defendant conspired to participate, and that the defendant conspired
that a member of the enterprise would perform at least two racketeering acts constituting a
'pattern of racketeering activity.'"  *Pinson*, 860 F.3d at 161 (quoting *Salinas v. United States*, 522
U.S. 52, 62 (1997)).  Because Tauran fails to allege a RICO enterprise as explained above, the
court will grant Defendants' motion to dismiss as to this claim.

**D. State-Law Claims (Counts IV–IX)**

Because the court will grant Defendants' motions to dismiss as to all federal claims, it
will decline to exercise supplemental jurisdiction over Tauran's remaining state-law claims.  *See*
28 U.S.C. § 1367(c)(3).  There is no basis for exercising diversity jurisdiction over the state
claims under 28 U.S.C. § 1332, as Tauran and at least one Defendant share Virginia citizenship.
(*See* Compl. ¶¶ 2–4, 6.)  The court has "wide latitude in determining whether or not to retain
jurisdiction over state claims when all federal claims have been extinguished."  *Henderson v.
Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th
Cir. 1995)).  "[G]enerally, when a district court dismisses all federal claims in the early stages
of litigation . . . it should decline to exercise jurisdiction over any remaining pendent state law

---

threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).  Although
the court does not reach this analysis here, even had Tauran sufficiently alleged predicate acts, it likely has not shown the
continuity required to state a § 1962(c) claim.  *See Pinson*, 860 F.3d at 163 (collecting cases).

claims by dismissing those claims without prejudice." *Id.* (citation omitted). In deciding whether to exercise supplemental jurisdiction, the court weighs multiple factors, including "judicial economy, convenience, fairness, and comity." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Here, the court concludes that the relevant factors weigh in favor of dismissal.

### IV.    Conclusion

For the foregoing reasons, the court will **GRANT** the motions to dismiss filed by the Kuhlman Defendants (Dkt. 26) and Kreitzer Defendants (Dkt. 29). The court will **DISMISS without prejudice** with leave to amend all of Parker's claims and Tauran's RICO and state-law claims. The court will **DISMISS with prejudice** Tauran's DTSA claim, as the court concludes that Tauran cannot correct the legal deficiencies in this claim via amendment.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 15th day of September, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE