**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division**

TAURAN MANAGEMENT GROUP, LLC,
  Plaintiff,

v.            Civil Action No. 5:24-cv-00060

KAYNE S. KREITZER,      **JURY TRIAL DEMANDED**
BRUCE R. KUHLMAN,
TRINITY TECHNOLOGY GROUP, INC.,
KREITZER GROUP, LLC, and
KR CONTRACTING, INC.
  Defendants.

## AMENDED COMPLAINT

Plaintiff TAURAN MANAGEMENT GROUP, LLC ("TMG"), by and through undersigned counsel, JARVIS LAW PLLC, complains of Defendants, Kayne Kreitzer ("Kreitzer"), Bruce Kuhlman ("Kuhlman"), Trinity Technology, LLC ("TTG"), Kreitzer Group, LLC ("KG LLC") and KR Contracting, Inc. ("KRC"), stating and alleging as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Tauran Management Group, LLC (hereinafter "TMG") is a Virginia limited liability company with its registered office located at 1 North Broad Street, Suite A, Luray, Virginia 22835. Elizabeth Parker ("Parker") is the Chief Executive Officer ("CEO") of TMG.

2.  Defendant Kayne Kreitzer (hereinafter "Kreitzer") is a natural person who resides at 430 N. Henry St., Apt. #B, Alexandria, VA 22314.

3.  Kreitzer is also the sole member of Kreitzer Group, LLC (hereinafter referred to as "KG LLC"), a Virginia limited liability corporation with its principal office and its registered office located at 430 N Henry St #2, Alexandria, Virginia 22314. As of July 31, 2025, KG LLC has been inactive for non-payment of the registration fee.

4.      Defendant Bruce R. Kuhlman (hereinafter "Kuhlman") is a natural person who resides at 144 Greentree Farm Drive, Dickerson, Maryland 20842. Defendant Kuhlman is alternatively known as "The Bruce R. Kuhlman Jr. Revocable Trust, dated August 29, 2019."

5.      Kuhlman is the Chief Executive Officer of Trinity Technology Group, Inc. (hereinafter "TTG"), a business entity authorized to do business in Virginia, with its principal office located at 20300 Seneca Meadows Pkwy, Ste 200, Germantown, MD 20876, and its registered office located at 100 Shockoe Slip Fl 2, Richmond, VA 23219.

6.      Kuhlman is also the Chief Executive Officer of KR Contracting, Inc. (hereinafter "KRC") a Maryland corporation with its principal office located at 223 N Prospect St Ste 105, Hagerstown, Maryland 21740.

7.      Defendants Kreitzer, KG LLC, and TTG are subject to personal jurisdiction in the Western District of Virginia because they are citizens of Virginia or corporate entities domesticated in Virginia and because most of the acts or omissions alleged by the Plaintiff occurred in Page County.

8.      Defendants Kuhlman and KR Contracting, Inc. are subject to personal jurisdiction of this Court because these defendants purposefully availed themselves of Virginia laws by conducting regular business activities on a large scale, including but not limited to providing services to other parties in this lawsuit, such that it was foreseeable that they could be sued in Virginia. Additionally, these Defendants committed tortious acts in Virginia that directly injured the plaintiff.

9.      This Court has supplemental jurisdiction over the relevant state claims involved in this cause of action, pursuant to 28 U.S.C. § 1367 (a).

10.      Defendant Kuhlman is an alter ego for the Bruce R. Kuhlman Jr. Revocable

Trust, dated August 29, 2019.

11.     Venue is appropriate in this District because the cause of action arose in Luray. *See* 28 U.S.C. § 1391(b)(2).

12.     This Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331.

## INTRODUCTION

13.     This action arises out of Defendants' operation of an enterprise, comprising Kayne Kreitzer (Kreitzer), Kreitzer Group, LLC ("KG LLC"), Bruce Kuhlman (Kuhlman), Trinity Technology Group, Inc. ("TTG"), and KR Contracting, Inc. ("KRC"), that conspired to and did misappropriate Plaintiff's proprietary government cloud environments, Concourse HRIS/OMS system, and TMG's role as TTG's Microsoft Reseller.

14.     Acting through this enterprise, Defendants orchestrated a coordinated campaign to dismantle TMG's operations and seize its proprietary systems, clients, and market position. Their conduct interfered with TMG's subcontract with TTG, diverted Microsoft licensing revenues, and destroyed TMG's Concourse HRIS/OMS platform, including its OIG Compliance CRM and Traveler's Claims Management modules, which deprived Plaintiff of millions of dollars in existing and prospective contracts with federal contractors. The enterprise's acts included unauthorized access to TMG's protected Microsoft Government Cloud environment, removal of TMG's administrative rights, duplicative invoicing, and false statements designed to conceal the theft and destruction of TMG's intellectual property.

15.     When Defendants manipulated TMG's SYNNEX reseller account and removed TMG as TTG's delegated Microsoft Partner, Trinity's subsequent non-payment for Microsoft licenses, despite other TMG clients having paid their own invoices, caused SYNNEX to

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—3

terminate all of TMG's services. This termination abruptly cut off service for TMG's other clients, including System High Corporation (SHC), Valley Administrative Services (VAS), Armistech (ARM), and Buffalo Business Consulting (BBC). Although TMG was ultimately able to restore service by paying Trinity's outstanding balance, the interruption caused significant reputational harm across the GovCon sector. ARM had been referred to TMG by VAS, and after the disruption, VAS withdrew its own business and ceased all future referrals, further compounding TMG's losses. These coordinated acts destroyed TMG's established subcontract revenues and extinguished its pipeline opportunities with TSA Screening Partnership Program (SPP) vendors and other federal clients, which served the enterprise's objective: to eliminate TMG from the government contracting market and usurp its proprietary systems for Defendants' own use.

16.     These actions were not isolated or accidental; they marked the beginning of a sustained and deliberate effort by Defendants to erase TMG's technological and contractual footprint. The purposeful destruction of TMG's Concourse systems began in 2021 and continued through at least 2024, encompassing the deletion, corruption, and unauthorized replication of software environments, data repositories, and intellectual property integral to TMG's federal contracting operations. This is not merely a case of a former employee taking data from an employer. This Amended Complaint describes a coordinated campaign to destroy entire operational systems, disable client environments, and conceal the Defendants' own misuse of those assets. These actions constitute a continuous pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act, tortious interference with contract and business expectancy, and common law and statutory conspiracy under Virginia law. Moreover, Defendants Kreitzer and Kuhlman used their respective corporate entities as alter egos to

perpetrate fraud, evade accountability, and unjustly enrich themselves at Plaintiff's expense, confirming the enterprise's unified purpose: to dismantle TMG and absorb its market, clients, and intellectual property for their own gain.

### (2003-2012) Trinity Technology Group, Inc.'s Origins

17.    Beginning in 2003, Elizabeth Parker served as HR and IT Manager at TTG, where she helped to grow it into a multimillion-dollar TSA contractor. By 2012, after selling its intelligence division, TTG downsized to ~45 employees. At that time, Jamal Parker began providing IT consulting to TTG.

### 2014-2018 Concourse Development and Commercialization

18.    In 2014, Elizabeth and Jamal Parker formed TMG to provide TTG's IT services and expand into help desk and compliance-driven HR/IT solutions. Drawing on Elizabeth Parker's HR and IT expertise and Jamal Parker's IT and contact center management experience, the Parkers conceived, designed, and developed the Concourse Operations Management System ("Concourse OMS") as an integrated platform to manage the full life cycle of federal contracting operations, including HR, compliance, contract administration, and workflow automation. Although the system is adaptable for commercial use, Concourse OMS was specifically created to meet the operational and regulatory needs of the government contracting sector, commonly referred to in the industry as "GovCon." TMG's early adoption of FedRAMP[1]-authorized infrastructure and adherence to NIST[2]-aligned security controls positioned Concourse as a specialized solution for federal contractors and subcontractors, where data integrity, personnel security, and audit readiness are critical performance requirements.

---

[1] FedRAMP stands for Federal Risk and Authorization Management Program.
[2] NIST stands for National Institute of Standards and Technology.

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—5

19.     In August 2015, TMG executed a Non-Disclosure Agreement with Lanteria, and TMG's leadership disclosed TMG's confidential vision for Concourse to Kreitzer, then Lanteria's U.S. Sales Director. These disclosures, protected by the NDA, established Concourse as TMG's trade secret. The same year, TMG entered into a Partner Agreement with Lanteria, which authorized TMG to market and resell Lanteria software within the United States and to collaborate with Lanteria on customization and implementation for clients. This relationship enabled TMG to build on Lanteria's HR platform to create its own specialized GovCon instance of Concourse, reinforcing TMG's commercial control over its customized configurations and client deployments. *See* Plt. Exh. 1, Trinity Subcontract with Tauran; Plt. Exh. 2, Lanteria Non-Disclosure Agreement; Plt. Exh. 3, Tauran Partnership Goals with Lanteria; Plt. Exh. 4, Lanteria Authorized Partner Agreement; and Plt. Exh. 5, Lanteria Gov Customization Email. These exhibits are incorporated as if restated in full herein.

20.     On April 16, 2018, TTG and TMG executed an NDA to govern the exchange of proprietary information for potential mutual business opportunities in Information Technology, HR automation, call-center support, and other government contracting ventures. The NDA expressly defined "Proprietary Information" to include all software, code, system designs, algorithms, data compilers, financial and client information, and "Government programmatic information," whether disclosed verbally or in writing. It required that such information "be used only for the purpose of the Opportunities," that it "remain the property of the disclosing party," and that unauthorized disclosure or use would cause "irreparable harm and significant injury" entitling the non-breaching party to immediate injunctive relief.

21.     The 2018 TTG–TMG NDA thus memorialized TTG's knowledge that Concourse, its custom modules, and related data were the proprietary property of TMG, not Trinity. It also

prohibited TTG and its representatives, including Kreitzer, from using or disclosing any of TMG's proprietary systems or information for their own benefit or for any third party. *See* Plt. Exh. 6, TTG's 2018 Non-Disclosure Agreement with TMG. These exhibits are incorporated as if restated in full herein.

22.     Along with its Concourse IP, TMG developed and deployed two proprietary modules within Concourse: (i) the OIG Contact Records Management (CRM), tailored to hotline intake and compliance reporting, and (ii) Traveler's Claims Management (Traveler's), a centralized claims administration module modeled as TMG's proprietary version of the "Passenger's First" program. Traveler's extended Concourse into the passenger-facing side of operations by centralizing incident intake, claims processing, and resolution workflows through TMG's HUBZone contact center.

23.     TMG actively marketed its Traveler's module, developed from the proprietary workflows and administrative processes it had originally designed and operated in support of TTG's "Passenger's First" program. By building on its own Concourse customizations rather than TTG's branding, TMG positioned Traveler's as a stand-alone commercial service and as an integrated Concourse module. In 2017, TMG included the module in its BOS Security proposal, and in 2021, TMG was again positioned as the subcontractor responsible for IT, customer support, and claims management in the Team STSS proposal for San Francisco International Airport (SFO), one of the largest TSA SPP opportunities. *See* Plt. Exh. 7, TMG's BOS Concourse Proposal; Plt. Exh. 8, STSS SFO Technical Volume. These exhibits are incorporated as if restated in full herein.

24.     TMG's HUBZone contact center in Luray, Virginia was an established component of its Concourse service infrastructure, used and marketed for multiple functions

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—7

including Help Desk support, OIG hotline intake, customer service, IT support, employee resource assistance, and claims administration. Within its subcontract for Trinity, TMG utilized this contact center to administer passenger claims across TSA SPP airports, while also providing administrative surge support for Trinity's benefits processing, accounting, and audit preparation. Except for the OIG hotline services performed under separate federal prime contracts, these functions were delivered under TMG's subcontracted support for Trinity.

25. As TMG's consultant and later employee, Kreitzer administered the environments in which the OIG CRM and Traveler's modules operated. With that privileged access, he obtained intimate knowledge of Concourse's configuration, data structures, and integrations. His later unauthorized access to those environments and manipulation of system configurations were not routine administrative actions but intentional acts that dismantled TMG's control over its own platform. These actions did not merely disrupt TMG's HRIS functions but disabled the entire Concourse suite, including the OIG and Traveler's modules. In doing so, the Defendants destroyed the technical and administrative infrastructure supporting TMG's federal-facing business ecosystem, compromising its proprietary systems, ongoing subcontract revenues, and pipeline opportunities.

26. By late 2015, Concourse was fully operational and successfully deployed to TTG during a TSA contract reassignment in Montana that required rapid employee onboarding. The deployment demonstrated Concourse's effectiveness and commercial potential within the GovCon sector and established TMG's independent ownership of the system. In 2016 and 2017, TMG expanded Concourse's commercialization by commissioning professional marketing materials, including a brochure designed by Charles Kreitzer, the spouse of Kayne Kreitzer, at TMG's direction. TMG pitched the system to BOS Security, another TSA SPP vendor, and

hosted TTG's Concourse environments within TMG's Microsoft Government Cloud infrastructure. *See* Plt. Exh. 9, Concourse Brochure; Plt. Exh. 7, BOS Proposal. These exhibits are incorporated as if restated in full herein.

27.    These activities showed that Concourse, and later Traveler's, were branded, marketed, and sold as TMG products to multiple government contractors, with TMG maintaining exclusive control over pricing, licensing, and hosting. Contemporaneous statements by Kreitzer acknowledging that business development and coding were "above my skill level" confirmed that his role was limited to technical support under TMG's direction. This history established Concourse and its related modules as TMG's proprietary trade secrets and business assets. It also set the stage for the later period of Kreitzer's employment and consulting roles, during which his privileged access to TMG's systems and client data would be leveraged to the company's detriment. *See* Plt. Exh. 10, Lanteria TMG Setup; Plt. Exh. 11, Lanteria Materials Usage; Plt. Exh. 12, Trinity IT Needs; Plt. Exh. 13, Tauran Partnership with Lanteria; and Plt. Exh. 14, Hosting TTG on TMG GCC. These exhibits are incorporated as if restated in full herein.

