CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
August 28, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| Tauran Management Group, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:24-cv-00060 |
| | ) | |
| Kayne Kreitzer *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

In August of 2024, Plaintiff Tauran Management Group, LLC ("Tauran") and its CEO, Elizabeth F. Parker, brought an action against Defendants Kayne Kreitzer, Kreitzer Group, LLC ("Kreitzer Group"), Bruce Kuhlman, Trinity Technology Group, Inc. ("Trinity"), and K.R. Contracting, Inc. ("KR Contracting"). The complaint alleged nine state and federal causes of action arising from the events surrounding Trinity's termination of Tauran's subcontract. The court granted Defendants' motions to dismiss but granted Tauran leave to amend certain claims. Thereafter, Tauran filed an amended complaint.

In its amended complaint, Tauran once again asserts that Defendants have participated in a coordinated campaign to seize Concourse, Tauran's proprietary Operations Management System ("OMS"); interfere with access to Tauran's Microsoft accounts and administrative rights; and ultimately "eliminate [Tauran] from the government contracting market." (Am. Compl. ¶¶ 14–15 (Dkt. 69).) Tauran alleges that Kreitzer, a former Tauran employee, accessed Tauran's systems and data without authorization just before the termination of Tauran's

subcontract with Trinity, worked with the other Defendants to destroy the Concourse system, and continued to replicate Tauran's "software environments, data repositories, and intellectual property." (*Id.* ¶¶ 16, 25.)

This matter is before the court on Kuhlman, Trinity, and KR Contracting's (collectively, "Kuhlman Defendants") motion to dismiss, (Dkt. 78), and Kreitzer and Kreitzer Group's (collectively, "Kreitzer Defendants") amended motion to dismiss, (Dkt. 81). For the reasons stated below, the court will grant both motions and dismiss Tauran's amended complaint.

## I. Background

### A. Factual History[1]

Many of the facts underlying Tauran's claims are set out in detail in the court's previous memorandum opinion granting Defendants' motions to dismiss Tauran and Parker's complaint. (Dkt. 67 at 2–12.) This section will summarize the timeline of events as currently alleged, including the new factual allegations in the amended complaint.

Tauran's claims arise from the end of a seven-year business relationship between Tauran and Trinity. (*See* Am. Compl. ¶¶ 17–18, 40, 64.) Elizabeth and Jamal Parker created Tauran in 2014 to provide Trinity's information technology ("IT") services and "expand into help desk and compliance-driven HR/IT solutions." (*Id.* ¶ 18.) Elizabeth had worked for Trinity since 2003, and Jamal had been consulting for Trinity since 2012. (*Id.* ¶¶ 17–18.)

[1] The facts in this section are taken from Tauran's amended complaint and the attached exhibits. The court accepts these factual allegations as true when resolving the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

Tauran's allegations revolve around Concourse Operations Management System ("Concourse"), a custom integrated platform that Tauran "specifically created to meet the operational and regulatory needs of the government contracting sector." (*Id.* ¶ 18.) Concourse was "buil[t] on" the HR platform of another software company, Lanteria. (*Id.* ¶ 19.) Under Lanteria and Tauran's 2015 "Partner Agreement," Tauran would "collaborate with Lanteria on customization and implementation [of the software] for clients." (*Id.*) Also in 2015, Tauran executed a Non-Disclosure Agreement ("NDA") with Lanteria, in which Tauran and Lanteria agreed to not disclose "Proprietary Information" received from the other party for five years after receipt of such information, subject to certain exceptions. (*Id.*; *see* Dkt. 69-1 at 21–22.) Kayne Kreitzer signed this agreement on behalf of Lanteria on August 25, 2015. (*See* Am. Compl. ¶ 19; Dkt. 69-1 at 23.)

Concourse was fully operational and deployed to Trinity by late 2015. (Am. Compl. ¶ 26.) Tauran also continued to expand Concourse's offerings. Specifically, Tauran developed two additional proprietary "modules" that were integrated into Concourse: (1) the Office of Inspector General Contact Records Management system ("OIG CRM"), which was "tailored to hotline intake and compliance reporting"; and (2) Traveler's Claims Management ("Traveler's"), which centralized "incident intake, claims processing, and resolution workflows" through Tauran's "HUBZone contact center" in Luray. (Am. Compl. ¶¶ 22, 24; *see* Dkt. 69-1 at 56.) Tauran "used and marketed" this Luray contact center for "Help Desk support, OIG hotline intake, customer service, IT support, employee resource assistance, and claims administration," and delivered such functions under its subcontract for Trinity. (Am.

Compl. ¶ 24.) Tauran marketed Concourse's capabilities, including the Traveler's module, to multiple government contractors. (Am. Compl. ¶¶ 23, 26–27; *see* Dkt. 69-1 at 50–66.) Tauran also "maintain[ed] exclusive control over pricing, licensing, and hosting." (Am. Compl. ¶ 27.)

Tauran's relationship with Kreitzer began in 2015, when Kreitzer was serving as Lanteria's U.S. Sales Director. (*Id.* ¶ 19.) In 2016, Kreitzer left Lanteria to join Tauran as a "systems administrator," at which point he signed a "Consultant Agreement" setting forth the terms of his position. (*Id.* ¶ 28; *see* Dkt. 69-1 at 71–78.) Kreitzer worked for Tauran as either a consultant or employee for about four years—from 2016 through 2020. (Am. Compl. ¶¶ 28, 32, 39.) In 2016, Kreitzer gained administrative privileges to Concourse and other Tauran "client integrations." (*Id.*) Kreitzer maintained this "privileged access" to Concourse throughout his different roles as a Tauran consultant and employee, (*id.* ¶¶ 25, 28), which he acknowledged in various agreements, (*id.* ¶¶ 28, 32; *see* Dkt. 69-1 at 71–81 (signed NDA and Consultant Agreement in September 2016).) Throughout this time, he worked "as a service provider under contract, not as a coowner, partner, or developer of Concourse." (*Id.* ¶ 28.)

In March 2018, Kreitzer "created Tauran's Microsoft reseller account with SYNNEX and installed himself as the primary administrator," such that Kreitzer had "unilateral control over Tauran's reseller relationships and licensing channels." (*Id.* ¶ 29; *see* Dkt. 69-1 at 85–94.) Also in 2018, at Tauran's request, Kreitzer signed a "limited Consulting Agreement" with Trinity to perform ten hours per month of work so that Kreitzer could maintain eligibility for a federal security clearance. (Am. Compl. ¶ 30; *see* Dkt. 69-1 at 95.)

That same year, Tauran and Trinity signed an NDA "to govern the exchange of proprietary information," which included software, code, system designs, and "Government programmatic information." (*Id.* ¶ 20; *see* Dkt. 69-1 at 47–49.) It excluded certain types of information from the definition of "Proprietary Information," such as information "independently developed by or for the recipient as evidenced by the recipient's own files and records," or "that as of the time of receipt by the recipient. is already known to or in the possession of the recipient, and written notice of such prior knowledge or possession is given to the disclosing party immediately after receipt." (Dkt. 69-1 at 47.) The NDA specified that the Proprietary Information received from the other party:

> (i) will only be used for the purpose of the Opportunities;
>
> (ii) will not be disclosed to any third party without prior written approval of the disclosing party;
>
> (iii) may only be disclosed within the receiving organization on a "need-to-know" basis to persons who have been advised of the existence of this Agreement and agree to be bound by its terms;
>
> (iv) will be treated with at least the same degree of care as the recipient treats its own Proprietary Information, but in no event with less than a reasonable degree of care;
>
> (v) will be copied only to the extent necessary for the purpose of the Opportunities; and
>
> (vi) will remain the property of the disclosing party.

(Dkt. 69-1 at 47–48.) The same year as the Trinity-Tauran NDA execution, Tauran submitted "formal Security Policies . . . to the Department of Commerce as a contract deliverable." (Am. Compl. ¶ 31.) This attachment describes the different security features of Tauran's "Information System," access control and access use requirements, incident response plans,

requirements for Tauran personal computers, and risk assessment and management processes. (Dkt. 69-1 at 97–167.)