### 2016-2020 Kreitzer's Roles and Access

28.    In 2016, shortly after being briefed under TMG's nondisclosure agreement ("NDA") with Lanteria, Kreitzer left his position at Lanteria and accepted a position with TMG as a systems administrator. He executed a Consultant Agreement and NDA requiring him to maintain the confidentiality of TMG's proprietary and client information. By joining TMG, Kreitzer moved from serving as an outside vendor representative with limited visibility into Concourse to becoming a trusted insider with administrative privileges to TMG's Microsoft Government Cloud, Concourse instances, and client integrations. His employment and

*Tauran Management Group, LLC v. Kreitzer, et al.,* Amended Complaint—9

subsequent consultant work were performed as a service provider under contract, not as a co-owner, partner, or developer of Concourse, and his access was expressly conditioned on protecting TMG's intellectual property. *See* Plt. Exh. 15, Consultant Agreement; Plt. Exh. 16, TMG's Non-Disclosure Agreement with Kreitzer, Plt. Exh. 17, Kreitzer's Job Description. These exhibits are incorporated as if restated in full herein.

29.     In March 2018, while serving as Tauran's consultant, Kreitzer created Tauran's Microsoft reseller account with SYNNEX and installed himself as the primary administrator. This gave him unilateral control over Tauran's reseller relationships and licensing channels—authority that should have remained under Tauran's corporate account controls. *See* Plt. Exh. 18, SYNNEX Account Application. These exhibits are incorporated as if restated in full herein.

30.     That same year, at TMG's request, Trinity executed a limited Consulting Agreement with Kreitzer so that he could be sponsored for a federal security clearance. The arrangement was part-time—approximately ten hours per month—and was intended to benefit both TMG and Trinity by enabling Kreitzer to maintain clearance eligibility while continuing to perform IT administration for TMG's federal subcontract work. Although Trinity administered the clearance, Kreitzer's work remained performed on TMG's behalf, managing its Microsoft and Concourse environments for Trinity's use. His dual role underscored that the systems he serviced were TMG's property and that his clearance existed solely to fulfill TMG's federal subcontracting responsibilities. *See* Plt. Exh. 19, Kuhlman Letter. This exhibit is incorporated as if restated in full herein.

31.     In 2018, TMG also issued formal Security Policies, submitted to the Department of Commerce as a contract deliverable, which required access controls, documentation, and administrative segregation for IT administration. In combination with the April 16, 2018 Non-

Disclosure Agreement between TTG and TMG, these measures demonstrated TMG's systematic and reasonable efforts to protect its proprietary information and trade secrets. The NDA obligated both parties to maintain the confidentiality of all proprietary information, to use it only for the limited business opportunities described in the agreement, and prohibited any unauthorized use, retention, or disclosure of that information for other purposes. It expressly stated that all proprietary materials remained the property of the disclosing party and that any unauthorized use or disclosure would cause irreparable harm, entitling the non-breaching party to immediate injunctive relief. Together, the 2018 Security Policies and NDA bound TTG and Kreitzer, as TMG's consultant and later employee, to preserve and refrain from any unauthorized use or retention of TMG's systems and data. *See* Plt. Exh. 20, TMG's Security Policies; Plt. Exh. 6, TTG–TMG NDA. These exhibits are incorporated as if restated in full herein.

32.    On January 1, 2019, Kreitzer became a full-time employee of TMG, entrusted with near-total control of TMG's IT infrastructure, including reseller relationships, client tenant administration, and TTG's Concourse environment. TMG had already recognized his contributions through a Key Personnel Incentive Plan in 2017 and continued to invest in his professional development, including funding his attendance at Microsoft Ignite and related Microsoft certifications. Unlike other TMG employees, however, his signed employment records disappeared after May of 2021, an irregularity consistent with his later pattern of withholding documentation and access credentials. The W-2 nonetheless confirmed his employment status and his duty to comply with TMG's Non-Disclosure Agreement, Security Policies, and system controls. *See* Plt. Exh. 21, Kreitzer W2; Plt. Exh. 22, Transition to Contractor; Plt. Exh. 23, Kreitzer Email about Invoicing as Employee; Plt Exh 24, Kreitzer Key

Personnel Incentive Plan; Plt. Exh. 25, Invoice 158 MS Ignite. These exhibits are incorporated as if restated in full herein.

33.    In November 2019, Kreitzer admitted by email that much of TMG's IT knowledge was "in his head or Googled," and that key system credentials were linked to personal accounts rather than documented in TMG's records. This admission underscored the deliberate gap he created between TMG's formal security requirements and his actual practices. By withholding documentation and centralizing control in himself, Kreitzer directly violated TMG's Security Policies and professional standards, undermining the transparency and accountability required of his position. These actions weakened TMG's internal controls and explain why, in 2021, it became extraordinarily difficult for TMG to regain access after he removed administrative rights. *See* Plt. Exh. 26, Request for IT Files. This exhibit is incorporated as if restated in full herein.

34.    That same year, TMG implemented an Employment Record SOP integrated with Concourse to standardize how employee data, credentials, and system access were documented and managed. This SOP was part of TMG's continuing effort to safeguard its intellectual property, ensure accountability, and comply with federal contracting requirements. Kreitzer, as Systems Administrator, was expected to follow and enforce these procedures. Unbeknownst to TMG at the time, he resisted creating independent service accounts, withheld documentation, and circumvented the very controls designed to prevent misuse of authority—laying the groundwork for his later misconduct. *See* Plt. Exh. 27, Employment Record SOP. This exhibit is incorporated as if restated in full herein

35.    By the end of 2019, TMG had fully developed Concourse into a marketed GovCon product, safeguarded through its NDAs, Security Policies, and SOPs. TMG's

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—12

leadership regarded Kreitzer as both a trusted colleague and personal friend and even engaged his spouse to redesign the company website and Concourse marketing materials, further reflecting the trust extended to him and his household. Plaintiff took reasonable measures to protect its trade secrets while rewarding Kreitzer as a valued team member. Unbeknownst to TMG, however, by 2020 he had entrenched himself as the sole technical gatekeeper, obstructing documentation and concealing his activities in ways that set the stage for the 2021 takeover.

36.    By 2020, Kreitzer had entrenched himself as TMG's technical gatekeeper. Despite TMG's Security Policies and Employment Record SOP requiring proper documentation and separation of accounts, he withheld credentials and tied critical system access to personal accounts, preventing TMG from exercising independent control. Emails throughout 2020 confirm this pattern: he resisted providing passwords requested by TMG staff, altered third-party service accounts such as Twilio and Plumsail without authorization, and interfered with the implementation of the DOC OIG webform by delaying or restricting required system changes. Unbeknownst to TMG, these actions consolidated his personal control over TMG's infrastructure and weakened its ability to safeguard its own systems, a condition he would later exploit in 2021. *See* Plt. Exh. 28, SendGrid KeyVault; Plt. Exh. 29, Password Requests; Plt. Exh. 30, Lanteria SysAdmin Issues; Plt. Exh. 31, Twillio Account Change; Plt. Exh.32, Plumsail Acct Issues; Plt. Exh. 33, DOC Access for Changes; Plt. Exh. 34, Microsoft Acct Change; Plt. Exh. 35, DOC Web Form Issue; and Plt. Exh. 36, Workflows. These exhibits are incorporated as if restated in full herein.

37.    During the same period, Kreitzer intercepted system notifications and technical failure reports related to DOC OIG submissions and other security operations, preventing TMG from receiving critical alerts required for contract oversight. Vendors continued to recognize

him as the account administrator, forcing TMG personnel to request his credentials to manage essential security tools and resolve incidents. Audit logs, enabled by default and manually disabled only by an administrator, were later discovered to have been turned off, indicating that Kreitzer intentionally concealed his activities. These acts violated TMG's protective policies and its duty to maintain verifiable audit trails. TMG did not discover the disabled audit logs until it attempted to repair the systems he damaged during and after 2021. *See* Plt. Exh. 37, Microsoft Flows Failure; Plt. Exh. 38, Malwarebytes Account; and Plt. Exh. 39, Twilio Account. These exhibits are incorporated as if restated in full herein.

38.    Although TMG repeatedly created opportunities for Kreitzer to document procedures and train additional IT staff, he delayed or deflected, claiming he was too busy or that it was faster to perform the tasks himself. These repeated excuses prevented the transfer of knowledge and ensured that no other employee could independently manage the systems.

39.    In October 2019, Kreitzer reverted to contractor status at a higher rate of pay, and through 2020 he continued in that role with broad administrative privileges. The arrangement was intended both to ensure continuity for TMG's government clients, including its hotline support contracts for the SEC OIG and DOC OIG, and to provide him the time and flexibility to complete the documentation and training that TMG had repeatedly requested. Had Kreitzer fulfilled those obligations, his services would have concluded as planned. Instead, he continued to delay and withhold information, tightening his exclusive control over system access. By maintaining control over TMG's Microsoft Government Cloud, Concourse, and client environments, he positioned himself to act on behalf of the enterprise by removing TMG as TTG's delegated administrator and by misappropriating and damaging Concourse in 2021. *See*

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—14

Plt. Exh. 40, Kreitzer's Transition From Employee to Contractor, Plt. Exh. 23, Kreitzer Consents to Pay as Employee. These exhibits are incorporated as if restated in full herein.

40. In April 2020, TMG and TTG, along with several other companies, executed a Letter of Cooperation forming the "5 Star" Consortium, a business development group created to pursue government contracts collaboratively. TMG and TTG were founding members. In late 2020, Kuhlman, representing KRC, was invited to join the Consortium as he prepared to acquire TTG, with full knowledge that KRC was and would continue to operate as a government contractor. Throughout 2020 and into January 2021, the Consortium met regularly to share capabilities and coordinate on federal opportunities. During these meetings, participants, including Kuhlman, were briefed on TMG's proprietary systems and expertise, including its Microsoft Government Cloud capabilities, the Concourse OMS platform, hotline intake services, and compliance support operations.

41. On January 26, 2021, TMG CEO Elizabeth F. Parker circulated the 5 Star Bi-Weekly Opportunity Review, which again listed Kuhlman as a participant. These activities demonstrated that, even on the eve of TTG's sale to KRC, TMG, TTG, and KRC were actively engaged in cooperative business development and that Kuhlman had direct exposure to TMG's proprietary technology and services. *See* Plt. Exh. 42, 5 Star Letter of Cooperation; Plt. Exh. 43, 5 Star Bi-Weekly Opportunity Review. These exhibits are incorporated as if restated in full herein.

42. TTG was acquired by KR Contracting, Inc. ("KRC") in December 2020. As part of the transition, TMG continued to provide IT and Concourse support while migrating TTG's infrastructure to the Azure Government Community Cloud.

43.     On December 8, 2020, Kuhlman outlined initial integration plans following KRC's acquisition of TTG. In that communication, he stated that Elizabeth F. Parker, TMG's CEO, would be contacted by TTG's HR Director to be briefed on TTG's internal HR systems, while Jamal Parker, TTG's Director of IT, would meet separately to discuss integration of KRC and TTG's IT networks. These distinctions confirmed that Kuhlman understood Concourse and TMG's role were separate from TTG's internal HR functions. *See* Plt. Exh. 44, Director of HR and KR TTG IT Integration.

44.     On December 27, 2020, TTG's Director of Information Technology, Jamal Parker, emailed Kuhlman an "I.T. Notes for the Merge/Migration" memorandum outlining the steps to merge TTG's and KRC's commercial cloud tenants into TTG's GCC tenant. The memorandum detailed plans for email, OneDrive, Teams, SharePoint, device management, and licensing, and specifically reflected TMG's collaboration on the Teams layout. Jamal Parker did not include Concourse in the December migration scope, which directly contradicted Kuhlman's later claims that its migration began in December 2020. *See* Plt. Exh. 45, IT Notes for Merge Migration. This exhibit is incorporated as if restated in full herein.

45.     During the course of transition discussions, TMG's CEO, Elizabeth F. Parker, provided Kuhlman with a demonstration of Concourse. In that meeting, she made it clear that Concourse was TMG's proprietary product, presented for KRC's consideration in future operations. This representation was reinforced in a January 24, 2021, email introducing a TMG subject-matter expert to explain Concourse's customizations. *See* Plt. Exh. 46, Concourse Eval and SME Intro. This exhibit is incorporated as if restated in full herein.

46.    These communications gave TTG and KRC leadership actual knowledge that Concourse was owned and developed by TMG, not TTG, and that it was not part of the systems being migrated.

47.    The December 2020 sale and migration planning thus provided the enterprise, Kreitzer, KG LLC, Kuhlman, TTG, and KRC, with the access and opportunity they later used to displace TMG in 2021, despite their contemporaneous awareness that Concourse was a TMG-owned product excluded from the migration scope.

### 2021 Phase I – Enterprise Sets the Stage (Jan-Feb 2021)

48.    In early 2021, the enterprise comprising Defendants Kayne Kreitzer, Kreitzer Group, LLC ("KG LLC"), Bruce Kuhlman, Trinity Technology Group, Inc. ("TTG"), and KR Contracting, Inc. ("KRC") moved from preparation to execution. Its objective was to displace Tauran Management Group, LLC ("TMG") as TTG's subcontractor, seize administrative control of TTG's Microsoft Government Community Cloud licensing, and misappropriate TMG's proprietary Concourse HRIS/OMS platform for Defendants' own benefit.

49.    On January 26, 2021, Plaintiff's CEO Parker emailed Defendant Kuhlman and TTG's Human Resources Director to introduce a TMG subject-matter expert, Dayna Senter, as the appropriate point of contact for understanding Concourse's customizations. The email explained that Concourse had been developed and modified by TMG beyond Lanteria's base configuration, and that Ms. Senter possessed the specialized expertise to explain both Concourse and the underlying Lanteria platform. This contemporaneous communication was one of multiple written notices to TTG leadership, including Kuhlman, reiterating what Defendants had already been told in prior years, through TMG's 2018 NDA with TTG, and again in the 2020 TTG–TMG Subcontract Agreement and associated deliverables, that

Concourse was TMG's proprietary system and that only TMG personnel possessed the expertise necessary to manage and support it. Just weeks later, despite this continuing notice and history of acknowledgment, Defendants Kreitzer and KG LLC began migrating Concourse without authorization. *See* Plt. Exh. 46, Concourse Eval and SME Intro; *see also* Plt. Exh. 1 and Plt. Exh. 6. These exhibits are incorporated as if restated in full herein.

50.    On February 8, 2021, Defendant TTG executed a Consultant Agreement with KG LLC, an entity that had not yet been legally formed. The agreement tasked Kreitzer and KG LLC with "separating any remaining IT services from current vendor," i.e., TMG, and further obligated KG LLC to assume responsibility for Microsoft licensing effective May 1, 2021, followed by migration of Concourse into a TTG-controlled environment. These duties directly overlapped with TMG's existing subcontracted responsibilities under the 2020 TTG–TMG Subcontract Agreement.