Eventually, Elizabeth became Tauran's CEO, and Jamal became Trinity's Director of IT. (Am. Compl. ¶¶ 1, 41, 43.) Kreitzer maintained a close working relationship with both individuals for some time. (*See id.* ¶¶ 26, 28, 32, 39, 43.) Elizabeth also saw Trinity's executive, Jim Smith, as a "mentor" and "family friend." (*Id.* ¶ 57.) Trinity and Tauran similarly maintained a collaborative business relationship, forming a "business development group" with other contractors in April of 2020. (*Id.* ¶ 40.) As KR Contracting prepared to acquire Trinity, KR Contracting's CEO Bruce Kuhlman was also invited to the development group, where he learned about Tauran's "proprietary systems," including Concourse. (*Id.* ¶¶ 6, 40.)

On January 1, 2019, Kreitzer became a full-time employee of Tauran. (*Id.* ¶ 32.) But in October 2019, he "reverted to contractor status at a higher rate of pay" to give him "the time and flexibility to complete the documentation and training that [Tauran] had repeatedly requested" while maintaining continuity for Tauran's government clients. (*Id.* ¶ 39; *see* Dkt. 69-2 at 3.) In this position, he still had "broad administrative privileges." (Am. Compl. ¶ 39.)

Kreitzer stated in November 2019 that Tauran's IT knowledge was largely "in his head or Googled," and that the "key system credentials were linked to personal accounts rather than documented in [Tauran's] records." (*Id.* ¶ 33.) Tauran asserts that this violated its Security Policies, weakened its internal controls, and made it especially difficult for Tauran to regain access after its administrative rights were later removed. (*Id.*; *see* Dkt. 69-2 at 21–22.) Kreitzer "intercepted system notifications and technical failure reports related to DOC OIG

submissions and other security operations, preventing [Tauran] from receiving critical alerts required for contract oversight." (Am. Compl. ¶ 37.) Kreitzer also "withheld documentation" and "circumvented . . . controls designed to prevent misuse of authority" despite Tauran's "Employment Record SOP" and associated policies implemented in 2019. (*Id.* ¶ 34.) He avoided documenting procedures and training additional IT staff. (*Id.* ¶ 38.) The amended complaint characterizes Kreitzer as Tauran's "sole technical gatekeeper" by 2020. (*Id.* ¶¶ 35–36.)

In December 2020, Trinity was acquired by KR Contracting. (*Id.* ¶ 42.) Kuhlman sought to merge KR Contracting and Trinity's data into a new server. (*Id.* ¶¶ 42–43.) By March of 2021, Jamal Parker, as Trinity's Director of IT, was managing the migration of Trinity's data off of the servers maintained by Tauran. (*Id.* ¶¶ 42–43, 50, 52; Dkt. 69-2 at 92–93.) Throughout this process, Tauran understood that Concourse would not be included in the data migration, and that it was a "proprietary product" available for KR Contracting to use "in future operations" if it so chose. (Am. Compl. ¶¶ 45, 49.) Accordingly, Jamal Parker did not include Concourse in the memorandum outlining the scope of the December migration. (*Id.* ¶ 44.) Additionally, Elizabeth Parker explained Concourse to Kuhlman during transition discussions, but "made it clear that Concourse was TMG's proprietary product, presented for [KR Contracting's] consideration in future operations." (*Id.* ¶ 45.) She also introduced Kuhlman to Dayna Senter, a Tauran employee who could explain Concourse and the underlying Lanteria platform. (*Id.* ¶ 49; Dkt. 69-2 at 80.)

After March of 2020, Kreitzer had continued to consult only "sparingly" for Tauran. (Dkt. 69-2 at 65.) Still, he assisted Jamal Parker with the Trinity data migration in March of 2021. (*See* Am. Compl. ¶¶ 52, 54–55). In February of 2021—unbeknownst to Tauran—Kreitzer signed a separate consultant agreement with Trinity as Kreitzer Group, LLC—"an entity that had not yet been legally formed." (*Id.* ¶¶ 50, 65; Dkt. 69-2 at 81–88.) Under the agreement, Kreitzer Group was to "separat[e] any remaining IT services from the current vendor" (*i.e.*, Tauran) and perform the migration of Concourse "from current Microsoft Azure environment to a Trinity owned Azure subscription." (Am. Compl. ¶ 50; Dkt. 69-2 at 88.)

On May 3, 2021, Trinity terminated Jamal Parker as its Director of IT. (Am. Compl. ¶ 56.) That same day, at around 12:04 PM, a Tauran employee reported being locked out of Trinity's Microsoft Teams environment. (*Id.*) Without Jamal Parker, Tauran did not have "an internal contact capable of addressing the sudden loss of access." (*Id.*) Elizabeth Parker reached out to Smith about the issue, and he asked for a day to investigate and respond. (*Id.* ¶ 57.) At 6:03 PM that same day, Kreitzer used his Trinity credentials to remove Tauran and its reseller partner SYNNEX as delegated administrators of Trinity's Microsoft tenant. (*Id.* ¶ 59.) Tauran's Project Manager saw the notification of this removal and forwarded it internally at 9:14 PM. (*Id.*) Tauran states that this was the first time it learned that its administrative rights had been revoked. (*Id.*) That same evening, Jamal Parker and Kreitzer exchanged text messages about Jamal's sudden loss of access to Tauran's Azure Government Cloud environment. (*Id.* ¶¶ 60–61.) After asking Jamal what username he was using, Kreitzer asked "Really? You are locking me out of my accounts?" (Dkt. 69-3 at 3.) After confirming

that he did, Jamal notified Kreitzer that it was unlocked again. (*Id.*) Jamal then expressed frustration and stated, "I hope you DO understand what a terrible situation this has put us in." (*Id.*) At 9:17 PM, after learning of the SYNNEX removal, Jamal said, "I see from the Synnex change, you've made your decision." (*Id.*)

Later that evening, after learning that its access was revoked, Tauran canceled Trinity's Microsoft licenses that Tauran maintained on the SYNNEX account "to prevent further unauthorized charges and escalating financial liability." (*Id.* ¶ 62.) Tauran argues that this was not the cause of Trinity's temporary email disruption, and instead, Kreitzer's unauthorized removal of Tauran caused such disruption. (*Id.*) Kreitzer was also aware that Tauran was required to notify SYNNEX of their subscription cancellations before April 17 to avoid paying for May. (*Id.* ¶ 70.) Because Trinity failed to cancel these Microsoft licenses, it was too late to avoid charges for the month of May, and Tauran ended up owing over $10,000 for Trinity's licenses. (*Id.* ¶¶ 70–71.) Tauran alleges that Kreitzer "orchestrated this overlap intentionally." (*Id.* ¶ 71.) By June 10, 2021, SYNNEX invoicing showed the amount owed by Tauran for Trinity's accounts. (*Id.* ¶ 70.)

On May 4, Trinity terminated its subcontract with Tauran for convenience, effective May 31, 2021. (*Id.* ¶ 64; Dkt. 69-3 at 5.) In doing so, Trinity and KR Contracting told Tauran that they sought to bring the functions performed by Tauran "back in-house." (Dkt. 69-3 at 5.) Their notice instructed Tauran to "ensure a smooth transition of services and licenses," including the Concourse migration, despite Tauran having lost administrative access the day before. (Am. Compl. ¶ 64; Dkt. 69-3 at 5.) Tauran "immediately sought to protect [Trinity's]

data and ensure an orderly transition," and worked to complete the migration. (Am. Compl. ¶¶ 67–69.) On May 18, Trinity stated that they expected Concourse to be "fully migrated" by May 21. (Dkt. 69-2 at 112.) On May 24, Trinity informed Tauran that it no longer needed Tauran to assist with the transfer of Trinity's Concourse data. (Am. Compl. ¶ 69; Dkt. 69-3 at 17.) Trinity's Vice President of Finance Aaron Dobbs also directed Tauran to remove services regarding the transfer of Concourse from Tauran's invoice to Trinity, as Trinity "do[es] not require these services." (Am. Compl. ¶ 69.)