51.    Whether Kreitzer misrepresented KG LLC's legal status to TTG, or TTG knowingly executed the agreement despite KG LLC's nonexistence, the result was the same: a contract executed in furtherance of the enterprise's plan to supplant TMG, reassign TMG's scope of work, and seize control of TMG's proprietary systems under the guise of a new vendor relationship. The February 08, 2021 Consultant Agreement thus became a pivotal step in advancing the enterprise's scheme to displace TMG and unlawfully acquire TMG's intellectual property. *See* Plt. Exh. 47, KG LLC Consulting Agreement dated February 08, 2021; Plt. Exh. 48, KG LLC Entity Information; and Plt. Exh. 49, Fictional Name Reservation for KG LLC. These exhibits are incorporated as if restated in full herein.

**2021 Phase II – Unauthorized Access and Removal (Mar–May 2021)**

52.    Between March and May 2021, the enterprise escalated its conduct from obstruction to direct removal of TMG's access. Although Plaintiff did not know it at the time, discovery later established that the enterprise began unauthorized migration of TMG's systems as early as March 7, 2021. KG LLC has admitted that the migration of the Concourse HRIS/OMS Instance began approximately March 7, 2021 and continued through May 4, 2021. Defendant Kuhlman's July 21, 2021, letter likewise claimed that on March 6, 2021, he directed Jamal Parker to initiate migration and that on March 7, 2021, Kreitzer "began moving all of Trinity's data". *See* Plt. Exh. 19, Kuhlman Letter. This exhibit is incorporated as if restated in full herein.

53.    These statements are contradicted by the contemporaneous Migration SOW and email chain (Jan. 28 – Mar. 12, 2021), which confirm the March 5 "green light" referenced by Kuhlman in his letter, concerned the purchase and shipment of laptops to Trinity's satellite offices as part of the continuing Microsoft 365, GCC migration, not the Concourse system. The same email explicitly stated, "We are currently assessing the level of effort to move over Lanteria & Concourse and will provide a separate time/cost estimate for this," confirming Concourse migration was not authorized. *See* Plt. Exh. 50, Tauran Migration SOW. This exhibit is incorporated as if restated in full herein.

54.    Jamal Parker's March 7 response further clarified that "we won't need the laptops now as we can use the units returned from the old exec team. Also, we currently have someone in Florida so we may be able to do this without a lot of the logistical hurdles." The "someone in Florida" was Kreitzer himself, who was working remotely while on vacation. These contemporaneous communications directly refute Defendants' later claim that Concourse

migration had been authorized and demonstrate that the enterprise's unauthorized access and data migration were already underway by March 7, 2021.

55.    During this same period, Defendant Kreitzer submitted invoices directly to TMG for services that overlapped with both TMG's subcontracted responsibilities and his own obligations under the February 8, 2021 KG LLC–TTG Consultant Agreement. On March 10, 2021, Kreitzer transmitted Invoice 176 to TMG for $1,200 in printer and network support that was already covered under TMG's subcontract with TTG. On April 11, 2021, he transmitted Invoice 179 to TMG for $3,300 in "Migration Services," despite being concurrently contracted to provide those same services directly to TTG. These invoices reflect the enterprise's duplicative billing scheme and Kreitzer's attempt to extract additional payment from TMG for work encompassed within the TTG–TMG subcontract and his own consultant obligations. *See* Plt. Exh. 51, Kreitzer Invoice 176; Plt. Exh. 52, Kreitzer Invoice 179. These exhibits are incorporated as if restated in full herein.

56.    On May 3, 2021, at approximately 12:04 PM (local), a TMG employee reported being locked out of TTG's Microsoft Teams environment. The lockout occurred around the same time TTG was terminating its Director of Information Technology, Jamal Parker. His removal left Plaintiff without an internal contact capable of addressing the sudden loss of access.

57.    Believing the disruption to be administrative, and with no other reliable point of contact inside TTG, Elizabeth Parker reached out to Jim Smith, the executive who had long served as a mentor to TMG and who was a family friend. Call logs reflect three calls between them that afternoon. Two made by Parker, 12:25 PM (21 seconds) and 1:36 PM (47 seconds), and one returned by Jim Smith, 2:14 PM (3 minutes), during which Mr. Smith stated he was

unaware of what had occurred but would look into it and asked to be given until lunch the following day to investigate and respond. *See* Plt. Exh. 53, TTG Lock Out Notification and Plt. Exh. 54, Call Logs. These exhibits are incorporated as if restated in full herein.

58.    On May 18, 2021, TTG Vice President of Finance Aaron Dobbs confirmed in an email that Jim Smith acknowledged the May 3 call and stated, "we had until close of business on 5/4 to respond." This written confirmation demonstrates TTG's contemporaneous awareness of the issue and that Parker reasonably expected clarification from TTG the next day. Smith's professed uncertainty was inconsistent with his position as the TTG executive who had personally signed the February 8, 2021, Consultant Agreement with KG LLC, placing him in a position to know precisely what changes were being made and when. *See* Plt. Exh. 55, Dobbs' Confirmation of Smith Conversation. These exhibits are incorporated as if restated in full herein.

59.    Later that same day (May 03, 2021), at approximately 6:03:55 PM (EDT), Defendant Kreitzer, using his TTG account, caused Microsoft to remove TMG and its reseller partner SYNNEX as delegated administrators of TTG's Microsoft tenant. This action stripped TMG of administrative control and was executed in concert with Kuhlman and TTG management. A confirmation notice of this action was automatically sent to TTG's IT Help Desk email account, which was monitored by TMG's Project Manager. At 9:14 PM, the Project Manager forwarded that notification internally, marking the first time TMG learned that its administrative rights had been revoked. *See* Plt. Exh. 56, Microsoft Confirmation of Delegated Administration. This exhibit is incorporated as if restated in full herein.

60.    Between 7:01 PM and 9:17 PM (EST), TTG's recently terminated Director of IT, Jamal Parker, and Defendant Kreitzer exchanged text messages regarding the sudden loss of

access to TMG's Azure Government Cloud environment. Parker wrote, "It appears that TMG no longer has a azure.us instance. Please tell me I'm mistaken somehow." Kreitzer replied, "That can't be right—what username are you using?" Parker responded that he had used his normal credentials and that it showed "there is no TauranGroup.com domain." Kreitzer answered, "That's not the right format for username. Just a sec—I will look it up."

61.    As the conversation continued, Parker expressed frustration, stating, "I hope you DO understand what a terrible situation this has put us in." Kreitzer replied, "I completely understand, but I hope you see the terrible situation I have been put in as well." Parker responded, "Yes... I think we BOTH should say screw them... what they are doing is wrong... I would have never harmed Trinity." The exchange ended at 9:17 PM, when Parker texted, "I see from the Synnex change, you've made your decision." *See* Plt. Exh. 57, J. Parker-Kreitzer Text Messages. This exhibit is incorporated as if restated in full herein

62.    Later that evening, after learning that TTG's Microsoft licenses appeared "unclaimed" following Kreitzer's removal of TMG as delegated administrator, TMG cancelled the affected licenses on TMG's SYNNEX account at 6:37 PM (PDT) to prevent further unauthorized charges and escalating financial liability to TMG. Defendants have since attempted to misrepresent this protective action as the cause of TTG's temporary email disruption. In truth, that disruption occurred only because Kreitzer's unauthorized removal severed TTG's administrative relationship within Microsoft's system, leaving the licenses without an active partner of record. TMG's cancellation was a good-faith, immediate mitigation measure taken after the unauthorized removal to limit additional financial harm. *See* Plt. Exh. 58, SYNNEX License Cancellation. This exhibit is incorporated as if restated in full herein.

63.    Defendants have likewise mischaracterized the May 3, 2021, text exchange between Jamal Parker and Kreitzer as proof that Plaintiff "knew what was going on." In fact, the exchange was triggered by Parker's discovery that "TMG no longer has a azure.us instance," meaning Tauran's own Azure Government Cloud tenant had suddenly become inaccessible. Lacking notice, documentation, or functioning credentials, and believing Kreitzer, a longtime colleague and friend, might help diagnose the outage, Parker contacted him as the only available technical resource. The conversation that followed reflected confusion, disbelief, and distress, not knowledge or consent. Plaintiff did not understand that Defendants had intentionally removed TMG's administrative access or misappropriated its systems. Those facts emerged only months later through discovery and Defendants' own admissions.

### Phase III: Fallout and Entrenchment (May – Sept 2021)

64.    The events of May 3, 2021, marked the first part of the culmination of the Enterprise's covert takeover of TMG's systems. By the next morning, the effects of those acts became formalized. On May 4, 2021, TTG issued written notice terminating the TTG-TMG subcontract effective May 31, 2021. The notice simultaneously instructed TMG to "ensure a smooth transition of services and licenses," including the Concourse migration and data transfer, even though TMG's administrative access had been removed less than twenty-four hours earlier. *See* Plt. Exh. 59, Trinity Subcontract Termination. This exhibit is incorporated as if restated in full herein.

65.    The termination letter confirmed what the prior day's events had made plain: the Enterprise had already displaced TMG in practice and now sought to legitimize that displacement on paper. At the time of the notice, KG LLC was actively migrating Concourse without authorization and assuming control of Microsoft licensing, while TMG remained

*Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint*—23

contractually bound to safeguard and support the very systems that had been taken. TMG was not yet aware that Kreitzer had formed KG LLC or that it was performing any work for TTG; the entity's existence and activities became known only later through discovery. These contradictory demands exposed the calculated nature of the Enterprise's plan: to exploit TMG's proprietary systems while erasing its contractual role.

66.    Within weeks of TMG's lockout, KG LLC began invoicing TTG directly for Microsoft services, backdating the period of performance to April 1, 2021. These invoices demonstrate the Enterprise's deliberate coordination, reassigning TMG's work to KG LLC while TMG's subcontract remained active, and setting the stage for financial harm that soon followed. *See* Plt. Exh. 60, KGLLC INV 1001; Plt. Exh. 61, KGLLC INV 1002. These exhibits are incorporated as if restated in full herein.

67.    Despite receiving TTG's termination-for-convenience letter, TMG immediately sought to protect TTG's data and ensure an orderly transition. TMG acted in good faith, notwithstanding that its administrative access had already been removed by the Enterprise less than twenty-four hours earlier.

68.    On May 5, 2021, TMG contacted Lanteria for assistance in securing TTG's data. On May 13, 2021, Lanteria confirmed it could help by creating a database backup and erasing TTG's data from TMG's servers once a proper transfer was completed. Lanteria also explained that its support was limited because TMG's Concourse environment included extensive customizations and functionality developed by TMG, its proprietary intellectual property, well beyond Lanteria's standard configuration. This exchange underscored both the unique value of TMG's Concourse adaptations and the Enterprise's misappropriation of those systems while

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—24

TMG remained contractually responsible for them. *See* Plt. Exh. 62, Lanteria DB Export. This exhibit is incorporated as if restated in full herein.

69.     Meanwhile, TTG began conditioning payment on the removal of Concourse-related charges. On May 24, 2021, TTG Vice President of Finance Aaron Dobbs instructed TMG to "remove" such items from its invoices, stating, "Regarding the transfer of Concourse data, we do not require these services and ask that they are removed from the invoice." This communication confirmed TTG's awareness that Concourse-related work was a distinct, billable service owned and performed by TMG. It also demonstrated TTG's intent, consistent with the Enterprise's broader scheme, to deny payment for those proprietary services while continuing to benefit from them. *See* Plt. Exh. 63, Remove Concourse from Invoice. This exhibit is incorporated as if restated in full herein.

70.     The financial consequences of the Enterprise's coordination materialized within weeks. Because TTG failed to cancel its Microsoft license subscriptions through SYNNEX before the required April 17 deadline, TMG remained financially liable for those licenses even after its administrative access had been revoked. By June 10, 2021, SYNNEX invoicing reflected over $10,000.00 owed by TMG for TTG's accounts, while Kreitzer Group, LLC ("KG LLC") was simultaneously billing TTG for the same Microsoft services. *See* Plt. Exh. 64, SYNNEX Invoice. This exhibit is incorporated as if restated in full herein.

71.     Kreitzer, fully aware that SYNNEX required subscription cancellations before the 17th of each month, a policy confirmed in SYNNEX's June 2, 2021 correspondence, orchestrated this overlap intentionally, ensuring that TMG would be charged for services it no longer controlled. TMG's prompt cancellation on May 3, 2021, therefore, represented due diligence to mitigate further charges, though it did not prevent substantial financial loss. This

sequence evidences both causation and knowledge, confirming that the Enterprise's acts imposed direct monetary harm on TMG while enriching Kreitzer and KG LLC. *See* Plt. Exh. 65, SYNNEX Cancellation Policy. This exhibit is incorporated as if restated in full herein.

72.     In July of 2021, Defendants attempted to rewrite the history of these events. In a July 21 letter, Kuhlman falsely asserted that Concourse migration was authorized on March 6 and that TTG's former IT employee, J. Parker, had canceled TTG's licenses on May 3 on TMG's behalf. These assertions were demonstrably false and directly contradicted by Microsoft's confirmation that Kreitzer performed the removal and the contemporaneous Migration SOW and email chain show no authorization for any Concourse migration. *See* Plt. Exh. 19, Kuhlman Letter; Plt. Exh. 50, Migration SOW. These exhibits are incorporated as if restated in full herein.

73.     During this same period, TMG continued acting responsibly to protect its government clients, reporting unauthorized access and data loss to the SEC OIG, DOC OIG, CISA, Microsoft, and DCSA, and on August 27, 2021, by filing an IC3 complaint documenting Kreitzer's deletion and downloading of personally identifiable information (PII) from TMG's Government Cloud. At the time, TMG reasonably believed these issues reflected technical failures and contract disputes. *See* Plt. Exh. 66, DOC Unauthorized Access Notification; Plt. Exh. 67, SEC Unauthorized Access Communication; Plt. Exh. 68, CISA Incident Report; Plt. Exh. 69, Microsoft Abuse Report; Plt. Exh. 70, DCSA Adverse Incident Reports; Plt. Exh. 71, IC3 Complaint. These exhibits are incorporated as if restated in full herein.