Unbeknownst to Tauran, Kreitzer had started migrating the Concourse instance from Tauran's servers as early as March 7, 2021. (Am Compl. ¶ 52; *see* Dkt. 69-1 at 95.) Migration of "the Concourse HRIS/OMS Instance" continued through May 2021. (Am. Compl. ¶ 52.) Kuhlman sent a letter on July 21, 2021, which recounted that he had directed Jamal Parker to initiate migration on March 6 of that year, and that Kreitzer began moving the data the following day. [2] (Dkt. 69-1 at 95–96.)

Then, on May 21 and 22, 2021, without Tauran's authorization, Kreitzer used his credentials from his prior Tauran consultant role to access Tauran's "Microsoft Government Cloud tenant." (Am Compl. ¶ 100(d).) Kreitzer downloaded "confidential and proprietary data," including the Concourse system, "associated employee records, and Microsoft tenant

[2] Tauran asserts that Kuhlman's letter is contradicted by an email chain between Jamal Parker and Kuhlman regarding Tauran's Statement of Work. (Am. Compl. ¶ 53; Dkt. 69-1 at 95–105.) It argues that the email chain shows that Kuhlman only approved migration of Microsoft 365 and "GCC," not migration of the Concourse system. (Am. Compl. ¶ 53.) Tauran emphasizes that Jamal Parker explained in a March 11 email: "We are currently assessing the level of effort to move over Lanteria & Concourse and will provide a separate time/cost estimate for this." (Dkt. 69-2 at 93.) This email, sent after the March 5 "green light" email, does not alone show that Concourse migration was not authorized when it allegedly began on March 7. *See Kashdan v. George Mason Univ.*, 70 F.4th 694, 700 (4th Cir. 2023) ("[The court] need not accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences, unreasonable conclusions, or arguments.'" (cleaned up)).

configurations and files." (*Id.*) He used these for migration to Trinity's systems, despite Concourse being owned by Tauran. He also destroyed the Concourse data remaining on Tauran's "cloud-hosted environment," (*id.* ¶ 100(d)(i)), and "disabled the entire Concourse Suite, including the OIG and Traveler's modules," (*id.* ¶ 25).

Tauran reported Kreitzer's May 21 and 22 unauthorized access to its government clients and filed a complaint with the Internet Crime Complaint Center. (*Id.* ¶ 73.) Throughout August of 2021, Tauran believed the Concourse-related issues were caused by "technical disruptions and the theft of [Trinity] employment data" rather than "deliberate misappropriation of [Tauran] proprietary systems." (*Id.* ¶ 74.) But in September of that year, Tauran realized its "loss of access was not reversible," and learned that "Kreitzer had retained a backdoor into [Tauran's] systems after his departure." (*Id.*; Dkt. 69-3 at 70.) As of the filing of the Amended Complaint, Concourse remains advertised on Trinity's website as a service available to employees. (*Id.* ¶ 106.)

Kreitzer, through Kreitzer Group, submitted multiple invoices to Trinity for Concourse-specific work throughout 2021 and 2022. (*Id.* ¶¶ 55, 77.) Additionally, Kreitzer and Kreitzer Group submitted invoices to Tauran for work "for services that overlapped with both [Tauran's] subcontracted responsibilities and [Kreitzer's] own obligations." (*Id.* ¶¶ 55, 70.) On March 10, 2021, Kreitzer sent an invoice to Tauran for "printer and network support" services that were already covered under Tauran's subcontract with Trinity. (*Id.*) In April of 2021, Kreitzer invoiced Tauran for migration services, even though Kreitzer Group was concurrently contracted to provide such services to Trinity under the Kreitzer Group-Trinity

Consultant Agreement. (*Id.*; *see* Dkt. 69-2 at 105–07.) Kreitzer Group also invoiced Trinity for "Microsoft services, backdating the invoices to April 1, 2021," which effectively "reassign[ed] [Tauran's] work to [Kreitzer Group]" even though Tauran's subcontract with Trinity was still active. (Am. Compl. ¶ 66.) Kreitzer Group continued to bill Trinity for work as a consultant until July 2024. (*Id.* ¶ 77.)

**B. Procedural History**

Tauran's original complaint asserted two federal claims against all Defendants: a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim under 18 U.S.C. § 1962(c), and a RICO conspiracy claim under 18 U.S.C. § 1962(d). (Compl. ¶¶ 109–35 (Dkt. 1).) The court dismissed both counts, finding that Tauran failed to plausibly allege an enterprise between Defendants and insufficiently alleged a pattern of racketeering activity. (Mem. Op. at 24 (Dkt. 67).) The court also dismissed as time barred a claim brought under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836. (*Id.* at 22–23.) Finally, the court declined to exercise supplemental jurisdiction over Tauran's remaining state law claims: misappropriation of trade secrets; two tortious interference with contract claims; and two conspiracy claims. (*Id.* at 31; *see* Compl. ¶¶ 136–96.)

On October 6, 2025, Tauran filed an amended complaint. (Dkt. 69.) Tauran's amended complaint removes Parker as a plaintiff but re-alleges both federal RICO claims against all Defendants. (Am. Compl. ¶¶ 85–121.) The amended complaint provides additional factual allegations about the existence of an enterprise between all Defendants, (*see id.* ¶¶ 90–97), and alters the type and number of predicate acts alleged, (*see id.* ¶¶ 98–115). The amended

complaint also adjusts the two claims for tortious interference with contract to assert: (1) a claim for "tortious interference with contract or business expectancy" against all Defendants; (2) a claim for tortious interference with contract against Kreitzer, KR Contracting, and Trinity; and (3) a claim for tortious interference with business expectancy against all Defendants. (*Id.* ¶¶ 122–43, 165–73.) Finally, the amended complaint re-alleges claims for statutory and common law conspiracy. (*See id.* ¶¶ 122–73.)

On November 19, 2025, the Kuhlman Defendants moved to dismiss the amended complaint. (Dkts. 78, 79.) Tauran later responded in opposition, (Dkts. 85, 86), and the Kuhlman Defendants replied, (Dkt. 89). On the same day as the Kuhlman Defendants' motion to dismiss, the Kreitzer Defendants filed two separate motions to dismiss the amended complaint. (Dkts. 77, 80.) The following day, November 20, the Kreitzer Defendants filed an "amended" motion to dismiss, which stated that the previous two motions had been "inadvertently filed." (Dkt. 81 at 1.) Tauran responded in opposition to the amended motion, (Dkts. 87, 88), and the Kreitzer Defendants replied, (Dkt. 90). Tauran's response in opposition briefly argues that the Kreitzer Defendants did not cite any legal authority supporting leave to file their amended motion, and that they failed to seek leave to file a brief exceeding 25 pages in violation of the court's Scheduling Order. (Dkt. 88 at 1–2; *see* Dkt. 53 at ¶ 16.)

The Kreitzer Defendants' amended motion and memorandum in support were filed within the fourteen days allotted for response by Rule 15, *see* Fed. R. Civ. P. 15(a)(3), and only one day after the Kreitzer Defendants' original motions to dismiss. Additionally, Tauran already responded to the amended motion and accompanying brief. Thus, allowing the

Kreitzer Defendants to amend their initial motion to dismiss does not prejudice Tauran. *See, e.g.*, *Styles v. Triple Crown Publ'ns*, LLC, No. WDQ-11-3759, 2012 WL 1964443, at *3 (D. Md. May 30, 2012) (permitting Defendants to amend their first motion to dismiss because Plaintiff would not be prejudiced and allowing the amendment furthers judicial economy); *Cadmus v. Frederick Cnty. Sheriff's Off.*, No. 5:15-cv-00053, 2016 WL 5231823, at *1 n.3 (W.D. Va. Sept. 20, 2016) ("Because [Defendant] filed an amended motion to dismiss, the original motion to dismiss is superseded and replaced."). Moreover, while Tauran correctly notes that Kreitzer Defendants' amended memorandum is a 32-page filling, the memorandum includes a table of contents, table of authorities, and certificate of service. Because the Western District does not require supporting briefs to include a table of contents or a table of authorities, *see* W.D. Va. Local R. 11, and the portion containing Defendants' argument is only 25 pages long, the court does not view this as a filing over the page limit. The court will consider the Kreitzer Defendants' amended motion, (Dkt. 81), as operative and deny the two earlier motions, (Dkts. 77, 80), as moot.