74.     Until September 2021, Plaintiff reasonably believed that the issues surrounding Concourse stemmed from technical disruptions and the theft of TTG employment data, not from any deliberate misappropriation of TMG proprietary systems. Plaintiff understood Kreitzer's

removal of administrative access as a betrayal tied to TTG's internal transition, not as evidence of a broader scheme. That understanding changed on September 7, 2021, when a former TTG Benefits Administrator confirmed that Kreitzer had retained a backdoor into TMG's systems after his departure. This revelation shattered Plaintiff's prior assumptions, revealing that Kreitzer's conduct had not merely disrupted access or copied data, it had allowed the Enterprise to maintain hidden administrative control over Concourse itself. Only then did Plaintiff realize that the loss of access was not reversible, that Concourse had been stolen outright, and that the Enterprise's conduct was coordinated, ongoing, and intentional. From that date forward, Plaintiff began to understand the full scope of the scheme and the continuity of the Enterprise's racketeering activities. *See* Plt. Exh. 72, Bates Written Statement. This exhibit is incorporated as if restated in full herein.

75.    By the end of 2021, Defendants' Enterprise had removed TMG as administrator, misappropriated Concourse and related systems, diverted Microsoft license payments through KG LLC, even as TMG remained liable to SYNNEX for the same licenses, and refused to compensate TMG for transition work, which left TMG liable for unpaid invoices and diverted government contract revenues.

76.    Until July 02, 2024, KG LLC continued to bill TTG for work pursuant to the Consultant Agreement executed February 08, 2021. *See* Plt. Exh. 60; Plt. Exh. 61; Plt. Exh. 73A to 73DD1-DD2, KG LLC Microsoft Invoices. These exhibits are incorporated as if restated in full herein.

77.    Defendant Kreitzer, through his corporation KG LLC, also submitted multiple invoices to TTG throughout 2021 and 2022, which represented that he was authorized to bill for

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—27

Concourse. *See* Plt. Exh. 74A-74H, KG LLC Concourse-Specific Invoices. These exhibits are incorporated as if restated in full herein.

CONCOURSE VALUE TO MARKET

78.    Concourse itself was a high value service, which TMG provided to TTG for a discounted price due to TMG and TTG's prior business relationship. According to the Subcontract signed between the parties (specifically, Attachment 1.A). These amounts were at a market discount, as reflected in the BOS Offer made in 2017, which advertised an hourly rate of $90.00 instead of the lower rates in the TTG Subcontract. Adjusted for inflation, by 2022-2023, the BOS licenses and administration of Concourse would have cost:

a.    **Administrator**: $34.25 per license;

b.    **Corporate**: $20.55 per license;

c.    **Ops Management**: $11.42 per license;

d.    **Screener/Employee**: $4.57 per license;

e.    **Concourse Hosting and Support in GCC** (per 410 GB): $2.85 per month;

f.    **Concourse Implementation**: $102.75 per hour;

g.    **Concourse Admin Helpdesk**: $20.76 per hour;

h.    **Concourse IT Helpdesk**: $36.33 per hour;

i.    **Software Development**: $93.41 per hour; and

j.    **Any other hourly function**: $93.41 per hour.

79.    TMG's Concourse HRIS/OMS platform generated significant recurring revenue when deployed to TTG, a contractor with approximately 410 employees. Under the 2020–2021 subcontract, Concourse services were discounted under the mentor-protégé relationship and priced at $268,347.00. The fair market value of those services without discount ranged from

*Tauran Management Group, LLC v. Kreitzer, et al.,* Amended Complaint—28

$280,000.00–$300,000.00 per year, or roughly $683.00 per employee annually. Including Microsoft license resale, TMG's average revenue with TTG approached $400,000.00 per year, or approximately $975.00 per employee annually. This per-employee benchmark demonstrates Concourse's scalable market value:

    a.  For every 100 employees supported, Concourse represented approximately $68,000.00–$97,000.00 per year in revenue.

    b.  A contractor of TTG's size (400–500 employees) would therefore be worth $300,000.00–$500,000.00 annually.

    c.  Larger GovCon clients with 1,000 or more employees would yield $700,000.00–$1 million annually.

80.   Accordingly, Concourse's fair market value was not limited to TTG, but could be readily applied across similarly sized federal contractors, as evidenced by TMG's marketing of Concourse to BOS Security and its inclusion in the Team STSS proposal for San Francisco International Airport.

**TRAVELER'S CLAIMS MANAGEMENT SYSTEM VALUE**

81.   These Traveler's Claims Management System created by TMG also generated ongoing annual revenues and helped to form the foundation of TMG's reasonable business expectancy for future opportunities.

82.   Defendants Kreitzer, Kuhlman, TTG, KRC, and KG LLC had knowledge of TMG's proprietary claims-management solution by virtue of direct involvement with TTG, KRC, and BOS business development collaborations, including, SFO Technical Volume, DOE Portsmouth kickoff meetings, 5-Star pipeline reviews, and subcontractor negotiations. *See* Plt.

Exh. 75, DOE Portsmouth Meeting, Plt. Exh. 43, 5 Star Bi-Weekly Opportunity Review, Plt. Exh. 8, STSS_SFO Technical Volume.

83.    Before Defendants' interference, Plaintiff had a strong probability of securing future economic benefit from Traveler's Claims Management through continued subcontracting with TTG, expansion to other claims administration clients, and additional TSA SPP prime contractors.

84.    Because of Defendants' intentional interference, Plaintiff lost substantial revenues, including no less than $60,000.00 annually in claims-management subcontracting, the SPP business development pipeline, and other contractual opportunities.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION: VIOLATIONS OF 18 U.S.C. § 1962(c)
### (PURSUANT TO 18 U.S.C. § 1964)
### AGAINST DEFENDANTS KAYNE S. KREITZER, BRUCE R. KUHLMAN, KREITZER GROUP LLC, TRINITY TECHNOLOGY GROUP, INC., AND K.R. CONTRACTING, INC.

85.    The allegations contained in the preceding paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

86.    Plaintiff alleges that the Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering activity as set forth in 18 U.S.C. § 1961(1).

87.    As detailed below, TMG alleges two different causes of action for federal RICO violations.  In summary, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, and Section 1962(d) provides relief against those who conspire to violate the Racketeer Influenced Corrupt Organizations Act (RICO). Defendants are liable under these two sections of the statute.

88.    As stated by 18 U.S.C. § 1962(c),

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*See* 18 U.S.C. § 1962 (c).

89. To successfully bring a claim under 18 U.S.C. § 1962(c), Plaintiff must allege: (a) conduct of (b) an enterprise through (c) a pattern (d) of racketeering activity that (e) injured him in his business or property (f) by reason of the foregoing RICO violations. *See Borg v. Warren,* 545 F.Supp.3d 291 (E.D. Va. 2021).

### RICO Enterprise: Parties

90. There was a valid RICO enterprise whose activities (or, conduct) affected interstate commerce at the time the acts alleged occurred.

91. The many parties named in this matter are involved in an enterprise for the purposes of RICO, the "Overarching Enterprise," which consists of all actors, who are arranged, pursuant to 18 U.S.C. § 1961(4), in an association-in-fact.

92. The Overarching Enterprise engaged in activities that affected interstate commerce. In furtherance of the racketeering enterprise, Defendants used interstate wires and electronic communications, including Microsoft Government Cloud, Azure, SharePoint, Teams, SYNNEX reseller accounts, and email transmissions, to misappropriate Plaintiff's proprietary Concourse HRIS/OMS system, to remove Plaintiff as delegated Microsoft Partner, and to submit duplicative invoices. These acts disrupted Plaintiff's performance on federal subcontracts serving agencies and facilities across multiple states, including TSA's SPP airports in Florida, Montana, Mississippi, South Dakota and California, as well as hotline and compliance services for the SEC OIG and DOC OIG. The scheme diverted Microsoft licensing revenues administered through

out-of-state vendors, interfered with nationwide federal contracting opportunities, and corrupted cloud environments hosted across state lines. By targeting government contracts and data systems that are inherently interstate in scope, Defendants' pattern of racketeering activity directly impaired and burdened interstate commerce within the meaning of 18 U.S.C. § 1962(c).

93.    The parties involved in the Overarching Enterprise are:

a.    Kayne S. Kreitzer. Former employee to/consultant of TMG. Kayne Kreitzer directed the operations of the Overarching Enterprise, directly interacted with Plaintiff, committed multiple acts of wire fraud to further the aims of the Enterprise, and further, participated in access device fraud, theft of trade secrets, and interstate transportation of stolen property. The Overarching Enterprise has unlawfully obtained at least $1,089,897.02 in expected Concourse profits as a result of the acts of Kayne S. Kreitzer and other parties and/or entities so identified herein.

b.    Bruce R. Kuhlman. Owner of TTG and CEO of KRC. Bruce R. Kuhlman directed the operations of the Overarching Enterprise and/or ratified its actions, directly interacted with Plaintiff, made written misrepresentations to government and private sector interested parties to further the aims of the Overarching Enterprise, and further conspired with Kreitzer and KG LLC in his individual capacity and in his directorial capacity at TTG and KRC, in order to fulfill the goals of the Overarching Enterprise. The Overarching Enterprise has unlawfully obtained at least $1,089,897.02, which belonged to Plaintiff as a result of the acts of Bruce R. Kuhlman and other parties and/or entities so identified herein.

c.    Trinity Technology Group, Inc. Former client of TMG. TTG directly participated in the operation and management of the Overarching Enterprise (or ratified behavior of the Overarching Enterprise), directly interacted with Plaintiff, and committed predicates of wire fraud and the knowing receipt of stolen trade secrets, in order to fulfill the goals of the Overarching Enterprise. Trinity Technology Group, Inc. also ratified acts taken by Kreitzer, KG LLC, Kuhlman, and KRC to further the aims of the Overarching Enterprise. This led to Trinity Technology Group, Inc. receiving substantial benefits from the Enterprise, including the Concourse system and a pecuniary benefit of at least $1,089,897.02 in saved costs to legally purchases rights to use Concourse from TMG.

d.    Kreitzer Group LLC. Shell corporation created by Kreitzer to avoid liability. KG LLC directly participated in the operation and management of the Overarching Enterprise (and continues to do so) and has also ratified its behavior. KG LLC has interacted personally with Plaintiff through its agent and sole Member-Manager Kreitzer, committed multiple acts of wire fraud, interstate transportation of stolen property, and to further the aims of the Overarching Enterprise, ratified those acts taken by Kreitzer. This has led to Kreitzer Group LLC receiving substantial benefits from the Overarching Enterprise, including pecuniary benefits for taking

over TMG's sub-contract, as well as enhanced reputation in the GovCon market as a result of its association with KRC and TTG.

e. K.R. Contracting, Inc. Entity that owns TTG. K.R. Contracting, Inc. has directly participated in the operation/management of the Overarching Enterprise (and continues to do so) and also ratified its behavior. K.R. Contracting, Inc. has interacted personally with Plaintiff through its agent Kuhlman, committed wire fraud, and knowingly received stolen trade secrets, in order to fulfill the goals of the Overarching Enterprise. This led to K.R. Contracting, Inc. receiving substantial benefits from the Enterprise, including the Concourse system and a pecuniary benefit of at least $1,089,897.02 in saved costs to legally purchase rights to use Concourse from TMG.

94. The Overarching Enterprise, which engages in and whose activities affect interstate commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Overarching Enterprise is an ongoing one, which functions as a continuing unit with separate roles and responsibilities. The predicate acts listed below are not an exhaustive list, and continue to occur, since Concourse continues to be used by TTG. Kreitzer/KG LLC invoiced TTG for services related to the use of the stolen product (Concourse) as late as November of 2022, and evidence of TTG and members of the Overarching Enterprise's reliance on Concourse for employees remains to the present day. It does not appear as if the acts will end soon.

95. While the parties implicated in this count all have participated in and continue to participate in the conduct of the Overarching Enterprise, they also have an existence separate and distinct from the Overarching Enterprise. Further, the Overarching Enterprise exists separate and distinct from any pattern of racketeering activity in which the parties implicated in this count engage.

96. Defendants Kreitzer, Kuhlman, KG LLC, TTG, and KRC, as members of the

Overarching Enterprise, serve a common purpose to, among other things, obtain pecuniary benefits by taking TMG's intellectual property and proprietary information unlawfully, as described in Paragraphs ¶¶ 13-15, ¶¶ 49-50, and ¶¶ 52-65 of this Amended Complaint.

97.    Defendants Kreitzer, Kuhlman, KG LLC, TTG, and KRC (as the Overarching Enterprise's members) benefit from this common purpose by receiving the benefits described in the Amended Complaint.

### Racketeering (Predicate Acts)

98.    The members of the Overarching Enterprise conduct and participate in the conduct of the affairs of the Overarching Enterprise through a pattern of racketeering activity that has consisted of numerous and repeated violations of federal statutes (18 U.S.C. §§ 1028, § 1343, § 1344, §§ 1832(a)(2); (3), § 2314)).