## II. Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing*, 959 F.3d at 616. At the motion to dismiss stage, the court may also examine documents attached to the complaint as exhibits or those explicitly incorporated into the complaint by reference. *See* Fed. R. Civ. P. 10(c); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016).

Ordinarily, Rule 8 of the Federal Rules of Civil Procedure requires a plaintiff to set forth a "short and plain statement" of a claim for relief. *Pledger v. Lynch*, 5 F.4th 511, 519 (4th Cir. 2021); Fed. R. Civ. P. 8(a)(2). But a RICO plaintiff alleging wire fraud must go a step further. Fraud-based claims are subject to the "heightened pleading standard" of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), a plaintiff must state with "particularity" the circumstances constituting fraud. *See* Fed. R. Civ. P. 9(b); *Borg v. Warren*, 545 F. Supp. 3d 291, 311 (E.D. Va. 2021). This includes identifying "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby . . . often referred to as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 670 F. App'x 126, 127 (4th Cir. 2016) (first quoting *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015); and then *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008))

(cleaned up). A plaintiff's "lack of compliance with Rule 9(b)'s pleading requirements is treated as [a] failure to state a claim under Rule 12(b)(6)." *Dunn v. Borta*, 369 F.3d 421, 426 (4th Cir. 2004) (quoting *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 n.5 (4th Cir. 1999)).

## III. Analysis

### A. RICO 18 U.S.C. § 1962(c) Claim (Count I)

RICO is a federal law that imposes criminal and civil liability for actions taken as part of an organized criminal enterprise. *See* 18 U.S.C. §§ 1961–68. RICO provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of" § 1962. 18 U.S.C. § 1964(c). Tauran's amended complaint maintains two RICO causes of action under §§ 1962(c) and 1962(d) against all Defendants. (*See* Am. Compl. ¶¶ 85–121.) "Section 1962(c) prohibits the conduct of a 'pattern of racketeering activity' affecting interstate commerce; Section 1962(d) prohibits conspiracy to engage in such conduct." *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 105 (4th Cir. 2025). The court will first address Defendants' motions to dismiss Tauran's § 1962(c) claim.

Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim for a § 1962(c) RICO violation, a plaintiff must sufficiently plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473

U.S. 479, 496 (1985). Defendants argue that Tauran's amended complaint does not state a claim under Count I because it does not plausibly allege either an enterprise between Defendants or a pattern of racketeering activity.

1. Enterprise

Tauran alleges that the RICO Defendants formed an association-in-fact enterprise. (Am. Compl. ¶¶ 91, 94.) "[A]n enterprise [is] defined as an ongoing organization, formal or informal, in which the various associates function as a continuing unit." *Delk v. ArvinMeritor, Inc.*, 179 F. Supp. 2d 615, 626–27 (W.D.N.C. 2002), *aff'd*, 40 F. App'x 775 (4th Cir. 2002); *see* 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such an enterprise must contain three structural elements: (1) "a purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). To constitute an enterprise, the individual members must show some level of coordination or collaboration. *See Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 537 & n.6 (D. Md. 2019) (citing *Boyle*, 556 U.S. at 947 n.4).

Tauran alleges that all Defendants shared a "common purpose to, among other things, obtain pecuniary benefits by taking [Tauran's] intellectual property and proprietary information unlawfully," (Am. Compl. ¶¶ 91–96), or more specifically, "to eliminate [Tauran] from the government contracting market and usurp its proprietary systems for Defendants'

own use," (*id.* ¶¶ 14–15). "[A]n enterprise's purpose must be the same as the purposes of its individual members." *Oriole Grp., LLC v. Pool Scouts Franchising, LLC*, 791 F. Supp. 3d 661, 684–85 (E.D. Va. 2025). The Kreitzer and Kuhlman Defendants argue that Tauran's allegations do not show that the members of the alleged association-in-fact enterprise shared a common purpose. (*See* Dkt. 82 at 7–9; Dkt. 79 at 10.) The court agrees.

First, Tauran "fail[s] to provide any specific allegations as to how, when, or where this agreement" to take Tauran's proprietary information and eliminate it from the government contracting market "actually occurred or who made what communications to bring the agreement about." *Rojas*, 425 F. Supp. 3d at 538. Rather, it relies on conclusory and vague allegations about the Defendants' "scheme," as well as statements that the Kuhlman Defendants "directed" and "ratified" the actions of the enterprise. (*See, e.g.*, Am. Compl. ¶¶ 51, 55, 69, 92, 93.) The only allegations regarding the specifics of an agreement or collective decision among the Defendants involve the Consultant Agreement between Trinity and Kreitzer Group, (*id.* ¶¶ 50–51; Dkt. 69-2 at 81–88), and the joint evaluation of Trinity's departments and subcontracts for cost-cutting after the acquisition, (Dkt. 69-3 at 5). But the Consultant Agreement only suggests collaboration between Trinity and Kreitzer Group for the limited purposes of the specified IT services, which included migrating Concourse. And Trinity's post-acquisition coordination with KR Consulting to evaluate Trinity's subcontracts does not suggest collaboration to misappropriate or defraud Tauran. None of these allegations suffice to raise a plausible inference that all the Defendants "function[ed] as a continuing unit" to form a criminal enterprise. *United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981); *see Rojas*,

425 F. Supp. 3d at 538 (finding no association-in-fact enterprise where plaintiff alleged "that Defendants reached an express or tacit agreement to fraudulently collect the Tax," as this "is conclusory").

Second, the allegations in the amended complaint demonstrate that Defendants were acting in their own self-interest—and even, at times, with conflicting purposes—rather than in service of an overarching enterprise. (*See* Dkt. 82 at 8–9.) For example, Tauran characterizes the February 2021 Consultant Agreement between Kreitzer, Kreitzer Group, and Trinity as evidence that Trinity "conspired" with Kreitzer to "administer[] a system" that Trinity knew was stolen from Tauran. (Am. Compl. ¶ 102(a).) Conversely, at other points in the amended complaint, Tauran characterizes the agreement as an act taken by *Kreitzer* through Kreitzer Group to benefit himself and to defraud Trinity. (*See, e.g.*, *id.* ¶ 103(a) (presenting Kreitzer Group's Consultant Agreement with Trinity as a "deliberate act of self-dealing" by Kreitzer, which allowed him to then invoice Trinity for tasks Trinity had already subcontracted out to Tauran); *id.* ¶ 100(a) (stating that Kreitzer's execution of the Consultant Agreement with Trinity "falsely presented Kreitzer Group, LLC as a legitimate organization"); *id.* ¶ 100(d)(i) (alleging that this February Consultant Agreement evinces Kreitzer's intent to convert Concourse "for his own use").)

Similarly, Tauran relies on the Kreitzer Group's invoices to Trinity over a period of about eighteen months to allege fifteen separate predicate acts by Kreitzer Group. (*See id.* ¶ 103; Dkt. 88 ¶ 33.) Yet, the amended complaint simultaneously alleges that through these same invoices, Kreitzer Group was defrauding Trinity for its own financial benefit, rather than

for a common purpose shared by all enterprise members. Specifically, Tauran describes Kreitzer Group's invoices to Trinity as "misrepresent[ing]" Kreitzer Group's authority to sell "services related to management of [Concourse]" in order for Kreitzer Group to "obtain money" from Trinity under false pretenses. (Am. Compl. ¶ 103(d)–(p); *see id.* ¶ 100(a) (alleging that the invoices allowed Kreitzer to secure "professional and financial gain" and "financial benefits [for] himself" while also serving Kreitzer's purpose of harming Tauran and "guaranteeing [Trinity] the benefit of Concourse").)

Even Kreitzer's alleged theft of Concourse is not clearly characterized as an action taken by Kreitzer in service of the enterprise's common purpose. (*See id.* ¶ 100(d) (describing how Kreitzer's act of downloading Concourse allowed him to give the data to Trinity, while also alleging that Kreitzer acted with the intent to "convert the trade secret, or Concourse, for his own use").) These conflicting allegations do not plausibly show that Defendants comprised an association-in-fact enterprise with a shared purpose. *See Ekstrom v. Cong. Bank*, No. CV ELH-20-1501, 2020 WL 6565251, at *20 (D. Md. Nov. 9, 2020) ("[T]he group must engage in a course of conduct for a common purpose and on behalf of the enterprise, as opposed to 'their individual capacities, to advance their individual self-interests.'" (cleaned up)). "At best, Plaintiff alleges consciously parallel conduct, which is not sufficient to satisfy *Twombly*'s pleading standard." *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1007 (E.D. Va. 2021) (cleaned up); *see Rojas*, 425 F. Supp. 3d at 540 ("Plaintiffs have therefore pled no facts to suggest that Defendants' parallel conduct is anything more than the result of independent economic decisions or interdependence in a concentrated market.").