99.    Each party has committed at least two predicate acts within a ten-year time period.

100.    Kayne S. Kreitzer has committed the following predicate acts on the behalf of the Overarching Enterprise (hereinafter "Kayne S. Kreitzer Predicate Acts" collectively):

a.        **Act 1**, February 08, 2021, **by electronic means**, located at Kayne S. Kreitzer's residence, address 430 N Henry St, Apt. B, Alexandria, VA 22314: wire fraud (defined in 18 U.S.C. § 1343). On this date, Kreitzer executed a consultant agreement with TTG as "Kreitzer Group, LLC," transmitted electronically, despite Kreitzer Group not yet existing as a legal entity. The agreement falsely presented Kreitzer Group, LLC as a legitimate organization capable of providing contract services and obligated Kreitzer to provide "guidance on separation of any remaining IT services from current vendor," i.e., TMG. This Consultant Agreement conveyed false and fraudulent information and directly overlapped with TMG's contractual responsibilities under its Subcontract with TTG, thereby constituting a deliberate act of self-dealing. Kreitzer bound TTG to use his purported entity for the very services TMG was obligated to provide under the SOW, including Microsoft license administration, and system access management. The effect was to induce TTG to replace TMG with Kreitzer/KG LLC, while TMG continued to provide the labor and infrastructure that Kreitzer/KG LLC sought to appropriate. The Consultant Agreement furthered a scheme to defraud TMG by obligating it to continue supporting TTG while Kreitzer positioned himself to strip TMG of its intellectual property, including Concourse, and divert the subcontract's financial benefits to himself and his co-

conspirators for the benefit of the Overarching Enterprise. Kreitzer/KG LLC transmitted this agreement through interstate wire facilities (i.e., email and/or Government Cloud servers) to further the above-described scheme to defraud TMG of its Intellectual Property (Concourse) and effectively poach its sub-contract with TTG. Mr. Kreitzer participated in this act knowingly, as his signature is clearly affixed to the Agreement, despite Kreitzer Group, LLC's not being in existence at the time. In addition, Mr. Kreitzer acted with the specific intent to harm TMG and to further the aims of the Overarching Enterprise by, *inter alia*, guaranteeing TTG the benefit of Concourse without paying TMG, denying TMG more than $533,000.00 in subcontract payments over the next two years pursuant to TTG's Sub-Contract with TMG, and securing for himself professional and financial gain through his association with a larger company in the GovCon industry.

b.    **Act 2, Primary Predicate Act:** 05/03/2021, located **electronically,** at Kayne S. Kreitzer's residence, address 430 N Henry St, Apt. B, Alexandria, VA 22314. Wire fraud (defined in 18 U.S.C. § 1343). Kreitzer's misuse of SYNNEX/Microsoft administrative rights to strip TMG of its delegated partner status was part of a scheme to defraud TMG. While using electronic credentials in a manner unauthorized by TMG, Kreitzer misrepresented to TMG servers that he was duly authorized to strip TMG's delegated partner status. The tasks required to complete this act were done electronically, through TMG and TTG's cloud-hosted environments, and passed through interstate wire facilities.[3] By committing this act, Kreitzer benefited economically (as he had signed the Consultant Agreement identified in Kayne S. Kreitzer Predicate Act 1) and furthered the aims of the Overarching Enterprise; when Kreitzer performed this action, it damaged TTG's access to its Microsoft licenses as well, and TTG later blamed this damage on Jamal Parker, in effect permitting TTG help cover Kreitzer's tracks.

c.    **Act 2 (Secondary Predicate):** fraud and related activity in connection with access devices (defined in 18 U.S.C. § 1029). On May 3, 2021, by means of interstate wires, Defendant Kreitzer, acting from his residence and KG LLC's principal place of business at 430 N. Henry St., Apt. B, Alexandria, VA 22314, and using both his TTG user account and SYNNEX administrative reseller privileges that had been entrusted to him while serving as TMG's consultant, knowingly and with intent to defraud, removed TMG as the delegated Microsoft Partner of Record for TTG's Microsoft tenant. As described in 18 U.S.C. § 1029(e)(1), an "access device" includes account numbers, login credentials, and any means of account access used to obtain something of value. Defendant Kreitzer's use of TTG's Microsoft login credentials and SYNNEX administrative authority to remove TMG from its role as TTG's delegated administrator constituted unauthorized use of an access device. Specifically, Defendant Kreitzer violated 18 U.S.C. § 1029(a)(2) by using credentials obtained and utilized with the intent to defraud TMG to obtain something of value, namely: (1) exclusive administrative control over TTG's Microsoft licensing tenant, depriving TMG of its reseller and administrative rights; (2) diversion of Microsoft revenue streams, within weeks, Kreitzer's newly-formed entity, Kreitzer Group, LLC ("KG LLC"), began invoicing TTG directly for Microsoft services,

---

[3] Server data travels in "packets." According to Azure, or the Microsoft Government Cloud, "While data in transit between two points within your chosen Geography will typically remain in that Geography, it isn't possible to guarantee this outcome 100% of the time because of the way networks automatically reroute traffic to avoid congestion or bypass other interruptions." *See* "Data in Transit," *https://learn.microsoft.com/en-us/azure/azure-government/documentation-government-overview-wwps.* Accessed September 20, 2025, 6:41 PM.

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—35

backdating the period of performance to April 2021, even as TMG remained under subcontract through May 31, 2021; and (3) shifting of financial liability, because Trinity's license cancellations missed SYNNEX's deadlines, TMG was left liable for over $10,000 in licensing invoices in May and June 2021, while Kreitzer simultaneously billed TTG for those same licenses through KG LLC. by removing TMG's access, Kreitzer positioned KG LLC to justify Trinity's May 4, 2021 "termination for convenience" and to conceal the ongoing theft of Concourse. Through this unauthorized use of an access device, Kreitzer obtained tangible and intangible property interests of substantial value, including licensing revenues, control of TTG's Microsoft environment, and business opportunities that had belonged to TMG. These actions furthered the aims of the Overarching Enterprise by damaging TMG's relationship with TTG in a manner that allowed TTG and its co-conspirators to separate from TMG under the guise of convenience, while simultaneously paving the way for Defendants' later misappropriation of Concourse. *See* Plt. Exh. 56, Microsoft Confirmation; Plt. Exh. 60, KGLLC INV 1001; Plt. Exh. 61, KGLLC INV 1002; Plt. Exh. 64, Synnex Invoice; and Plt. Exh. 59, Trinity Subcontract Termination. These exhibits are incorporated as if restated in full herein.

        d.        **Act 3**: On May 21 and May 22, 2021, **electronically**, while located in Alexandria, VA. Kreitzer accessed TMG's Microsoft Government Cloud tenant using credentials from his prior role as TMG's consultant without authorization. Kreitzer downloaded confidential and proprietary data, including TMG's customized Concourse HRIS/OMS system, associated employee records, and Microsoft tenant configurations and files—collectively constituting TMG's trade secrets and intellectual property. Kreitzer then gave the Concourse data to TTG as part of a contract signed with TTG as the entity KG LLC. Kreitzer, using KG LLC as a shield, violated § 1832(a)(1) when he: (a) stole and/or without authorization appropriated the relevant Concourse data or information; and (b) obtained said data through artifice or deception (by using a "backdoor" account associated with TMG after earlier losing access for prior unauthorized access, Plt. Exh. 72, Bates Statement). Kreitzer intended to convert the trade secret, or Concourse, for his own use. This is evidenced by Kreitzer's prior contract with TTG as KG LLC to, *inter alia*, "separate from current vendor" (TMG) and his use of invoices for migration of Concourse to TTG systems despite Concourse being TMG's IP. Kreitzer also committed these acts knowingly, as to commit the acts, Kreitzer needed to input specific information and perform specific activities. These trade secrets were used in a trade or a service that affects interstate commerce. Furthermore, the above-mentioned documentary evidence of Kreitzer's Sub-Contract with TTG through the shell company KG LLC and Kreitzer's later economic benefit from the illicit use of the IP demonstrate that Kreitzer knew the trade secrets were TMG's, and that the theft of the trade secrets would and could injure TMG as the owner of the trade secrets in the form of the amounts Kreitzer invoiced TTG in order to perform tasks using the IP.

        i.   **Act 3: Secondary Predicate Act**. Kreitzer, using KG LLC as a shield, also violated 18 U.S.C. § 1832(a)(2) when he (a) without authorization downloaded and/or copied Concourse data onto the TTG cloud-hosted environment; and (b) without authorization destroyed the Concourse data remaining on the TMG cloud-hosted environment. Kreitzer intended to convert the trade secret, or Concourse, for his own use. This is evidenced by Kreitzer's prior contract with TTG as KG LLC to, *inter alia*, "separate from current vendor" (TMG) and his use of invoices for migration of Concourse to TTG systems despite Concourse being TMG's IP. Kreitzer also committed these acts knowingly, as to commit the acts, Kreitzer

needed to input specific information and perform specific activities. These trade secrets were used in a trade or a service that affects interstate commerce. Furthermore, the above-mentioned documentary evidence of Kreitzer's contract with TTG through the shell company KG LLC and Kreitzer's later economic benefit from the illicit use of the IP demonstrate that Kreitzer knew the trade secrets were TMG's, and further, knew the theft of the trade secrets would injure TMG as the owner of the trade secrets in the form of the amounts for which Kreitzer, as KG LLC, invoiced TTG in order to perform tasks using the IP.

e.     **Act 4**: May 21 and May 22, 2021, Kayne S. Kreitzer participated in the interstate transportation of stolen property, as defined in 18 U.S.C. § 2314, when he transported the stolen Concourse intellectual property across multiple state lines using the Internet. Concourse, as described in the Complaint, is an online system used by employees at TTG-contracted airports in multiple states, including Florida. In order to upload all Concourse information into TTG's system, Kreitzer needed to transmit data and signals across multiple state lines. This conferred the benefit of giving the Overarching Enterprise the Concourse intellectual property, while at the same time, destroying TMG's access to its own property.

101.   <u>Bruce R. Kuhlman</u> committed the following predicate acts on behalf of the

Overarching Enterprise (hereinafter "Bruce R. Kuhlman Predicate Acts"):

a.   **Act 1**: May 21 and May 22, 2021, 223 N Prospect St #105, Hagerstown, MD 21740: knowingly receiving and using stolen trade secrets (defined in 18 U.S.C. § 1832(a)(3)). On these dates, Kuhlman received the stolen Concourse IP from Kreitzer, with the intention of converting Concourse to his own use, for the benefit of his companies. Concourse itself was used, and continued to be used by, Kuhlman and other members of the Overarching Enterprise in matters relating to or affecting interstate commerce. The Concourse IP gave Kuhlman economic benefits by (a) eliminating competition in the GovCon market and (b) ensuring that Kuhlman and his companies acquired the IP without paying the IP's rightful owner for its use. Furthermore, Kuhlman knew well that the theft of the trade secrets would injure TMG, especially given TMG's forward-moving position in the GovCon market, and yet, he still intentionally received the stolen trade secrets. This is evidenced by Kuhlman's ratification of TTG's payments for Kreitzer/KG LLC's acts related to Concourse. Kuhlman also conspired with KG LLC and Kreitzer to do so, as evidenced by the February 08, 2021 Contract with a then-nonexistent KG LLC to provide "maintenance of" and "migration of" Concourse. *See* Plt. Exh. XX, KG LLC Consultant Agreement dated Feb. 08, 2021. This exhibit is hereinafter incorporated as if restated in full.

b.   **Act 2**, July 21, 2021, electronically, from Maryland: wire fraud (defined in 18 U.S.C. § 1343). On or about July 21, 2021, Defendant **Bruce Kuhlman**, acting as CEO of KR Contracting and owner of Trinity Technology Group, transmitted by electronic mail a letter across state lines from Maryland to Virginia (the "Kuhlman Letter"). In furtherance of the Enterprise's scheme to defraud, the Kuhlman Letter contained multiple knowingly false and misleading statements, including but not limited to: (a) that Trinity Technology Group was the originator and rightful owner of the Concourse HRIS/OMS system; (b) that Plaintiff mishandled the May 2021 migration of TTG's Microsoft environment and were responsible for resulting

service disruptions; and (c) that Defendant Kreitzer's removal of Plaintiff as delegated administrator and access to data in May 2021 constituted authorized system administration rather than unauthorized access and deletion of data. Each of these statements was false. The Migration SOW of March 2021 established Plaintiff as the originator and administrator of the Concourse and Microsoft GCC migration. The Timeline of Events (May 21–22, 2021) shows Kreitzer accessed Plaintiff's GCC environment using credentials created during his prior employment, and downloaded and deleted data without authorization. Defendant KG LLC has admitted that TTG was the sole client of KG LLC, and that Concourse and Microsoft systems were transferred from Plaintiff, not originated by TTG. Kuhlman created this letter in direct response to a complaint filed with the Defense Information Systems Agency (DISA) Office of Inspector General, and did so to mislead federal oversight agencies by fabricating a false narrative that TTG originated Concourse and that Plaintiff was at fault for the May 2021 disruption(s). By transmitting the Kuhlman Letter via interstate wire communications, Kuhlman and the Enterprise furthered their scheme to defraud Plaintiff, misled federal oversight authorities, and caused injury to Plaintiff, including: (a) reputational harm with government agencies and stakeholders; (b) the loss of Plaintiff's subcontract with TTG (terminated May 4, 2021); and (c) loss of future government contract opportunities as a direct result of reputational damage and the Enterprise's continued misappropriation of Plaintiff's intellectual property. The July 21, 2021 Kuhlman Letter therefore forms part of the pattern of racketeering activity undertaken by the Enterprise in violation of 18 U.S.C. § 1962(c) and (d).

102.   Trinity Technology Group, Inc. committed and/or ratified the following predicate acts on the behalf of the Overarching Enterprise (hereinafter "Trinity Technology Predicate Acts"):

a.   **Act 1**: May 21 and May 22, 2021, 10687 Gaskins Way, Ste 200, Manassas, VA 20109: knowingly receiving and using stolen trade secrets (defined in 18 U.S.C. § 1832(a)(3)). On these dates, TTG received the stolen Concourse IP from Kreitzer, with the intention of converting Concourse to its own use. Concourse itself was used, and continued to be used by, TTG and other members of the Overarching Enterprise in matters relating to or affecting interstate commerce. The Concourse IP gave TTG economic benefits by (a) eliminating competition in the market and (b) ensuring that TTG acquired the IP without paying the IP's rightful owner for its use. Furthermore, TTG knew well that the theft of the trade secrets would injure TMG, especially given TMG's forward-moving position in the GovCon market, and yet, TTG still intentionally received the stolen trade secrets. This is evidenced by TTG's ratification of and payment for Kreitzer/KG LLC's acts related to Concourse, as well as the multiple written invoices demonstrating TTG's payments to KG LLC for "administering" a system TTG knew was stolen from TMG. TTG also conspired with KG LLC and Kreitzer to do so, as evidenced by the February 08, 2021 Contract with a then nonexistent KG LLC to provide "maintenance of" and "migration of" Concourse. *See* Plt. Exh. 47, KG LLC Consultant Agreement dated Feb. 08, 2021. This exhibit is hereinafter incorporated as if restated in full.

b.   **Act 2**, July 21, 2021, electronically, from Maryland: wire fraud (defined in 18

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—38

U.S.C. § 1343). On or about July 21, 2021, Defendant Bruce Kuhlman, acting as CEO of KR Contracting and owner of Trinity Technology Group, transmitted by electronic mail a letter across state lines from Maryland to Virginia (the "Kuhlman Letter"). Kuhlman acted in his capacity as the owner of Trinity Technology Group—or, in individual and official capacities. In furtherance of the Enterprise's scheme to defraud, the Kuhlman Letter contained multiple knowingly false and misleading statements, including but not limited to: (a) that Trinity Technology Group was the originator and rightful owner of the Concourse HRIS/OMS system; (b) that Plaintiff mishandled the May 2021 migration of TTG's Microsoft environment and were responsible for resulting service disruptions; and (c) that Defendant Kreitzer's removal of Plaintiff as delegated administrator and access to data in May 2021 constituted authorized system administration rather than unauthorized access and deletion of data. Each of these statements was false. The **Migration SOW of March 2021** established Plaintiff as the originator and administrator of the Concourse and Microsoft GCC migration. The **Timeline of Events (May 21–22, 2021)** shows Kreitzer accessed Plaintiff's GCC environment using credentials created during his prior employment, and downloaded and deleted data without authorization. Defendant KG LLC has admitted that TTG was the sole client of KG LLC, and that Concourse and Microsoft systems were transferred from Plaintiff, not originated by TTG. Kuhlman created this letter in direct response to a complaint filed with the Defense Information Systems Agency (DISA) Office of Inspector General, and did so to mislead federal oversight agencies by fabricating a false narrative that TTG originated Concourse and that Plaintiff was at fault for the May 2021 disruption(s). By transmitting the Kuhlman Letter via interstate wire communications, Kuhlman and the Enterprise furthered their scheme to defraud Plaintiff, misled federal oversight authorities, and caused injury to Plaintiff, including: (a) reputational harm with government agencies and stakeholders; (b) the loss of Plaintiff's subcontract with TTG (terminated May 4, 2021); and (c) loss of future government contract opportunities as a direct result of reputational damage and the Enterprise's continued misappropriation of Plaintiff's intellectual property. The July 21, 2021 Kuhlman Letter therefore forms part of the pattern of racketeering activity undertaken by the Enterprise in violation of 18 U.S.C. § 1962(c) and (d).