Even assuming Tauran sufficiently alleged common purpose, the factual allegations regarding longevity are also weak. To show longevity, Tauran must demonstrate that the enterprise "function[ed] as a continuing unit and remain[ed] in existence long enough to pursue a course of conduct." *Amazon.com, Inc. v. WDC Holdings LLC*, 155 F.4th 313, 326 (4th Cir. 2025) (quoting *Boyle*, 556 U.S. at 948). Like the initial complaint, the amended complaint does not allege the date of enterprise formation. (*See* Mem. Op. at 25.) Tauran states that the enterprise had "moved from preparation to execution" by "early 2021."[3] (Am. Compl. ¶ 48.) This date is consistent with the first alleged predicate act contained in the amended complaint—when Kreitzer signed a consultant agreement with Trinity as Kreitzer Group LLC—which took place in February of 2021. (*Id.* ¶ 100.) But, like the court noted in its first memorandum opinion, (Mem. Op. at 25–26), Tauran's "allegations are insufficient because the Court is [still] left to guess when, exactly, the enterprise took shape." *Nunes*, 531 F. Supp. 3d at 1007. If the enterprise existed in February 2021, Tauran fails to explain how or when Kreitzer Group joined the enterprise, given that it was not registered as a company until April of 2021. (*See* Dkt. 69-2 at 89.) And the amended complaint still does not describe how Kuhlman or KR Contracting joined the enterprise. (*See* Mem. Op. at 26.) Tauran does vaguely allege that Kreitzer's May 3 removal of Tauran as an administrator of Trinity's Microsoft

[3] Tauran argues in its response brief that the enterprise formed through "joint planning" in December 2020 when Trinity and KR Contracting "jointly evaluated subcontractors after [KR Contracting's] acquisition" of Trinity. (Dkt. 86 ¶ 37; *see id.* ¶¶ 36 n.1, 36 n.2, 41.) But the only factual allegations the amended complaint makes about the enterprise in December 2020 is that "[t]he December 2020 sale and migration planning thus provided the enterprise . . . with the access and opportunity they later used to displace [Tauran] in 2021." (Am. Compl. ¶ 47.) The amended complaint also mentions that Trinity was acquired by KR Contracting, that Kuhlman "outlined initial integration plans" to Trinity leadership and the Parkers, and that Jamal Parker and Kuhlman discussed the IT migration steps. (*Id.* ¶¶ 42–44.) None of these allegations pertain to "joint planning" among Defendants or the formation of an enterprise in December 2020, and Tauran cannot amend its complaint through its briefs. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184–85 (4th Cir. 2013).

licenses was somehow "executed in concert with Kuhlman and [Trinity] management." (Am. Compl. ¶ 59.) But it is unclear from this conclusory allegation what Kuhlman actually did to act in concert with the other Defendants.

The last predicate act that the amended complaint specifically alleges—wire fraud based on one of Kreitzer Group's invoices to Trinity for its work on the Concourse system—occurred on November 7, 2022. (*Id.* ¶ 103(p).) As discussed above, Tauran has not clearly alleged how the invoices Kreitzer Group sent to Trinity are part of "a course of conduct" supporting the enterprise as a whole, as it simultaneously alleges that Kreitzer Group had misrepresented these invoices to Trinity and had been obtaining these payments from Trinity under false pretenses. (*See id.* ¶ 103); *Amazon.com Inc.*, 155 F.4th at 326. Further, as the court explains *infra* in Subsection III.A.2, Tauran does not adequately allege many of the predicate acts that purportedly occurred throughout 2021 and 2022. When removing those insufficiently alleged predicate acts, the only remaining acts occurred in a single month, May of 2021. (*See* Am. Compl. ¶¶ 100(c)–(d), 101(a), 102(a), 104(a).) This significantly shortens the multi-year scheme Tauran asserts in its response briefs. (*See* Dkt. 86 ¶ 38; Dkt. 88 ¶ 33.)

Additionally, Tauran cannot rely on its allegation that Trinity continues to use Concourse to show that the RICO enterprise lasted beyond November 7, 2022. (*See* Am. Compl. ¶ 94.) As the court explained in its last memorandum opinion, this allegation does not suffice. (*See* Mem. Op. at 26 n.7.) Tauran only alleges continued actions taken by a single Defendant, Trinity, and thus does not suggest that Trinity remains in an enterprise alongside Kreitzer, Kreitzer Group, Kuhlman, and KG Contracting or that the remaining Defendants

are still participating in the enterprise. Accordingly, the amended complaint does not sufficiently allege the existence of an enterprise to support Tauran's § 1962(c) claim.

2. Pattern of Racketeering Activity

Even if Tauran had properly alleged an enterprise, the amended complaint's § 1962(c) claim would not survive Defendants' 12(b)(6) motions, as Tauran has not sufficiently alleged that any Defendant engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(c) imposes RICO liability only where the defendant, associated with the enterprise, "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity* or collection of unlawful debt." 18 U.S.C. § 1962(c) (emphasis added). "'Racketeering activity' is defined as any of a number of predicate acts, including mail and wire fraud." *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000); *see* 18 U.S.C. § 1961(1) (listing all the state and federal offenses that constitute predicate acts).

Tauran's amended complaint alleges a total of twenty-six predicate acts based on a series of actions taken by the defendants: the February 2021 Consultant Agreement between Kreitzer (as Kreitzer Group) and Trinity; Kreitzer's May 3, 2021 removal of Tauran as a delegated administrator of Trinity's Microsoft tenant; Kreitzer's May 21–22, 2021 access and removal of Concourse data from Tauran's servers; Kuhlman's July 2021 letter claiming that the migration of Concourse by Kreitzer was authorized by both Trinity and Tauran; and a series of invoices from Kreitzer Group to Trinity, sent from June 2021 to November 2022, that sought reimbursement for work covered under Tauran's subcontract and Concourse-

specific services. (*See* Am. Compl. ¶¶ 59, 100–104.) Based on these actions, Tauran has attempted to allege (1) twenty predicate acts of wire fraud under 18 U.S.C. § 1343; (2) four predicate acts of the theft of trade secrets under § 1832; (3) one predicate act of access device fraud under § 1029; and (4) one predicate act of interstate transportation of stolen goods under § 2314. (*Id.* ¶¶ 100–104.) Tauran has failed to adequately plead the vast majority of the total predicate acts alleged.

*i. Predicate Acts: Wire Fraud*

The court begins with the twenty alleged predicate acts of wire fraud. Wire fraud is an offense "indictable under . . . section 1343" and thus can serve as a predicate act for a RICO claim. *See* 18 U.S.C. § 1961(1)(B). "A plaintiff relying on . . . wire fraud as predicate acts must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *Doe 9 v. Varsity Brands, LLC*, 679 F. Supp. 3d 464, 486 (D.S.C. 2023). Rule 9(b) requires a plaintiff alleging wire fraud to "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), including "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby," *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019) (cleaned up); *see United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022). Rule 9(b)'s "particularity standard is steep." *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 196 (4th Cir. 2022).

To state a claim for wire fraud under 18 U.S.C. § 1343, Tauran must plausibly allege "(1) the existence of a scheme to defraud, (2) the use of the mails or wire communication in furtherance of the scheme, and (3) materiality of the falsehood." *Oriole Grp., LLC v. Pool Scouts*

*Franchising, LLC*, 791 F. Supp. 3d 661, 689 (E.D. Va. 2025) (first citing *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006); and then *Neder v. United States*, 527 U.S. 1, 25 (1999)). "A scheme to defraud exists where a party makes material misrepresentations, fails to disclose material information, or conceals material facts." *Rojas*, 425 F. Supp. 3d at 539. As used in 18 U.S.C. § 1343, the term "defraud" requires a "specific intent to deprive someone of something of value; mere dishonesty toward the victim isn't enough." *Pinson*, 860 F.3d at 169–70 (citing *United States v. Wynn*, 684 F.3d 473, 477–78 (4th Cir. 2012)). For materiality, the plaintiff must show that the misrepresentation had "a natural tendency to influence, or [was] capable of influencing, the payment or receipt of money or property." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (quoting *Neder*, 527 U.S. at 16).