103.  Kreitzer Group, LLC committed and/or engaged in the following

predicate acts on behalf of the Overarching Enterprise (hereinafter "KG LLC Predicate Acts"):

a.  **Act 1**: February 08, 2021, **by electronic means**, located at Kayne S. Kreitzer's residence, address 430 N Henry St, Apt. B, Alexandria, VA 22314: wire fraud (defined in 18 U.S.C. § 1343). On this date, Kreitzer executed a consultant agreement with TTG as "Kreitzer Group, LLC," transmitted electronically, despite Kreitzer Group not yet existing as a legal entity. The agreement falsely presented Kreitzer Group, LLC as a legitimate organization capable of providing contract services and obligated Kreitzer to provide "guidance on separation of any remaining IT services from current vendor," i.e., TMG. This Consultant Agreement conveyed false and fraudulent information and directly overlapped with TMG's contractual responsibilities under its Subcontract with TTG, thereby constituting a deliberate act of self-dealing. Kreitzer bound TTG to use his purported entity for the very services TMG was obligated to provide under the SOW, including Microsoft license administration, and system access management. The effect was to induce TTG to replace TMG with Kreitzer, while TMG continued to provide the labor and infrastructure that Kreitzer sought to appropriate. The

Consultant Agreement furthered a scheme to defraud TMG by obligating it to continue supporting TTG while Kreitzer positioned himself to strip TMG of its intellectual property, including Concourse, and divert the subcontract's financial benefits to himself and his co-conspirators for the benefit of the Overarching Enterprise. Kreitzer transmitted this agreement through interstate wire facilities (i.e., email and/or Government Cloud servers) to further the above-described scheme to defraud TMG of its Intellectual Property (Concourse) and effectively poach its sub-contract with TTG. Mr. Kreitzer participated in this act knowingly, as his signature is clearly affixed to the Agreement, despite Kreitzer Group, LLC's not being in existence at the time. In addition, Mr. Kreitzer acted with the specific intent to harm TMG and to further the aims of the Overarching Enterprise by, *inter alia*, guaranteeing TTG the benefit of Concourse without paying TMG, denying TMG more than $533,000.00 in subcontract payments over the next two years pursuant to TTG's Sub-Contract with TMG, and securing for himself professional and financial gain through his association with a larger company in the GovCon industry.

b. **Act 2**: On June 19, 2021, KG LLC committed an act of wire fraud (defined in 18 U.S.C. § 1343) when it transmitted, by electronic means, a false invoice to fellow member of the Overarching Enterprise, TTG, which claimed performance of services already performed by TMG, during TMG's contractual period with TTG, and was used to benefit the Overarching Enterprise. This act was knowingly false, as it identified work having been performed on April 30, 2021 that had been completed by TMG, and further, was used to deny TMG what it was contractually owed (in this invoice, $434.27). By representing that KG LLC had the requisite authority to act based on a fraudulent contract, and by making this invoice after TTG had terminated its contract with TMG for a period within the contemplated period of performance, KG LLC participated in a scheme or artifice to defraud in that, by making these false charges, KG LLC obtained a financial benefit, while taking what TMG was rightfully owed. KG LLC did so knowingly, while its sole member, Kreitzer, held a position of confidence with TMG.

c. **Act 3**: On June 19, 2021, KG LLC also transmitted a false invoice for the month of May, 2021. This invoice was transmitted electronically, and was an act of wire fraud (as defined in 18 U.S.C. § 1343). This act was knowingly false, as it identified work having been performed on May of 2021 that had been completed by TMG, and further, was used to deny TMG what it was contractually owed (in this invoice, $6,696.00). By representing that KG LLC had the requisite authority to act based on a fraudulent contract, and by making this invoice after TTG had terminated its contract with TMG for a period within the contemplated period of performance, KG LLC participated in a scheme or artifice to defraud in that, by making these false charges, KG LLC obtained a financial benefit, while taking what TMG was rightfully owed. KG LLC did so knowingly, while its sole member, Kreitzer, held a position of confidence with TMG.

d. **Act 4**: On August 15, 2021, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to the misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of eight (8) hours, at the hourly rate of $85.00 (total amount $680.00), for Kreitzer's "IT Consulting Services" related to "Concourse Admin." This is a misrepresentation,

made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

e. **Act 5**: On August 23, 2021, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to the misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of ten (10) hours, at the hourly rate of $85.00 (total amount $850.00), for Kreitzer's "IT Consulting Services" related to "Concourse server maintenance and career site updates/troubleshooting." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

f. **Act 6**: On September 06, 2021, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of five (5) hours, at the hourly rate of $85.00 (total amount $425.00), for Kreitzer's "IT Consulting Services" related to "Concourse server maintenance and career site updates/troubleshooting, updates/troubleshooting/ZipRecruiter troubleshooting." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

g. **Act 7**: On October 03, 2021, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of five (5) hours, at the hourly rate of $85.00 (total amount $425.00), for Kreitzer's "IT Consulting Services" related to "Concourse server maintenance." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false

pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

h. **Act 8**: On October 24, 2021, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of ten (10) hours, at the hourly rate of $85.00 (total amount $850.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

i. **Act 9:** On November 14, 2021, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of twelve (12) hours, at the hourly rate of $85.00 (total amount $1,020.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

j. **Act 10**: On December 19, 2021, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of twenty-two (22) hours, at the hourly rate of $85.00 (total amount $1,870.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance, Training, Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—42

related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

k.    **Act 11**: On January 16, 2022, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of twelve (12) hours, at the hourly rate of $85.00 (total amount $1,020.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

l.    **Act 12**: Also on January 16, 2022, through use of a separate written instrument, KG LLC transmitted another invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of eight (8) hours, at the hourly rate of $85.00 (total amount $680.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

m.    **Act 13:** On March 12, 2022, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of ten (10) hours, at the hourly rate of $85.00 (total amount $850.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—43

transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

n. **Act 14**: On June 19, 2022, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of twelve (12) hours, at the hourly rate of $85.00 (total amount $1,020.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

o. **Act 15**: On August 01, 2022, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of six (6) hours, at the hourly rate of $85.00 (total amount $510.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

p. **Act 16**: On November 07, 2022, KG LLC transmitted an invoice from Member-Manager Kreitzer's home at 430 N Henry St, Apt #2, Alexandria, VA 22314 by electronic means to TTG at its principal place of business, 10687 Gaskins Way, Ste 201, Manassas, VA 20109. This act constituted an act of wire fraud due to misrepresentations made in this invoice, which inured to the benefits of Kreitzer, KG LLC, TTG, Kuhlman, and KRC. The invoice identifies a total of six (6) hours, at the hourly rate of $85.00 (total amount $510.00), for Kreitzer's "IT Consulting Services" related to "Concourse Maintenance/Training/Development." This is a misrepresentation, made as part of a scheme to defraud, in order to permit KG LLC to obtain money under false pretenses. TMG was the rightful owner of Concourse; after KG LLC's only member, Kreitzer, stole TMG's system, KG LLC sold services related to management of that system to TTG, and profited from representing that it had the authority to do so. KG LLC transmitted this false information knowingly, to obtain the benefits above-described, as is

evidenced by KG LLC's intentional transmission of this invoice, and the payment made to KG LLC.

104.  K.R. Contracting, Inc. committed or ratified through agent Kuhlman the following predicate acts on the behalf of the Overarching Enterprise (hereinafter "Kuhlman-KRC Predicate Acts"):

a.  **Act 1**, May 21 and May 22, 2021, 223 N Prospect St #105, Hagerstown, MD 21740: knowingly receiving and using stolen trade secrets (defined in 18 U.S.C. § 1832(a)(3)). On these dates, KRC, through its CEO, Kuhlman, received the stolen Concourse IP from Kreitzer, with the intention of converting Concourse to his own use, for the benefit of his companies. Concourse itself was used, and continued to be used by, KRC/Kuhlman and other members of the Overarching Enterprise in matters relating to or affecting interstate commerce. The Concourse IP gave KRC/Kuhlman economic benefits by (a) eliminating competition in the GovCon market and (b) ensuring that KRC and its subsidiary company TTG acquired the IP without paying the IP's rightful owner for its use. Furthermore, KRC/Kuhlman knew well that the theft of the trade secrets would injure TMG, especially given TMG's forward-moving position in the GovCon market, and yet, he still intentionally received the stolen trade secrets. This is evidenced by KRC/Kuhlman's ratification of TTG's payments for Kreitzer/KG LLC's acts related to Concourse. KRC/Kuhlman also conspired with KG LLC and Kreitzer to do so, as evidenced by the February 08, 2021 Contract with a then-nonexistent KG LLC to provide "maintenance of" and "migration of" Concourse. *See* Plt. Exh. 47, KG LLC Consultant Agreement dated Feb. 08, 2021. This exhibit is hereinafter incorporated as if restated in full.

b.  **Act 2**, July 21, 2021, electronically, from Maryland: wire fraud (defined in 18 U.S.C. § 1343). On or about July 21, 2021, Defendant Bruce R. Kuhlman, acting in his individual capacity, as well as in his capacities as the CEO of KR Contracting and owner of Trinity Technology Group, transmitted by electronic mail a letter across state lines from Maryland to Virginia (the "Kuhlman Letter"). Kuhlman committed this act in his official and individual capacities—or, as the CEO of KRC, Owner of TTG, *and* as his own person. In furtherance of the Enterprise's scheme to defraud, the Kuhlman Letter contained multiple knowingly false and misleading statements, including but not limited to: (a) that Trinity Technology Group was the originator and rightful owner of the Concourse HRIS/OMS system; (b) that Plaintiff mishandled the May 2021 migration of TTG's Microsoft environment and were responsible for resulting service disruptions; and (c) that Defendant Kreitzer's removal of Plaintiff as delegated administrator and access to data in May 2021 constituted authorized system administration rather than unauthorized access and deletion of data. Each of these statements was false. The Migration SOW of March 2021 established Plaintiff as the originator and administrator of the Concourse and Microsoft GCC migration. The Timeline of Events (May 21–22, 2021) shows Kreitzer accessed Plaintiff's GCC environment using credentials created during his prior employment, and downloaded and deleted data without authorization. Defendant KG LLC has admitted that TTG was the sole client of KG LLC, and that Concourse and Microsoft systems were transferred from Plaintiff, not originated by TTG. Kuhlman created this letter in direct response to a complaint filed with the Defense Information Systems Agency (DISA) Office of Inspector General, and did so to mislead federal oversight agencies by

fabricating a false narrative that TTG originated Concourse and that Plaintiff was at fault for the May 2021 disruption(s). By transmitting the Kuhlman Letter via interstate wire communications, Kuhlman and the Enterprise furthered their scheme to defraud Plaintiff, misled federal oversight authorities, and caused injury to Plaintiff, including: (a) reputational harm with government agencies and stakeholders; (b) the loss of Plaintiff's subcontract with TTG (terminated May 4, 2021); and (c) loss of future government contract opportunities as a direct result of reputational damage and the Enterprise's continued misappropriation of Plaintiff's intellectual property. The July 21, 2021 Kuhlman Letter therefore forms part of the pattern of racketeering activity undertaken by the Enterprise in violation of 18 U.S.C. § 1962(c) and (d).

105.   In addition, Trinity Technology Group, Inc. ratified the following Kreitzer Group LLC Predicate Acts when it paid for services it knew Kreitzer was not authorized to perform, using a system stolen from TMG for the benefit of the Overarching Enterprise: KG LLC Predicate Acts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16. Trinity Technology Group, Inc., as pled in ¶¶ 20-23 and ¶¶ 39-49 of this Amended Complaint, knew well that Concourse was the property of TMG, and despite this, paid KG LLC large amounts of money for a service that belonged to TMG.

106.   Kayne S. Kreitzer, Bruce R. Kuhlman, Kreitzer Group LLC, Trinity Technology Group, Inc., and K.R. Contracting, Inc., as members of the Overarching Enterprise, engaged in a pattern of related and continuous predicate acts and are likely to continue to do so. The predicate acts constituted and constitute numerous unlawful activities, each conducted with the common purpose of defrauding Plaintiff and obtaining Plaintiff's Intellectual Property, as well as crippling Plaintiff's ability to compete in the GovCon market. The predicate acts were related— not isolated events. To this date, the acts continue; invoices for Concourse continue until at least November of 2022, and Concourse itself remains advertised on TTG's website as a service offered to Employees.

107.   By reason of and as a result of the conduct of Kayne S. Kreitzer, Bruce R.

Kuhlman, Kreitzer Group LLC, Trinity Technology Group, Inc., and K.R. Contracting, Inc. and the pattern of racketeering activity alleged on behalf of the Overarching Enterprise. Plaintiff has been injured in its property, particularly in its ownership of Concourse as intellectual property.

108.  Between 2015 and 2020, TMG invested substantial time, capital, and technical expertise developing the Concourse HRIS/OMS system as a proprietary and trade secret platform built upon, but far exceeding, the licensed Lanteria base system. TMG customized Concourse for the specialized compliance and operational needs of federal contractors, including modules for OIG Records Management and Traveler's Claims Administration, and hosted the entire suite within TMG's Microsoft Government Cloud environment.

109.  Through its 2015 Authorized Partner Agreement with Lanteria, TMG was granted the right to market, sell, and customize Lanteria software within the United States, and TMG's resulting derivative works, branding, data structures, and source configurations were the product of its own labor and proprietary design. Defendants' acts in 2021, removing TMG's administrative rights, copying and migrating the hosted environment, and continuing to operate Concourse under TTG and KG LLC control, deprived TMG of the entirety of this intellectual property.