Tauran does not plausibly allege any predicate acts of wire fraud by any Defendant. First, Tauran alleges Kreitzer signed a Consultant Agreement with Trinity as "Kreitzer Group, LLC" on February 8, 2021, despite his failure to register the LLC until after executing the contract. (Am. Compl. ¶ 100(a); *see* Dkt. 69-2 at 89.) Tauran alleges that Kreitzer and Kreitzer Group committed wire fraud by "falsely present[ing] Kreitzer Group, LLC as a legitimate organization capable of providing contract services." (Am. Compl. ¶ 100(a).) First, it is difficult to infer that any false presentation of Kreitzer Group as an existing organization on February 8, 2021 was material. Tauran's own exhibits show that Kreitzer Group was formed shortly after the Consultant Agreement; Kreitzer Group reserved its fictional name on February 20, 2021 and registered with the state on April 12, 2021. (Dkt. 69-2 at 89–91; *see* Am. Compl. ¶ 51.) There is nothing in the amended complaint suggesting that if Trinity had

known Kreitzer Group did not exist at the time of the Consultant Agreement, it may not have entered into the agreement. Thus, it is unclear how this misrepresentation was "capable of influencing the intended victim." *See United States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003), *aff'd*, 544 U.S. 349 (2005).

In fact, Tauran claims that the Consultant Agreement is evidence that: (1) Trinity "conspired" with Kreitzer and the Kreitzer Group to "administer[] a system" Trinity knew was stolen from Tauran, (Am. Compl. ¶ 102(a)); (2) the agreement is a "deliberate act of self-dealing" by Kreitzer, who used it to invoice Trinity for tasks Trinity had already subcontracted out to Tauran, (*id.* ¶ 103(a)); and (3) the agreement "induce[d]" Trinity into terminating Tauran's contract after it expired, (*id.* ¶ 100(a)). If Trinity *knew* Concourse was stolen and was conspiring with Kreitzer and Kreitzer Group to injure Tauran, then Tauran does not plausibly allege materiality of the falsehood as to the Kreitzer Group's existence, as this falsehood would not have influenced Trinity's decision to enter into the agreement. Thus, Tauran does not plausibly allege a predicate act of wire fraud committed by Kreitzer or Kreitzer Group based on the February Consultant Agreement.

Next, Tauran claims that Kreitzer's removal of Tauran's "delegated partner status" for Trinity's Microsoft licenses on May 3, 2021, constitutes wire fraud. (*Id.* ¶ 100(b).) Tauran alleges that Kreitzer "misrepresented to [Tauran] servers" that he was authorized to remove Tauran as Trinity's delegated Microsoft partner. (*Id.*) But the alleged unauthorized use of administrative rights does not constitute a misrepresentation made by Kreitzer, nor can a computer server be a recipient or target of a misrepresentation for purposes of wire fraud.

Rather, the allegation simply provides that Kreitzer used his own Trinity credentials to remove Tauran from the account. (*Id.* ¶ 59.) While he may have exceeded his authority, this paragraph does not sufficiently allege wire fraud.

Tauran also alleges that Kuhlman, Trinity, and KR Contracting committed wire fraud by making "knowingly false and misleading statements" in a letter dated July 21, 2021. (*See* Am. Compl. ¶ 101(b), 102(b), 104(b).) Tauran fails to meet Rule 9(b)'s particularity requirements. Although the amended complaint describes the letter as "transmitted by electronic mail . . . across state lines from Maryland to Virginia," it does not allege any recipients of the letter. (*Id.*) Tauran alleges that Kuhlman wrote the letter "in direct response to a complaint filed with the [DISA OIG]" in order to "mislead federal oversight agencies." (*Id.*) But without describing (1) which "government agencies" or "stakeholders" the letter was sent to, (2) who relied on the alleged misrepresentations in the letter, (3) how such reliance by an unidentified party caused Tauran "reputational damage," or (4) how a letter sent in July of 2021 could cause the "loss of [Tauran's] subcontract with [Trinity] (terminated May 4, 2021)," Tauran cannot state a claim for wire fraud. (*Id.*)

Finally, not one of the purported predicate acts concerning the invoices that Kreitzer Group sent to Trinity sufficiently alleges wire fraud. (*See id.* ¶¶ 103(b)–(p).) First, Tauran does not allege sufficient facts to raise a plausible inference that wire fraud perpetrated by Kreitzer Group on Trinity proximately caused Tauran's losses and injuries. A plaintiff must plead proximate cause of a RICO injury to survive a motion to dismiss. *See Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493–94 (4th Cir. 2018); *see* 18 U.S.C. § 1964(c)

("Any person injured in his business or property *by reason of* a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." (emphasis added)). "RICO causation requires a proximity of [a] statutory violation and injury such that the injury is sequentially the direct result—generally at 'the first step' in the chain of causation." *Slay's Restoration*, 884 F.3d at 494 (quoting *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)). Here, any invoices Kreitzer Group sent to Trinity that sought compensation based on misrepresentations or false pretenses financially injured Trinity, not Tauran. And Tauran has not adequately alleged that this harm to Trinity or any of the false invoices directly led to or resulted in *Tauran's* injuries.

Nor does the amended complaint plausibly allege that Tauran was defrauded by the invoices sent only to Trinity, or that any alleged false statement made in the invoices was material. Two of the invoices involve Kreitzer Group billing Trinity for backdated work "already performed by [Tauran]" in order to "obtain[] a financial benefit." (*Id.* ¶ 103(b)–(c).) Those allegations appear to identify Trinity as the target of Kreitzer Group's alleged double-billing, not Tauran. The remaining invoices are for Concourse-related work that Kreitzer Group allegedly "profited from representing that it had the authority to do." (*Id.* ¶ 103(d)–(p).) Assuming *arguendo* that the invoices constitute false statements, they cannot be material. Trinity is alleged to have "ratified" the invoices by "pa[ying] for services it knew Kreitzer was not authorized to perform." (*Id.* ¶ 105 (emphasis added).) If Trinity was already aware of and participating in the alleged fraud, Kreitzer Group's invoices could not have influenced Trinity. (*See* Dkt. 79 at 14.)

*ii. Predicate Acts: Interstate Transportation of Stolen Property*

Lastly, the court does not find any plausible allegations of interstate transportation of stolen property valued over $5,000 in violation of 18 U.S.C. § 2314. Tauran alleges that Kreitzer's May 21 to 22 access of Tauran's Concourse data and uploading of Concourse information on to Trinity's system involved "transmit[ting] data and signals across multiple state lines" and "transport[ing] . . . stolen . . . intellectual property across multiple state lines using the Internet." (Am. Compl. ¶ 100(e)); *see* 18 U.S.C. § 2314. Tauran first fails to allege that the value of the Concourse data "stolen" on those dates was over $5,000. And more fundamentally, this statute is inapplicable to Tauran's claim that Kreitzer transmitted "data and signals across multiple state lines." (Am. Compl. ¶ 100(e).) Cases prosecuted under § 2314 "have always involved physical 'goods, wares, [or] merchandise.'" *Dowling v. United States*, 473 U.S. 207, 216 (1985) (quoting 18 U.S.C. § 2314); *see also United States v. Aleynikov*, 676 F.3d 71, 77, 78 (2d Cir. 2012) (joining with the First, Seventh, and Tenth Circuits to find that "theft and subsequent interstate transmission of purely intangible property is beyond the scope of" § 2314); *Am. Online, Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 96 (4th Cir. 2003) (holding in the insurance context that "instructions, [computer] data, and information are abstract and intangible, and damage to them is not physical damage to tangible property"); *One Stop Deli, Inc. v. Franco's, Inc.*, CIV. A. No. 93-090-H, 1993 WL 513298, at *8 n.8 (W.D. Va. Dec. 7, 1993) ("'Goods' have been defined broadly under § 2314 to include proprietary business information affixed to some tangible medium. . . . The court notes that the trade secrets in this case were reduced to tangible form when transported."). Because Tauran does

not allege that Concourse is tangible property or was reduced to tangible form when transported, Tauran does not plausibly allege a predicate act of interstate transportation of stolen property.