110.  TMG no longer possesses the source code, system instances, or database structure that embodied years of confidential development and client integration. In effect, the Enterprise expropriated a functioning software platform that had cost TMG hundreds of thousands of dollars to build and that represented the core of its commercial identity.

111.  Plaintiff has also been injured in its business. When the Defendants displaced TMG as Microsoft Partner and began invoicing TTG directly, they diverted TMG's recurring revenues and eliminated its position as TTG's subcontractor and technology provider.

112. The scheme left TMG liable for over $10,000.00 in SYNNEX invoices for licenses the Defendants continued to use and profit from through KG LLC, while TMG was stripped of both its residual payments and its client relationships. The destruction and continued use of Concourse eliminated TMG's capacity to perform under other existing and prospective contracts, including its Travelers Claims and OIG systems, and extinguished its ability to commercialize Concourse across similarly-sized federal contractors.

113. The injury to TMG's property and business therefore includes: (a) the permanent loss of the Concourse HRIS/OMS intellectual property and all associated trade secrets; (b) diversion of approximately $400,000.00 in annual recurring revenue from Microsoft and Concourse licensing; (c) loss of fair-market business expectancy exceeding $1,089,897.02 in Concourse-related profits; and (d) consequential damages to TMG's reputation and goodwill in the government contracting marketplace.

114. These injuries constitute recoverable damages under 18 U.S.C. § 1964(c), as they directly flowed from Defendants' pattern of racketeering activity specifically, their acts of wire fraud, access-device fraud, theft of trade secrets, and interstate transportation of stolen property, by which the Enterprise obtained and continues to exploit TMG's property for its own pecuniary gain.

115. Kayne S. Kreitzer, Bruce R. Kuhlman, Kreitzer Group LLC, Trinity Technology Group, Inc., and K.R. Contracting, Inc.'s violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff, and Plaintiff is entitled to bring this action for three times its actual damages, costs, and reasonable attorney's fees, and injunctive/equitable relief pursuant to 18 U.S.C. § § 1964(a) and 1964(c).

## SECOND CAUSE OF ACTION
### VIOLATION OF 18 U.S.C. § 1962(D), "RICO CONSPIRACY"

**(AGAINST ALL DEFENDANTS)**

116.   The allegations contained in the preceding paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

117.   As discussed in the First Cause of Action of this Amended Complaint, hereinafter expressly reincorporated and realleged as though fully set forth herein), all Defendants engaged in a continuous pattern of racketeering activity, all of which was targeted towards TMG/Parker, and all of which caused TMG and Parker extreme damage.

118.   It is clear from the interactions between TMG and Kreitzer, as well as conversations Kreitzer later had with TMG's Benefit Administrator, that Defendants Kuhlman, TTG, KG LLC, KRC, and Kreitzer agreed to have Kreitzer commit the alleged Kreitzer-Kuhlman Data Breach so as to (a) destroy TMG's systems, and (b) steal TMG's trade secrets/intellectual property.

119.   Defendant Kreitzer knew of and agreed to this objective, as evidenced by his manipulation of the Microsoft audit logs, signing of a contract as KG LLC before its legal existence, and later billing for Concourse (despite knowing it was not his to use). He further knew that his predicate acts of wire fraud and/or mail fraud were a part of a pattern of racketeering activity and agreed to the commission of those acts to further his own business reputation and success at the expense of TMG. *See Borg v. Warren,* 545 F.Supp.3d 291 (E.D. Va. 2021).

120.   As a direct and proximate result of all Defendants' conspiracy and the multiple overt acts taken in furtherance of their conspiracy, the Plaintiff has been injured in its business and/or property, or $4.5 million.

121.   Plaintiff is entitled to recover threefold the damages sustained, or $13.5 million,

plus the costs of the lawsuit and reasonable attorney's fees.

**THIRD CAUSE OF ACTION:**
**TORTIOUS INTERFERENCE WITH CONTRACT OR BUSINESS EXPECTANCY**
**(FOR OIG CONTRACTS)**
**(AGAINST ALL DEFENDANTS)**

122. The allegations contained in the preceding paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

123. Plaintiff had a valid contractual relationship with two OIGs at the time of the events alleged: the Securities and Exchange Commission ("SEC"), and the Department of Commerce ("DOC"). Specifically, Plaintiff provided both OIGs with secure intake hotline services, which Plaintiff was contractually obligated to maintain 24/7.

124. At the time of Plaintiff's valid contractual relationship with the DOC and the SEC OIGs, Plaintiff had a strong probability of, and expectancy for, receiving future economic benefits from the DOC and SEC OIGs. Plaintiff also had, at that time, a strong reputation with both government clients.

125. Defendants Kreitzer, Kuhlman, KG LLC, TTG, and KRC had direct knowledge of the contracts and the business expectancies with which they interfered in the following manner(s):

a. **Kayne S. Kreitzer and Kreitzer Group, LLC.** Kreitzer, in his individual capacity and his official capacity as Member-Manager of KG LLC, had direct visibility into TMG's government contracts while working inside TMG (for example, emails demonstrate his handling of DOC and SEC technical issues in 2020). Kreitzer/KG LLC also had administrator access to TMG's Microsoft GCC, which hosted the hotline reporting environment; Kreitzer/KG LLC knew these were mission-critical federal systems. In addition, Kreitzer/KG LLC was copied on DOC OIG and SEC OIG technical issues and notifications, and in his capacity as a TMG

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—50

consultant/employee, he managed vendor accounts (Plumsail, Twilio, SendGrid) tied directly to OIG hotlines.

b. **Trinity Technology Group, Inc. and Bruce R. Kuhlman**. TTG and Kuhlman knew that TMG was performing prime hotline contracts while also serving as TTG's IT subcontractor. Further, TTG/Kuhlman benefited from TMG's hotline systems (Concourse also hosted HRIS/employee PII for TTG staff).

c. **KR Contracting, Inc. and Bruce R. Kuhlman.** KRC had direct knowledge of TMG's DOC OIG and SEC OIG Contracts. Further, after KRC and Kuhlman received a briefing on TMG's ownership of Concourse, KRC/Kuhlman knew that TMG owned Concourse and that TMG provided OIG services through it.

126. Defendants intentionally interfered with Plaintiff's relationship with the SHC as a result of:

a. Kreitzer/KG LLC's disabling or concealing of audit logs in TMG's GCC;

b. Kreitzer/KG LLC's interfering with vendor accounts (Twilio, Plumsail, SendGrid);

c. Kreitzer/KG LLC's misuse of SYNNEX authority to remove TMG as delegated Microsoft Partner on May 3, 2021, which blocked TMG from administering its GCC tenant used for contracts; and

d. TTG's efforts to misrepresent system failures and license deletions as TMG's fault, when they were caused by Kreitzer/KG LLC's obstructions—information spread to multiple clients of both parties.

127. This interference was intentional and strategic—the Defendants knew that OIG

contracts required secure reporting and tried to make TMG appear unreliable, while they seized control of its systems.

128. Plaintiff, at the time, was in a contractual relationship with DOC OIG and SEC OIG, while it had an expectation that all Defendants would honor the barest expectations of fair dealing, which require that they refrain from using improper methods to destroy TMG's ability to reasonably compete in the GovCon market. More importantly, Plaintiff had a business expectancy of growing its contractual relationships with said entities, and this interference damaged the probability of future economic benefit to the Plaintiff.

129. Defendants Kuhlman, KR Consulting, and TTG benefited from Kreitzer/KG LLC's use of improper means to interfere with the contractual relationship between Plaintiff and the DOC and SEC OIGs. Among the improper methods used to interfere with Plaintiff's future business expectancy include fraud, deceit, and the extreme misuse of inside, proprietary, confidential information. Defendants also used improper means, including violating federal laws set forth in 18 U.S.C. § 2701, 18 U.S.C. § 1030 ("Computer Fraud and Abuse Act") and Virginia laws as set forth in Va. Code §§ 18.2-152.1 ("Virginia Computer Crimes Act").

130. Without Defendants' intentional misconduct, Plaintiff would have continued improving its business relationships with the SEC and DOC OIGs or otherwise realized the expectancy of economic benefit. *See Smithfield Ham & Prods. Co. v. Portion Pac, Inc.*, 905 F. Supp. 346 (E.D. Va. 1995).

131. Plaintiff suffered damages as a result of Defendants' tortious acts, including but not limited to:

a. Actual damages to TMG's data, servers, HRIS/OMS Systems, CMS, Trade Secrets, Lanteria Instances, and Microsoft Instances, amounting to no less than $1.2 million; and

b.  Consequential damages in an amount to be proven at trial, but no less than

$150,000.00.

132.  Plaintiff is also entitled to punitive damages because Defendants'

actions were malicious, willful and wanton in the extreme. Indeed, Defendants interfered with

Plaintiff's business expectancy regarding its ongoing and prospective relationships with the SEC

and the DOC. This interference with a probability of future economic benefit to the Plaintiff, by

the destruction of TMG's Concourse and other systems, effectively left Plaintiff dead in the

water and unable to perform under its current contracts or grow future relationships with said

entities. Plaintiff thus requests no less than $350,000.00 in punitive damages.

**FOURTH CAUSE OF ACTION:**
**TORTIOUS INTERFERENCE WITH CONTRACT (SHC CONTRACT)**
**(AGAINST DEFENDANTS KREITZER, KG LLC, TTG)**

133.  The allegations contained in the preceding paragraphs are re-alleged and

incorporated by reference as though fully set forth herein.

134.  Plaintiff had a valid contractual relationship with System High ("SHC") at the

time of the events alleged. Specifically, Plaintiff was the contracted vendor of record, which

provided SHC's IT support. TMG's IT support included licensing through SYNNEX.

135.  At the time of Plaintiff's valid contractual relationship with SHC, Plaintiff had a

strong probability of, and expectancy for, receiving future economic benefits from SHC. Plaintiff

also had, at that time, a strong reputation with SHC.

136.  Defendants Kreitzer, Kuhlman, KG LLC, TTG, and KRC had direct knowledge

of the contracts with which they interfered in the following manner(s):

a.  **Kayne S. Kreitzer and Kreitzer Group, LLC.** Kreitzer, in his individual

capacity and his official capacity as Member-Manager of KG LLC, had direct visibility into TMG's contracts while working inside TMG. Kreitzer personally executed and administered the SHC/TMG Master Services Agreement while working for TMG, acting as TMG's program manager.

b. **Trinity Technology Group, Inc**. TTG executives (Harding and Smith) were aware of TMG's work with SHC, since they introduced TMG to SHC.

137. Defendants intentionally interfered with Plaintiff's relationship with the SHC as a result of:

a. Kreitzer/KG LLC's disabling or concealing of audit logs in TMG's GCC;

b. Kreitzer/KG LLC's interfering with vendor accounts (Twilio, Plumsail, SendGrid);

c. Kreitzer/KG LLC's misuse of SYNNEX authority to remove TMG as delegated Microsoft Partner on May 3, 2021, which blocked TMG from administering its GCC tenant used for contracts; and

d. TTG's efforts to misrepresent system failures and license deletions as TMG's fault, when they were caused by Kreitzer/KG LLC's obstructions—information spread to multiple clients of both parties.

138. This interference was intentional and strategic. By 2021, after Kreitzer had broken away under KG LLC, he leveraged his insider knowledge of TMG's Microsoft reseller accounts to disrupt TMG's SHC services. SYNNEX communications confirmed that TMG's licenses for System High were terminated in June 2021 due to TTG/Kreitzer/KG LLC-caused nonpayment disruptions. Kreitzer/KG LLC's control over SYNNEX accounts—while no longer employed by TMG—enabled him to attack TMG's ability to service SHC.

139.   Plaintiff, at the time, was in a contractual relationship with SHC, while it had an expectation that Defendants Kreitzer, KG LLC, and TTG would honor the barest expectations of fair dealing, which require that they refrain from using improper methods to destroy TMG's ability to reasonably compete in the GovCon market.

140.   Defendant TTG benefited from Kreitzer/KG LLC's use of improper means to interfere with the contractual relationship between Plaintiff and the DOC and SEC OIGs. Among the improper methods used to interfere with Plaintiff's future business expectancy include fraud, deceit, and the extreme misuse of inside, proprietary, confidential information. Defendants also used improper means, including violating federal laws set forth in 18 U.S.C. § 2701, 18 U.S.C. § 1030 ("Computer Fraud and Abuse Act") and Virginia laws as set forth in Va. Code §§ 18.2-152.1 ("Virginia Computer Crimes Act"). Kreitzer/KG LLC's actions included misuse of reseller credentials, concealment of account access, and deliberate nonpayment arrangements, which amounted to unauthorized interference with TMG's vendor relationships and service delivery. The early termination of prepaid services to SHC in June 2021 (before expiration of the paid term) demonstrated these improper means.

141.   Without Defendants Kreitzer, KG LLC, and TTG's intentional misconduct, Plaintiff would have continued improving its business relationships with SHC or otherwise realized the expectancy of economic benefit. *See Smithfield Ham & Prods. Co. v. Portion Pac, Inc.,* 905 F. Supp. 346 (E.D. Va. 1995).

142.   TMG lost a government-adjacent, defense-sector client (System High) and the associated revenue stream. TMG also incurred reputational harm because SHC's services were disconnected in the middle of contract performance, which undermined TMG's reliability.

143.   Plaintiff suffered damages as a result of Defendants' tortious acts, including but

not limited to:

    c.  Actual damages to TMG's data, servers, HRIS/OMS Systems, CMS, Trade Secrets, Lanteria Instances, and Microsoft Instances, amounting to no less than $1.2 million; and

    d.  Consequential damages in an amount to be proven at trial, but no less than $150,000.00.

144.   Plaintiff is also entitled to punitive damages because Defendants' actions were malicious, willful and wanton in the extreme. Indeed, Defendants interfered with Plaintiff's business expectancy interference with business expectancy of growing its business relationship with SHC which presented a probability of future economic benefit to the Plaintiff when they knowingly helped Kreitzer steal TMG's data and trade secrets (by ruining their HRIS and other proprietary systems), which effectively left Plaintiff dead in the water. Plaintiff thus requests no less than $350,000.00 in punitive damages.

### FIFTH CAUSE OF ACTION: COMMON LAW CONSPIRACY
### (AGAINST ALL DEFENDANTS)

145.   The allegations contained in the preceding paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

146.   Defendants Kreitzer, Kuhlman, KG LLC, and TTG entered into an agreement to participate in illegal acts, including wire fraud, misappropriation of trade secrets, and interstate transportation of stolen property.