*iii. Pattern: Continuity Plus Relationship*

Although Tauran is required to allege a minimum of two predicate acts of racketeering, "two acts alone do not necessarily establish a pattern." *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001). Tauran must also show a that (1) the racketeering predicates are related, and (2) they "amount to or pose a threat of continued criminal activity." *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The pattern requirement is essentially a "continuity plus relationship" test. *ePlus Technology, Inc. v. Aboud*, 313 F.3d 166, 182 (4th Cir. 2002).

Here, Defendants do not dispute that the alleged predicate acts are related. Rather, they assert that Tauran's "pattern of racketeering" allegations fail on continuity grounds. (*See* Dkt. 79 at 16–19; Dkt. 82 at 15–17.) To demonstrate continuity, Tauran must adequately allege that the Defendants' predicate acts "amount to or pose a threat of continued criminal activity." *GE Inv.*, 247 F.3d at 549. The continuity requirement is "centrally a temporal concept." *Borg v. Warren*, 545 F. Supp. 3d 291, 315 (E.D. Va. 2021) (quoting *H.J. Inc.*, 492 U.S. at 242). Continuity includes both (1) open-ended continuity, or "past conduct that by its nature projects into the future with a threat of repetition"; and (2) closed-ended continuity, or "a closed period of repeated conduct." *H.J. Inc.*, 492 U.S. at 241. Open-ended continuity may be established where the predicate acts "themselves involve a distinct threat of long-term

racketeering activity, or where the predicate acts are part of an ongoing entity's regular way of doing business or of conducting or participating in an ongoing and legitimate RICO enterprise." *GE Inv.*, 247 F.3d at 549 (quoting *H.J. Inc.*, 492 U.S. at 242–43). Closed-ended continuity may be shown through a "series of related predicates extending over a substantial period of time." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242).

The continuity requirement "demonstrates Congress's desire to limit RICO's application to 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 318 (4th Cir. 2010) (quoting *Al-Abood*, 217 F.3d at 238); *see Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989) ("In providing a remedy of treble damages for injury 'by reason of a violation of' RICO's substantive provisions, Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences." (internal citation omitted)); *Harlow v. Wells Fargo & Co.*, 608 F. Supp. 3d 377, 380-81 (W.D. Va. 2022). "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc.,* 492 U.S. at 242. Additionally, the Fourth Circuit has expressed that it is "cautious about basing a RICO claim on predicate acts" of wire fraud, because "it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood*, 217 F.3d at 238.

To show open-ended continuity, the plaintiff must allege "facts that give rise to a reasonable expectation that the racketeering activity will extend indefinitely into the future."

*US Airline Pilots Ass'n*, 615 F.3d at 318 (cleaned up). Thus, courts have refused to find open-ended continuity where a defendant's fraudulent scheme has a "built-in ending point." *Id.*; *see, e.g., GE Inv.*, 247 F.3d at 549 ("Where the fraudulent conduct is part of the sale of a single enterprise, the fraud has a built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity.").

Tauran argues that Trinity's "continued use, monetization, and exploitation of Concourse" provides a basis for open-ended continuity because it shows the enterprise is involved in an "ongoing operation" that "project[s] into the future." (Dkt. 88 ¶ 51.) Specifically, Tauran asserts that the predicate acts alleged

> are not an exhaustive list, and continue to occur, since Concourse continues to be used by [Trinity]. Kreitzer/[Kreitzer Group] invoiced [Trinity] for services related to the use of the stolen product (Concourse) as late as November of 2022, and evidence of [Trinity] and members of the Overarching Enterprise's reliance on Concourse for employees remains to the present day. It does not appear as if the acts will end soon.

(Am. Compl. ¶ 94.) First, this allegation is too conclusory to "give rise to a reasonable expectation that the racketeering activity will extend indefinitely into the future." *U.S. Airline Pilots Ass'n*, 615 F.3d at 318 (cleaned up). And Tauran itself alleges the objective of the enterprise was "to dismantle [Tauran] and absorb its market, clients, and intellectual property for [Defendants'] own gain." (Am. Compl. ¶ 16.) According to the amended complaint, all of those goals had been achieved by "the end of 2021": Trinity had full access to Concourse data, (*id.* ¶ 75), Concourse was stolen from Tauran, (*id.* ¶ 100), and Tauran's subcontracting relationship was terminated with its "largest customer," Trinity, (Dkt. 69-3 at 19).

Moreover, Tauran does not allege that Defendants' *theft* of trade secrets or acts of access device fraud is "part of an ongoing entity's regular way of doing business." *H.J.*, 492 U.S. at 242. Rather, the alleged theft of Tauran's trade secrets and Kreitzer's access device fraud occurred as isolated incidents in the past, and "there is no reasonable expectation that the [trade secret theft or access device fraud] scheme will proceed indefinitely." *FX Aviation Capital LLC v. Guerrero*, No. 24-1027, 2025 WL 521303, at *9 (4th Cir. Feb. 18, 2025). Thus, the alleged conduct, even if fraudulent, does not constitute the "organized, long-term, habitual criminal activity" that RICO "is concerned with eradicating." *Mitchell Tracey v. First Am. Title Ins. Co.,* No. WDQ-12-1329, 2013 WL 1296390, at *6–7 (D. Md. Mar. 28, 2013) (quoting U.*S. Airline Pilots Ass'n*, 615 F.3d at 317 (cleaned up)).

Nor does the amended complaint plausibly allege closed-ended continuity. The Fourth Circuit has recognized closed-ended continuity where a scheme "span[s] several years with numerous instances of fraudulent activity." *SS Richmond LLC v. Harrison*, 640 F. Supp. 3d 453, 472 (E.D. Va. 2022) (collecting cases). Tauran's twenty-six predicate acts last from February 2021 to November 2022.[4] Although it is a fact-specific inquiry, courts in this circuit have previously found that "time periods of less than two years have failed to provide the requisite period of time" for continuity. *Cook v. McQuate*, No. 7:15-cv-00456, 2016 WL 5794232, *8 (W.D. Va. Aug. 18, 2016), *report and recommendation adopted*, 2016 WL 5793999 (W.D. Va. Sep.

[4] As the court discussed *supra* in Subsection III.A.1, the allegations regarding Kreitzer Group's invoices to Trinity reflect Kreitzer and Kreitzer Group's self-interest rather than their participation in the conduct of the enterprises' affairs. Accordingly, the predicate acts may have only lasted through May 2021—approximately three to four months total.

30, 2016) (quoting *Hessek v. N. Am. Mortg. Ins. Servs.*, No. 2:02-cv-00985, 2003 WL 23961817, at *5 (E.D. Va. Oct. 17, 2003), *aff'd*, 94 F. App'x 981 (4th Cir. 2004)).

Even assuming that the alleged scheme lasted for a duration of twenty-one months, the allegations here do not demonstrate "the type of persistent, long-term fraudulent conduct" that RICO's continuity requirement is intended to address. *GE Inv.*, 247 F.3d at 550–51 (holding that a course of fraudulent conduct spanning "about two years" was insufficient to allege closed-ended continuity); *see Pinson*, 860 F.3d at 163 (holding that "fragmented schemes" spanning "around two and a half years" did not satisfy closed-ended continuity). Courts are generally "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood*, 217 F.3d at 238 (cleaned up). And when removing the wire fraud and interstate transportation of stolen property predicate acts as insufficiently alleged, the scheme of trade secret theft, trade secret receipt, and access device fraud only occurred on a few days in May 2021, with a single alleged victim. (Am. Compl. ¶¶ 100(c)–(e), 101(a), 102(a), 104(a).)