147.   These unlawful acts, conducted by Kreitzer/KG LLC, included the malicious and purposeful unauthorized access of TMG's protected computers by Kreitzer, by means of which TMG's Confidential Information and Trade Secrets were obtained, and as a direct result of such conduct, caused damage and loss to TMG.

148.    The agreement between the Defendants encompassed and included participation in an unlawful act: violation of 18 U.S.C. § 1030(a)(5)(a), which is defined as "knowingly causing the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causing damage without authorization, to a protected computer."

149.    TMG personnel lost access to TTG's HRIS and to its Microsoft Instance, which included TMG's services (HR Help Desk and IT Help Desk). Once that was severed, TMG lost access to its TTG accounts, including email—which meant that TMG was dead in the water and unable to provide HelpDesk services to TTG employees.

150.    TTG directed Kreitzer to sever TMG's access to its Microsoft Instance, which caused it to lose access to its HRIS even though TMG hosted this access. In order to accomplish this, Kreitzer had to knowingly cause the transmission of information that intentionally caused damage to the protected TMG computers.

151.    Kreitzer, who complained to Parker that "I hope you see the terrible situation I have been put in as well," knew that by severing TMG's access, he was taking an overt act in furtherance of his common scheme with TTG to intentionally cause damage to the protected TMG computers. *See* Plt. Exh. 18, Texts.

152.    As a direct result of this common scheme to intentionally damage TMG computers, TMG suffered actual damages in the amount of at least $1.2 million dollars (lost revenue) as well as consequential damages of at least $150,000.00, or in an amount to be proven at trial.

153.    The consequential damages include efforts to find the cause of the security

breach, required notifications to Government clients, subsequent efforts to rebuild the Microsoft

Instance, monies paid to consultants to ascertain the extent of the breach, as well as losses due to

destruction of the HRIS/OMS and CMS system and Lanteria instances, respectively.

## SIXTH CAUSE OF ACTION:
## STATUTORY CONSPIRACY IN VIOLATION OF VA. CODE §§ 18.2–499, 500
## (AGAINST ALL DEFENDANTS)

154.    The allegations contained in the preceding paragraphs are re-alleged and

incorporated by reference as though fully set forth herein.

155.    To state a claim for conspiracy to harm a business under Virginia law, a plaintiff

must allege 1) a combination of two or more persons for the purpose of willfully and maliciously

injuring the plaintiff in his business; and 2) resulting damage to the plaintiff. *See* Va. Code Ann.

§§ 18.2–499, 500. *See also Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596

(1984) (internal citations omitted). An act is "willful and malicious" if "undertaken to injure the

plaintiff intentionally, purposefully, and without legal justification." *Simmons v. Miller*, 261 Va.

561, 544 S.E.2d 666, 667 (2001).

156.    The Defendants combined for the purpose of willfully and maliciously

injuring the Plaintiff in its business as set forth herein.

157.    Kuhlman, acting through both TTG and KR Contracting Inc., helped Kreitzer

destroy TMG's intellectual properties, data, and business expectancies, with malice and the

intent to harm TMG.

158.    Similarly, and as set forth in greater details *supra*, the Defendants tortiously

interfered with Plaintiff's business expectancy and business relationships and acted in concert to

damage Plaintiff's reasonable probability of securing profits from said expectancies.

159.    Kuhlman, acting as stated above, used Kreitzer to improperly access TMG's

systems and its intellectual property; Kuhlman also instigated Kreitzer's unauthorized data breaches in an effort to get TMG's services for free, with the intent to paralyze TMG, so that it could no longer compete effectively in the same or similar HRIS government contract service provider market.

160.    Instead of going through TMG to migrate data, TTG reached out to Kreitzer beforehand, and used Kreitzer's access to the TMG backend to take advantage of this consultant's access to the data. Had TTG not used Kreitzer to maliciously and purposely destroy Plaintiff's Concourse system, as well as the aforementioned other systems, Plaintiff would have continued to prosper in its existing business relationships and to further realize its reasonable expectations of securing the same or larger profits.

161.    Under Virginia law, both Kreitzer and Kuhlman, as well as their respective companies, acted in concert to cut TMG out unlawfully and with malice aforesaid in regard to TMG's lawful business expectancy as well as TMG's property, which TMG alone had the right to own, profit from, and control.

162.    Moreover, Kreitzer's furtive interference with TMG's data, computer servers, and/or computers could not have occurred accidentally, or without willful and malicious intent to destroy TMG's management of TTG's Concourse Instances, as well as its future long and short-term relationship with SEC, DOC, and other governmental entities and vendors.

163.    Defendants Kuhlman and TTG acted with the purposeful intention to damage Plaintiff's business, particularly since TTG knowingly received and profited from stolen data and HRIS System applications that were both destroyed when stolen by Kreitzer/KG LLC and then utilized by TTG after his backdoor efforts to migrate Concourse unlawfully after he severed his relationship with TMG.

164. Among the damages caused to TMG include harm to its reputation among the defense contracting community, which views data breaches as a black mark on a government contractor's reputation. TMG has suffered damages to reputation in the amount of $1 million. TMG has also sustained actual damages in the amount of $1.5 million. Because the actions taken in concert by the Defendants willfully and maliciously to injure TMG in its reputation, trade, business or profession by the means described herein, TMG is entitled to treble damages amounting to $7.5 million, as well as costs and reasonable attorney's fees.

## SEVENTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
## (TRAVELER'S CLAIMS MANAGEMENT SYSTEM)
## AGAINST ALL DEFENDANTS

165. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

166. Along with TMG's Concourse IP, TMG developed a claims intake and processing system known as *Traveler's Claims Management*—a centralized contact center–driven solution modeled as TMG's version of the "Passenger's First" service they created for TTG. TMG marketed the product to TSA Screening Partnership Program contractors, including BOS Security, as a viable claims-management platform. TMG offered Traveler's Claims Management either stand-alone or as part of Concourse. See Plt. Exh. 7, Tauran_Concourse Proposal_BOS.

167. TMG actively deployed Traveler's Claims Management in its subcontract performance for Trinity Technology Group, LLC ("TTG"), where TMG provided passenger claims services and built a HUBZone contact center dedicated to claims processing. These services generated ongoing annual revenues and formed the foundation of TMG's reasonable business expectancy for future opportunities.

168. Defendants Kreitzer, Kuhlman, TTG, KRC, and KG LLC had knowledge of

TMG's proprietary claims-management solution by virtue of direct involvement with TTG, KRC, and BOS business development collaborations, including DOE Portsmouth kickoff meetings, 5-Star pipeline reviews, and subcontractor negotiations. *See* Plt. Exh. 43, 5 Star Bi-Weekly Opportunity Review. This exhibit is incorporated as if restated in full herein.

169. Defendants intentionally interfered with Plaintiff's expectancy by improper methods, including:

   a. Executing a fraudulent Consultant Agreement on February 8, 2021, in the name of "Kreitzer Group, LLC," a company not yet legally formed, to usurp TMG's role and present Defendants as a qualified provider of IT and claims-management services.

   b. Removing TMG as delegated Microsoft administrator on May 3, 2021, thereby disabling TMG's ability to fulfill claims-management functions under its subcontract.

   c. Misappropriating TMG's claims workflows and business development positioning by substituting Defendants' services in BOS Security proposals and other TSA-facing opportunities.

170. These actions constituted improper methods under Virginia law, including fraud, deceit, breach of confidential and fiduciary duties, and violations of federal and state computer crime statutes. See *Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832 (1987).

171. But for Defendants' interference, Plaintiff had a strong probability of securing future economic benefit from Traveler's Claims Management through continued subcontracting, expansion to BOS Security, and additional TSA prime contractors.

172. As a direct and proximate result of Defendants' intentional interference, Plaintiff

lost substantial revenues, including no less than $400,000.00 annually in claims-management subcontracting, the BOS Security business development pipeline, and consequential damages in reputational harm across the GovCon sector in an amount to be proven at trial.

173.   Plaintiff is entitled to recover actual damages in an amount to be proven at trial, but no less than $400,000.00, consequential damages for reputational and pipeline losses, punitive damages for Defendants' malicious and willful conduct, and attorney's fees.

**REQUESTED REMEDY:**
**PIERCE THE VEIL**
**(AGAINST DEFENDANTS KREITZER AND KUHLMAN)**

174.   The allegations contained in the preceding paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

175.   According to Virginia law, one who seeks to disregard the corporate entity must show that the shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage. Piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice. *See O'Hazza v. Executive Credit Corp.*, 246 Va. 11, 431 S.E.2d 318, (1993).

176.   Kreitzer, as the sole member of Kreitzer Group, LLC, has used this corporate shell to evade personal obligations to the Plaintiff, to perpetrate the crimes described above, and piercing the KG LLC veil is justified because the unity of ownership is such that the different personalities do not exist.

177.   Operating as if there is any separation between Kreitzer and KG LLC would work an injustice on the Plaintiff.

178.   Kuhlman, as the CEO and operating as the alter ego of KR Contracting, Inc., has used this corporate shell to evade personal obligations to the Plaintiff, to perpetrate the crimes described above, and piercing the KR Contracting, Inc. veil is justified because the unity of ownership is such that the different personalities do not exist.

179.   Operating as if there is any separation between Kuhlman and KR Contracting, Inc. would work an injustice on the Plaintiff, which has suffered a plethora of fraudulent acts committed by Kuhlman while acting under his alter ego, KR Contracting.

180.   Wherefore, the Plaintiff requests that this Court pierce the veil that separates Kreitzer and KG LLC, and further requests that this Court also pierce the veil that separates Kuhlman and KR Contracting Inc. and assess damages against Kreitzer and Kuhlman in their individual capacities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Honorable Court:

1.      Assume jurisdiction of this case and over these Defendants.

2.      For Count 1, find that the Defendants violated 18 U.S.C. § 1962 (c) and award actual damages to the Plaintiff in the amount of $4.5 million as recompense for actual financial losses suffered, threefold damages ($13.5 million) as well as the costs of this lawsuit, including reasonable attorney's fees.

3.      For Count 2, find that the Defendants violated 18 U.S.C. § 1962 (d) and award actual damages to the Plaintiff in the amount of $4.5 million, trebled ($13.5 million) as well as the costs of this lawsuit, including reasonable attorney's fees.

4.      For Count 3, find that Defendants committed tortious interference with contract and./or business expectancy, and award actual damages to Plaintiff in the amount

of $1.2 million; damages for emotional distress in the amount of $500,000.00; consequential damages in the amount of $150,000.00; and punitive damages for the willful and malicious acts described herein amounting to no less than $350,000.00.

5.      For Count 4, find that Defendants tortiously interfered with TMG's contract/business expectancy, award actual damages to Plaintiff against Defendants in the amount of $1.2 million; consequential damages in the amount of $150,000.00; and punitive damages for the willful and malicious acts described herein amounting to no less than $350,000.00.

6.      For Count 5, find that Defendants committed common law conspiracy, and award actual damages against the Defendants in an amount of at least $1.2 million dollars (lost revenue) as well as consequential damages of at least $150,000.00.

7.      For Count 6, find that all Defendants willfully violated Va. Code §§ 18.2–499 and -500, resulting in injury to Plaintiff's business, and award Plaintiff TMG $2.5 million in damages, trebled to $7.5 million, plus reasonable attorney's fees.

8.      For Count 7, find that Defendants tortiously interfered with contract/business expectancy and award Plaintiff damages in the amount of $400,000.00.

9.      Allow, as a remedy, Plaintiff to pierce the corporate veil as requested, and award Plaintiff damages against both individuals as assessed against their alter ego corporate shells.

10.      Award any and all such other relief as this Honorable Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

> **Respectfully Submitted,**
> **TAURAN MANAGEMENT GROUP, LLC**
>
> *By Counsel:*

Tauran Management Group, LLC v. Kreitzer, et al., Amended Complaint—64

_____

Elaine L. Jarvis, Esq.
VSB #41623
Jarvis Law PLLC
128 N. Royal Ave
Front Royal, Virginia 22630
Phone: (540) 546-0220
Facsimile: (540) 546-0229
Email: elaine@jarvislaw.org
*Counsel for Plaintiff Tauran Management Group, LLC*

**VERIFICATION BY PLAINTIFF TAURAN MANAGEMENT GROUP, LLC, A
VIRGINIA LIMITED LIABILITY CORPORATION**

COMMONWEALTH/STATE OF ___Virginia___,
CITY/COUNTY OF ___Warren___, to-wit:

Before me, the undersigned Notary Public in and for the above-mentioned jurisdiction, ___Elizabeth F. Parker___, Authorized Representative for **Tauran Management Group, LLC**, whose name is signed to the foregoing document, appeared and acknowledged her signature thereto.

The foregoing instrument was acknowledged, subscribed and sworn to before me this _6_ day of October, 2025, by ___Elizabeth F. Parker___, Authorized Representative for **TAURAN MANAGEMENT GROUP, LLC**.

The Plaintiff attests to the following:
- The plaintiff has reviewed the complaint.
- The plaintiff knows or believes that all allegations that the plaintiff has personal knowledge of to be true.
- The plaintiff believes the allegations that the plaintiff does not have personal knowledge of to be true based on specified information, documents, or both. Specifically, I have reviewed all of the exhibits attached hereto, as well as information released to me.

___Elizabeth F. Parker, CEO___ (SEAL)
TAURAN MANAGEMENT GROUP, LLC
(By Authorized Representative **Elizabeth F. Parker, CEO**)

___Tarra Reed Smeltzer___
NOTARY PUBLIC

My Commission No.: ___8011597___.
My Commission Expires: ___May 31, 2026___.

TARRA REED SMELTZER
NOTARY PUBLIC
REG. #8011597
MY COMMISSION
EXPIRES
May 31, 2026
COMMONWEALTH OF VIRGINIA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _6th_ day of _October_____, 2025, I will

electronically file the foregoing Amended Complaint with the Clerk of Court using the CM/ECF

system, which will send a notification to the following represented parties:

Roya Vasseghi
S. Courtney Toomath-West
VASSEGHI LAW GROUP
9663-D Main Street
Fairfax, VA 22031
*Counsel for Kreitzer Defendants*

William B. Jackson
Gabrielle Bohannon
JACKSON LEWIS P.C.
500 E. Main St., Suite 800
Norfolk, Virginia 23510
*Counsel for Kuhlman Defendants*

_____
Elaine L. Jarvis, Esq.