The fact that Tauran was the sole victim of this alleged fraudulent scheme further undercuts its showing of closed-ended continuity.[5] Courts consider the holistic "context in which the predicate acts occur" to determine whether RICO plaintiff meets continuity requirement. *Oriole Grp., LLC*, 791 F. Supp. at 692 (quoting *Brandenburg v. Seidel*, 859 F.2d

[5] The only other potential victim identified in the amended complaint is in fact a member of the alleged enterprise, Trinity. Tauran alleges that Kreitzer Group committed at least sixteen different predicate acts of wire fraud by misrepresenting that it was an existing legal entity and then obtained money from Trinity under false pretenses by misrepresenting services Kreitzer Group supposedly performed. (Am. Compl. ¶ 103.) As explained in Subsection III.A.1, this undermines Tauran's ability to plausibly allege a common enterprise with a common goal.

1179, 1185 (4th Cir. 1988)). In addition to the length of time over which the predicates were committed, relevant factors include "the number and variety of predicate acts . . . , the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Parcoil Corp. v. NOWSCO Well Serv., Ltd.*, 887 F.2d 502, 504 (4th Cir. 1989) (quoting *Brandenburg*, 859 F.2d at 1185). While "[t]here is no per se rule against a RICO claim involving only one victim," the Fourth Circuit has often held that such limited schemes fail to satisfy the pattern requirement—even when they took place over a number of years. *Al-Abood*, 217 F.3d at 238 (holding that predicate acts of mail and wire fraud involving schemes that "spann[ed] several years" did not satisfy the pattern requirement where "there was only one victim of the fraud"); *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (finding that the alleged fraudulent behavior, despite lasting for seven years, was insufficient for RICO liability where the acts were "part of a single scheme" and perpetrated "against a single victim"); *Anderson v. Found. for Advancement, Educ. & Emp. of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998) (holding that a limited scheme to defraud a single victim did not constitute a RICO violation).

Here, the Defendants' alleged criminal actions were primarily acts of wire fraud, which the court has found were not plausibly alleged as predicate acts. (*See supra* Subsection III.A.2.i.) Further, the alleged crimes only involved one victim and were "narrowly directed towards a single fraudulent goal" of dismantling Tauran by obtaining access to Concourse and taking Tauran's clients. *Menasco*, 886 F.2d at 684. Even assuming the predicate acts were sufficiently alleged, there is no indication that Defendants are engaged in a "prolonged criminal endeavor."

*ePlus*, 313 F.3d at 182. In other words, the alleged scheme is not "sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238 ("[T]he narrow focus of the scheme here—essentially a dispute between formerly close family friends—combined with the commonplace predicate acts persuades us that the facts here do not satisfy the pattern requirement."). Defendants' activities do not "threaten the social well-being such that RICO treatment is warranted." *Holland v. Cole Nat'l Corp.*, No. 7:04-cv-00246, 2005 WL 1799540, at *3 (W.D. Va. July 28, 2005). Instead, the amended complaint describes the type of "ordinary business contract or fraud disputes" that the Fourth Circuit has refused to "transform[] into federal RICO claims." *Flip Mortg. Corp.*, 841 F.2d at 538; *see Al-Abood*, 217 F.3d at 238. Such "ordinary fraud claim[s]" are "better prosecuted under state law." *Anderson*, 155 F.3d at 506.

Overall, "plaintiffs were not passive or helpless victims upon whom defendants preyed." *Layani v. Ouazana*, No. CV ELH-20-420, 2021 WL 805405, at *38 (D. Md. Mar. 3, 2021). "That the business relationship was not what it seemed to be, and ultimately caused plaintiffs injury, does not necessarily give rise to a RICO claim." *Id.* Tauran has failed to plausibly allege a violation of 18 U.S.C. § 1962(c) as to any of the Defendants. Accordingly, the court will grant Defendants' motion to dismiss as to Count I.

**B. RICO 18 U.S.C. § 1962(d) Claim (Count II)**

Tauran's amended complaint also brings a RICO conspiracy claim under 18 U.S.C. § 1962(d). Section 1962(d) makes it unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To establish a

RICO conspiracy, Tauran must show "the existence of a RICO enterprise in which the defendant conspired to participate, and that the defendant conspired that a member of the enterprise would perform at least two racketeering acts constituting a pattern of racketeering activity." *United States v. Taylor*, 942 F.3d 205, 213 (4th Cir. 2019) (quoting *Pinson*, 860 F.3d at 161). Thus, Tauran's "RICO conspiracy claim is tethered to the substantive RICO violations" it alleges under § 1962(c). *Nunes*, 531 F. Supp. 3d at 1013–1014. "Without a viable § 1962(c) claim, [Plaintiff's] conspiracy claim under § 1962(d) necessarily fails, too." *See Varsity Brands, LLC*, 679 F. Supp. 3d at 487. Because Tauran did not successfully allege a violation of § 1962(c)—the existence of a RICO enterprise and a pattern of racketeering activity—Tauran's § 1962(d) claim fails as well.

Moreover, Tauran does not allege that "each defendant agreed that another coconspirator would commit two or more acts of racketeering." *Walters v. McMahen*, 795 F. Supp. 2d 350, 355 (D. Md. 2011); *see Fitzgerald*, 687 F. Supp. 3d at 789 (pleading an agreement between Defendants is "required for a § 1962(d) claim"). Although a conspirator need not "agree to commit or facilitate each and every part of a racketeering act, each conspirator must share the same criminal objective." *Pinson,* 860 F.3d at 161 (cleaned up). Tauran argues that the amended complaint "pleads a coordinated plan among the . . . Defendants," (Dkt. 86 ¶ 60), but "[m]ere conclusory allegations that all Defendants generally conspired or helped each other violate Section 1962(a) or (c) is insufficient" to allege an agreement under § 1962(d), *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 608 (D. Md. 2014). As the court discussed in Subsection III.A.1, the facts alleged in the amended complaint fail to raise the

reasonable inference that Defendants shared a common purpose, let alone when or how "each Defendant agreed that some member of the conspiracy would commit at least two racketeering acts." *Varsity Brands*, 679 F. Supp. 3d at 487. Tauran has not adequately stated a claim for a RICO conspiracy, and the court will grant Defendants' motion to dismiss as to this claim.

**C. State-Law Claims (Counts III–VII)**

Since the court will grant Defendants' motions to dismiss as to all federal claims, it will once again decline to exercise supplemental jurisdiction over Tauran's remaining state-law claims. *See* 28 U.S.C. § 1367(c)(3). The court has "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)). When deciding whether to exercise supplemental jurisdiction, the court considers factors of "judicial economy, convenience, fairness, and comity." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Tauran argues retention will promote judicial economy and fairness because its state law claims "arise from the same operative events" and "dismissal would force duplicative, inefficient re-litigation." (Dkt. 86 ¶ 78.) But declining to exercise supplemental jurisdiction promotes comity and judicial economy where all remaining claims are "wholly based on state law" and can be "fully litigated in state court." *Conlon v. Baber*, No. 5:23-cv-00040, 2024 WL 314415, at *6 (W.D. Va. Jan. 25, 2024); *see also Arrington v. City of Raleigh*, 369 F. App'x 420, 423 (4th Cir. 2010) ("[O]ur precedents evince a strong preference that state law issues be left to state courts."). Moreover, the parties have engaged in minimal discovery. The court granted

the parties' requested extensions on initial expert disclosure deadlines, (Dkts. 57, 65), then stayed discovery pursuant to the parties' joint request back in November 2025, (Dkts. 72, 73). Where, as here, "all federal-law claims are eliminated before trial," the factors weighed by the court "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7 (1988). Accordingly, the court will dismiss Tauran's state law claims without prejudice. *See Henderson*, 102 F.4th at 251.

## IV. Conclusion

For the foregoing reasons, the court will grant the Kuhlman Defendants' and the Kreitzer Defendants' motions to dismiss. (Dkts. 78, 81.) Tauran's amended complaint will be dismissed without prejudice. Should Tauran wish to further amend its complaint, it must file a motion for leave to amend within 21 days and attach as an exhibit a copy of the proposed second amended complaint that shows how the amended pleading differs from the dismissed amended complaint. The court will deny the Kreitzer Defendants' duplicative motions to dismiss, (Dkts. 77, 80), as moot.

An appropriate Order will issue.

**ENTERED** this 28th day of August, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE